# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

## CV08- 810 PSG (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================================

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Stephen Stetson, Shane LaVigne, Christine Leigh Brown-Roberts, Valentin Yuri Karpenko, and Jake Jeremiah Fathy, on behalf of themselves and all others similarly situated **PLAINTIFF(S)** <br><br> v. <br><br> West Publishing Corporation, a Minnesota Corporation dba BAR/BRI, and Kaplan, Inc. <br><br><br> **DEFENDANT(S).** | **CASE NUMBER** <br><br> **CV08-00810 PSG** (Ex) <br><br><br><br> **SUMMONS** |

TO:    DEFENDANT(S): _____ _____

    A lawsuit has been filed against you.

    Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _The Disner Law Corporation_____, whose address is _2029 Century Park East, 19th Floor, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                    Clerk, U.S. District Court

Dated: _____FEB - 6 2008_____          By: _Natalie Gongoria_
                                            Deputy Clerk

                                        *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) Stephen Stetson, Shane LaVigne, Christine Leigh Brown-Roberts, Valentin Yuri Karpenko, and Jake Jeremiah Fathy, on behalf of themselves and all others similarly situated | DEFENDANTS West Publishing Corporation, a Minnesota Corporation dba BAR/BRI, and Kaplan, Inc., |
|---|---|
| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): | County of Residence of First Listed Defendant (in U.S. Plaintiff Cases Only): |
| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) The Disner Law Corporation 2029 Century Park East, 19th Floor Los Angeles, CA 90067 (310) 286-0600 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No      ☑ MONEY DEMANDED IN COMPLAINT: $ Exceeds $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. 1 and 2; Antitrust case against West Publishing Corp. and Kaplan, Inc. for monopolizing and conspiring to monopolize the bar review market.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS — PERSONAL INJURY | TORTS — PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**III(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No  ☐ Yes

If yes, list case number(s):

FOR OFFICE USE ONLY:   Case Number: ___

CV08-00810

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

/III(b). RELATED CASES: Have any cases been previously filed that are related to the present case? ☐ No  ☑ Yes

If yes, list case number(s): CV 05-3222-R (MCx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or

☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

IX. VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.
Alabama, San Diego, Sacramento, Michigan,

List the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.
Minnesota
New York

List the California County, or State if other than California, in which EACH claim arose. (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.
Los Angeles County and all of the United States

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date 2/6/08

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit, Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

FILED

1  Eliot G. Disner, Esq. (SBN: CA 068832)
   A Professional Corporation
   edisner@disnerlaw.com
2  Joel R. Bennett, Esq. (SBN: CA 042162)
   rbennett@disnerlaw.com
3  Fredricka Ung, Esq. (SBN: 253794)
   fung@disnerlaw.com
4  DISNER LAW CORPORATION
   2029 Century Park East, 19th Floor
5  Los Angeles, California 90067-2901
   Tel: (310) 286-0600
6  Fax: (310) 282-2585

7  Alan Harris, Esq. (SBN CA 146079)
   aharris@harrisandruble.com
8  HARRIS & RUBLE
   5455 Wilshire Blvd., Suite 1800
9  Los Angeles, CA 90036
   Telephone: (323) 931-3777
10 Facsimile: (323) 931-3366

11 Attorneys for Plaintiffs

12

13                UNITED STATES DISTRICT COURT

14                CENTRAL DISTRICT OF CALIFORNIA

15                                    CV08-00810 PSG (Ex)

16 STEPHEN STETSON, SHANE           CASE NO. CV
   LAVIGNE, CHRISTINE LEIGH
17 BROWN-ROBERTS, VALENTIN          CLASS ACTION COMPLAINT
   YURI KARPENKO, JAKE JEREMIAH     FOR VIOLATIONS OF THE U.S.
18 FATHY, and all others similarly situated,  ANTITRUST LAWS (15 U.S.C. §§ 1
                                     AND 2)
19       Plaintiffs,
                                     JURY TRIAL DEMANDED
20       vs.

21 WEST PUBLISHING CORPORATION,
   a Minnesota Corporation dba BAR/BRI,
22 and KAPLAN, INC.,

23       Defendants.

24

25

26

27

28

1  Plaintiffs Stephen Stetson, Shane LaVigne, Christine L. Brown-Roberts,
2  Valentin Yuri Karpenko, and Jake Jeremiah Fathy on their own behalf and on behalf
3  of all others similarly situated, bring this action for injunctive relief and for damages
4  under the antitrust laws of the United States.

5
**INTRODUCTION**
6

7  1.  Plaintiffs file this complaint for two purposes: (1) to break up the
8  illegally obtained and maintained monopoly of BAR/BRI (an assumed name of
9  Defendant West Publishing Corporation) in the market for the provision of bar
10 review preparation courses for the nation's various bar exams, and to otherwise
11 restore viable and enduring competition in that market for the benefit of consumer
12 class members and (2) to recover the excess prices paid by many such class
13 members for a BAR/BRI course as a consequence of said monopoly.  BAR/BRI has
14 monopolized the bar review course market through means other than skill, industry,
15 foresight or historical accident.  In fact, it has committed literally a catalogue of
16 antitrust violations over the years in order to create and maintain said monopoly,
17 including market division, unlawful acquisition, and conspiracies to restrain trade.
18 As will be detailed further herein, the practices of BAR/BRI are longstanding and so
19 pervasive that this lawsuit seeks, in substantial part, the remedy of eviscerating
20 BAR/BRI's unlawful market power to permit the sun to shine in this dark corner of
21 the world, then to allow competition there to blossom.

22 2.  There are two proposed classes here.  Class A consists of individuals
23 who have heretofore paid for a BAR/BRI course since July 1, 2006 or will do so
24 prior to the time any injunctive relief obtained herein is fully implemented.  Class B
25 consists of law students who have not yet paid in full for a BAR/BRI course, but
26 will be purchasing such courses when they graduate from law school as soon as in
27 2008.  This Court then is asked to expeditiously and actively enforce the antitrust
28

1   laws here, in order to permit such a competitive marketplace to develop as soon as

2   reasonably possible.

3   **JURISDICTION AND VENUE**

4       3.    This Complaint is filed and these proceedings are instituted, in part,

5   under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief and

6   the costs of suit, including reasonable attorneys' fees, against Defendants to remedy

7   violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,

8   respectively, as alleged in great detail herein below.  This Complaint is also filed

9   under Section 4 of the Clayton Act, 15 U.S.C. § 15, as to individuals who have paid

10  for a BAR/BRI course or for whom injunctive relief is not timely provided. Such

11  members will be entitled to obtain their damages and the costs of suit, including

12  reasonable attorneys' fees thereunder.

13      4.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331

14  and 1337, and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26,

15  respectively.

16      5.    Defendants transact business, maintain offices, and are found within

17  this Judicial District.  The interstate commerce described hereinafter is also carried

18  on, in part, within this Judicial District.  Venue is proper in this District pursuant to

19  the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391.

20  **PLAINTIFFS**

21      6.    Stephen Stetson ("Stetson") is an individual who resides in Tuscaloosa,

22  Alabama.  Stetson is a graduate of the University of Alabama School of Law and is

23  currently enrolled in a BAR/BRI bar preparation course.  Stetson will take

24  Alabama's February 2008 Bar Examination.  He believes he overpaid for the

25  BAR/BRI bar preparation course as a consequence of Defendants' monopolistic

26  activities, and now seeks to recover his actual damages.

27      7.    Shane LaVigne ("LaVigne") is an individual who resides in San Diego,

28

1  California.  LaVigne is a graduate of the Thomas M. Cooley Law School in

2  Lansing, Michigan who enrolled in, and completed, a BAR/BRI bar preparation .

3  course after July 1, 2006.  LaVigne took the California July 2007 Bar Examination

4  and currently practices law in California.  He believes he overpaid for the BAR/BRI

5  bar preparation course as a consequence of Defendants' monopolistic activities, and

6  now seeks to recover his actual damages.

7      8.    Christine L. Brown-Roberts ("Brown-Roberts") is an individual who

8  resides in Sacramento, California.  Brown-Roberts is a fourth-year evening law

9  student at University of the Pacific McGeorge School of Law in Sacramento,

10  California.    Brown-Roberts seeks, to the extent possible, a competitive marketplace

11  for bar review preparation courses, in which market she will be a consumer, in

12  preparation for the bar exam she will be taking in one state or another in or about

13  July 2008.  At this time, Brown-Roberts has not decided in which state she intends

14  to practice law, and, therefore, seeks for herself and the class the creation of

15  competitive conditions throughout the U.S.

16      9.    Valentin Yuri Karpenko ("Karpenko") is an individual who resides in

17  Michigan.  Karpenko is a third-year law student at Emory University School of Law

18  in Atlanta, Georgia.   Karpenko has pre-enrolled in a BAR/BRI bar preparation

19  course.  Karpenko seeks, to the extent possible, a competitive marketplace for bar

20  review preparation courses, in which market he will be a consumer, in preparation

21  for the bar exam he will be taking in one state or another in or about July, 2008.  At

22  this time, Karpenko has not decided in which state he intends to practice law, and,

23  therefore, seeks for himself and the class the creation of competitive conditions

24  throughout the U.S.

25      10.    Jake Jeremiah Fathy ("Fathy") is an individual who resides in

26  Sacramento, California.  Fathy is a second-year law student at University of the

27  Pacific McGeorge School of Law in Sacramento, California.  Fathy has pre-enrolled

28

1  in a BAR/BRI bar preparation course.  Fathy seeks, to the extent possible, a

2  competitive marketplace for bar review preparation courses, in which market he will

3  be a consumer, in preparation for the bar exam he will be taking in one state or

4  another in or about July 2009.  At this time, Fathy has not decided in which state he

5  intends to practice law, and, therefore, seeks for himself and the class the creation of

6  competitive conditions throughout the U.S.

**DEFENDANTS**

8          11.    Defendant West Publishing Corporation is a wholly-owned subsidiary

9  of Thomson Company ("Thomson"), also known as "West Group" (here, "West").

10  West is a Minnesota corporation headquartered in Eagan, Minnesota.  Thomson is a

11  Canadian corporation with its principal place of business in Toronto, Ontario, and

12  with substantial offices in the U.S.  Thomson calls itself the "World's Leading

13  Information Resource."

14          12.    In or about 2001, Thomson's principal competitor, Reed Elsevier, Inc.,

15  dba Lexis/Nexis ("Reed Elsevier"), purchased BAR/BRI, among other lines of

16  business, from Harcourt General Inc. ("Harcourt"), which owned BAR/BRI at the

17  time.  After Reed Elsevier purchased BAR/BRI, it promptly sold it to its competitor

18  Thomson, which now operates BAR/BRI through West.  At that time, Thomson also

19  acquired MicroMash Bar Review ("MicroMash"), a full-service home study bar

20  review course.

21          13.    At all pertinent times, BAR/BRI has been the only full-service bar

22  review course operating throughout the United States that offers courses for

23  virtually all jurisdictions in which bar examinations are provided.  In the past, it has

24  also operated LSAT, GRE, GMAT, MCAT, and CPA test preparation courses.

25          14.    Defendant Kaplan, Inc. ("Kaplan") is a corporation organized under the

26  laws of Delaware, with its principal place of business in New York, New York.  It

27  formerly did business as the Stanley H. Kaplan Test Centers.  Kaplan is the largest

28

1 | provider of preparatory courses for numerous college and graduate school courses of
2 | study, including LSAT, SAT, GMAT, MCAT, TOEFL, GRE, CPA and others, but
3 | at all pertinent times it offered no full-service bar review course.

**TRADE AND COMMERCE**

5 |     15.    At all pertinent times, BAR/BRI has regularly sold and shipped bar
6 | review courses, course volumes, books, audio and video tapes and other materials,
7 | *inter alia*, across state lines.  It has also continuously engaged in soliciting students
8 | to take courses outside their resident states.  Therefore, BAR/BRI's activities,
9 | including the anticompetitive activities described herein, are in, and substantially
10 | affect, interstate commerce.

11 |     16.    Kaplan operates its various courses throughout the U.S.  It also
12 | regularly ships its course materials throughout the United States.  Also, the
13 | conspiracy entered into between Kaplan and BAR/BRI was accomplished through
14 | the use of, at least, the wire and mails across state lines.  Therefore, the activities of
15 | Kaplan, including the anticompetitive activities described herein, are in, and
16 | substantially affect, interstate commerce.

**RELEVANT MARKETS**

18 |     17.    The provision of bar review courses to individuals preparing to take a
19 | bar examination is a relevant product market for purposes of enforcement of the
20 | antitrust laws.  In addition, the provision of so-called full-service bar review courses
21 | to such individuals, which in dollar volume accounts for the vast preponderance of
22 | all sales in the overall market, is in and of itself a relevant product market (or
23 | submarket) for purposes of enforcement of the antitrust laws.

24 |     18.    There are also relevant markets for each test preparation course
25 | provided by Kaplan and previously provided by BAR/BRI, most particularly
26 | pertinent here, for courses for the LSAT, MCAT, GRE, and GMAT exams.

27 |     19.    A relevant geographic market for purposes of enforcement of the

1  antitrust laws here is the U.S.  Other relevant geographic markets for antitrust law

2  enforcement purposes may include each locale, e.g., state or the District of

3  Columbia, in which full-service bar review courses are provided (collectively

4  "states"), and the venues of all law schools, in which a measurable percentage of

5  students attend who emanate from, or migrate to, other states.

6       20.    The relevant business engaged in by BAR/BRI consists of training law

7  school graduates for the bar examination each needs to pass before receiving a

8  license to practice law in one or more states.  The bar examination in most states in

9  the U.S. consists of, at least, two parts.  One part is the Multistate Bar Examination

10  ("MBE").  The MBE is prepared by the National Conference of Bar Examiners and

11  is identical throughout the U.S.  It is required in nearly all states.  The second part of

12  the bar examination consists of a test prepared under the control of each State's

13  Board of Bar Examiners or similarly-titled state license-issuing body.  This second

14  part is designed to test local law and/or general legal concepts and the application

15  thereof, typically in essay format.  Numerous states also incorporate the so-called

16  Multistate Essay Examination and/or the Multistate Performance Test into their

17  exams.  These tests are substantially similar between and among the states where

18  employed.  The materials and courses overall are also substantially similar from

19  state to state.

20       21.    Like its erstwhile competition, BAR/BRI provides a full-service bar

21  review course, typically about seven weeks in duration, in which substantive law is

22  reviewed, test-taking techniques are taught, and pertinent skills honed for the

23  grueling multi-day exam that awaits each exam-taker.  Bar review courses are the

24  principal means employed by law school graduates to prepare for the bar

25  examination.  BAR/BRI provides to students, among other things, a set of written

26  review materials, live or pre-taped lectures on the subjects and points of substantive

27  law that are tested in that state, and review questions that are similar to those asked

28

-7-

1  previously, or have actually been asked previously, by the bar examiners therein.

2      22.    MicroMash offers courses in about 21 states, plus the District of

3  Columbia.  It, too, has prepared thousands of law school graduates to pass a state bar

4  examination.

5      23.    Despite, or more likely because, these intensive preparation courses are

6  predominately provided by BAR/BRI, with rare exception, the nation's bar exam

7  passage rate has been steadily sinking.  This trend has been occurring over the past

8  several years, while at the same time LSAT scores for incoming law students have

9  been rising and competition stiffening among students just to get in to law school.

10 (MBAs are less attractive then they were 10 years ago.)  There can be little doubt

11 that BAR/BRI has contributed to this decline, by behaving like many monopolists

12 that earn substantial profits by stinting on the quality of its products.  Thus,

13 BAR/BRI: (1) save money by reprinting materials without updates, e.g., using

14 summer material in the next winter's course without updates; (2) increasingly

15 offering videotaped over live lectures; and (3) investing more funds and energy in

16 killing any competitor that might threaten its position, rather than improving its

17 product offerings.

18     24.    Because of the practice of BAR/BRI signing up most law students for

19 the bar exam during their first year, it is important that a bar review course provider

20 offer courses for multiple states, as many such students are frequently unsure of the

21 particular State in which they will ultimately sit for an exam, then practice law.

22 BAR/BRI is now the only bar review course in the U.S. that offers full-service bar

23 review courses in every state, and offers many state courses in numerous other

24 states.  Therefore, it has an insurmountable advantage tying up most law students in

25 or about their first year of law school, so that those students are uninterested in

26 shopping for another bar review course thereafter, i.e., they are no longer consumers

27 in the market.

28

25. As the examination process is both grueling and obviously important, persons desiring to take a bar examination in a given state for the first time, will, with rare exception, take a full-service bar review course, designed to prepare them for the challenge that lies ahead. Even persons who have previously failed one or more bar exams frequently attend full-service bar review courses as often as they sit for an exam. Similarly, a substantial number of admittees to a state's bar will take at least a second state's bar exam and a subsequent bar review preparation course in or for that state, in all likelihood BAR/BRI's. The full-service bar review course proves then to be the principal means to specifically prepare for the bar examination of each state. There is little, if any, cross-elasticity of demand between full-service bar courses, on the one hand, versus supplementary specialty courses and generalized texts dealing with the substantive topics which happen to be covered on the bar examination, on the other.

26. At all relevant times, BAR/BRI's share of the national market for the provision of full-service bar review courses has been in excess of 90 percent. Until recently it boasted on its website: "BAR/BRI Bar Review is the largest bar review company in the United States, preparing more than 95 percent of all students sitting for the bar exam in any given year." In many states, its share of the market approaches 100 percent. As a practical matter, in all but a handful of states, Plaintiffs will literally be trapped into taking the BAR/BRI course, as whatever the quality of BAR/BRI's course may be, far too often it is the only choice.

27. Regarding entry barriers, they are very high in this market. In part, there are structural limitations to entry, mainly that to succeed, entry must occur in most states within a short period, which is a very costly proposition. But the principal entry barrier in the relevant market is BAR/BRI's own wrongful actions which serve to drive up that cost enormously. Thus, the entry barriers here are largely "endogenous." Such barriers can be readily lowered, then, only by

- 9 -

1  eviscerating BAR/BRI's monopoly and the practices that helped create it.  At such

2  time as that power is dissipated and those practices enjoined, it will become far

3  easier for potential competitors to enter the market and successfully market high

4  quality, reasonably priced courses.

5      28.   Successful entry has been made even more difficult since the

6  combination of BAR/BRI and West.  West provides its powerful data and legal

7  research retrieval service, Westlaw, free of charge to law students who, of course,

8  typically employ it on a virtually constant basis.  At pertinent times herein,

9  Westlaw's user screens have contained regular pop-up and other advertising to

10 promote BAR/BRI.  A substantial number of law students are, in fact, required to

11 view the Westlaw website and its advertising because their professors post

12 homework and related assignments on "The West Education Network," access to

13 which is available only by traversing said Westlaw website.  No other competitor

14 has comparable, if any, access to such a powerful promotional vehicle.

15     29.   There has been no successful entry against BAR/BRI since 1995.

16 (Regarding events commencing in that year, see West Bar Review discussion

17 below.)

18     30.   Due to BAR/BRI's clear monopoly in preparing (or failing to prepare)

19 students to take a state's bar examination, BAR/BRI has been able to unilaterally

20 control pricing in this market for many years. Specifically, it has raised prices for its

21 course approximately $100 per year in every state, across the board for several years

22 now.  Where "discounting" takes place, that principally seems to be in the area of

23 providing students discounts for early signups, scholarships and the like.  Such

24 discounts are unrelated to competitive factors, except for two known instances

25 which are detailed below.

26     31.   BAR/BRI is now the entrenched monopolist in the full-service bar

27 review market, with no significant likelihood of its offering reasonable, competitive

28

1   prices or of the entry of meaningful new competition, without the assistance of this

2   Court.

3        32.    Kaplan puts on training courses for almost every standardized exam

4   given to high school, college and graduate students and others seeking licenses of

5   one kind or another, as noted above.  One of the few professional training exams, if

6   not the only such exam, for which Kaplan did not have a preparation course in 1997,

7   was for the various state bar examinations.  It did, however, attempt to compete in

8   that market in the late 1980s to early 1990s in a failed joint venture with a then-

9   extant bar review course provider, SMH.

10        33.    Kaplan was well-suited to succeed West Bar Review as a full-service

11   bar review course operator in the U.S.  As of 1997, for example, Kaplan was the

12   largest provider in the live Law School Aptitude Test ("LSAT") preparation course

13   market, with classrooms and related facilities for such courses located around the

14   U.S.   Kaplan also occupies a similar position in providing preparation courses for

15   other exams, in the markets in which BAR/BRI was a competitor or potential

16   competitor at the time.  As the largest purveyor of LSAT courses, Kaplan offered a

17   natural audience to market a full-service bar review course.  Plus, Kaplan has

18   possessed a deep pocket and classrooms throughout the country, along with the

19   infrastructure in place to easily manage one more "training course."  BAR/BRI

20   controlled as much as seven percent of the LSAT course market during the years

21   preceding 1997.

## BAR/BRI's OVERALL SCHEME TO MONOPOLIZE THE RELEVANT MARKET

24        34.    BAR/BRI has engaged over many decades in an overall scheme to

25   monopolize the relevant market.  The following are substantial instances of said

26   overall scheme to monopolize.

27        35.    **BRC.**  Early in BAR/BRI's existence, back in the late 1970s, it

28

- 11 -

1  encountered a fast-growing competitor, BRC. With BAR/BRI, headquartered in
2  Illinois, and BRC, headquartered in Michigan, they secretly conspired then not to
3  compete against each other in their home states, in order to eliminate competition
4  between them at the time. As a consequence, BRC reversed its plan to enter Illinois
5  and BAR/BRI stayed out of Michigan – for more than a decade thereafter. That
6  permitted each company to monopolize their respective home states. The
7  conspiracy then endured for nearly a decade. The market-division conspiracy that
8  so endured violated Section 1 of the Sherman Act (15 U.S.C. § 1).
9      36.  In 1987, Steve Emanuel ("Emanuel") purchased BRC from its then
10 owner Wolters Kluwer. Within six weeks thereof, Emanuel closed the BRC course
11 without explanation, leaving some 9000 pre-signed students stranded. On
12 information and belief, BAR/BRI took action at the time involving Emanuel, to
13 drive BRC out of business. Upon BRC's departure, BAR/BRI sold its own course
14 to most of said students.
15     37.  **Becker.** In the early 1990s, the Becker CPA Review ("Becker") was
16 the largest provider of CPA courses in the U.S. At that time, it was a most likely
17 entrant into the bar review course business because of its pertinent national
18 infrastructure and related course. (As noted above, BAR/BRI itself generated a
19 CPA prep course at the time.) Enter Hugh Reed ("Reed"). Reed was a BAR/BRI
20 executive who left BAR/BRI around that time. Shortly thereafter he entered into an
21 agreement with Becker to commence a national bar review course to compete
22 against BAR/BRI. For a period of a few days in the early 1990s, Reed received
23 mysterious phone calls over several nights. At exactly the same time, Becker
24 inexplicably backed out of the deal. This all coincided with a suit BAR/BRI had
25 brought against Reed for purported violations of his employment agreement with
26 BAR/BRI during his tenure there. Subsequently, Becker never entered the bar
27 review business. On information and belief, BAR/BRI interfered with and
28

1  prevented Becker's entry into the relevant market.

2     38.    **PMBR.**  PMBR has provided only a multi-state bar review course for

3  many years, i.e., a course covering just the so-called "multi-state exam" or MBE.

4  BAR/BRI also marketed a separate MBE course to compete against the PMBR

5  course for many years.  In the early 1990s, however, PMBR entered into the full-

6  service bar review course business in California, as well as in several southeastern

7  states.  It then commenced to engage in very aggressive competition against

8  BAR/BRI.  Among other things, PMBR sued BAR/BRI in Colorado, essentially for

9  BAR/BRI changing its class times, such that its classes then interfered with PMBR's

10  supplemental course class times which were adjacent to the times BAR/BRI had

11  previously set for its own course.  PBMR claimed precisely $100,000 in damages in

12  that lawsuit.  However, BAR/BRI then inexplicably settled the matter in an amount

13  believed to be far more than this amount.

14     39.    Thereafter, PMBR never again offered a full-service course and

15  BAR/BRI never again offered a for-pay supplemental MBE course, though it did,

16  and does, continue to offer its separate for-pay so-called "Essay Advantage" course.

17  PMBR has never offered any comparable course.  In fact, PMBR's reps were trained

18  to praise BAR/BRI's course in the process of offering PMBR's MBE supplemental

19  course.  PMBR and BAR/BRI do not speak of each other in any critical or

20  comparative way and freely refer students from one program to the other.  In 2006,

21  Defendant Kaplan acquired PMBR.  This market division conspiracy described here

22  also violates Section 1 of the Sherman Act (15 U.S.C. § 1).

23     40.    **Marino.**  For many years Marino was a small competitor in New York

24  State.  (Its principal claim to fame there was successfully getting John F. Kennedy,

25  Jr. through the New York bar exam after he failed the test two prior times.)  By the

26  1990s, Marino had expanded into Pennsylvania and New Jersey.  Shortly after it

27  initiated this outward push from New York, BAR/BRI gave Marino's principal a

28

lucrative consulting contract, then shut down its competing course in the several states in which it then operated.  The elevated importance of Marino to BAR/BRI after it entered *other* states is consistent with BAR/BRI's sustained goal to keep competition out of the "national" market.  This restraint of trade also violates Section 1 of the Sherman Act (15 U.S.C. § 1).

41.  **Pieper.**  Pieper is one of the few remaining local competitors in the U.S. in the relevant market.  Although it prepares students for only the New York Bar Exam, Pieper has successfully operated there for decades.  Why has Pieper alone not come under the wrath of BAR/BRI?  Pieper, like Marino, had expanded into at least one other State in the distant past.  At that time in fairly short order, it withdrew from said state and restricted itself to New York, on information and belief, in response to BAR/BRI's threats, then peacefully reverting to its New York only program.  With respect to its pricing, curiously Pieper has no particular incentive to take business away from BAR/BRI, as its prices in New York are virtually identical to BAR/BRI's own high prices.  Thus, BAR/BRI still controls more than 75 percent of the entire New York market.  Whatever steps BAR/BRI took to restrict Pieper to New York also violates Section 1 of the Sherman Act (15 U.S.C. § 1).

42.  **West Bar Review.**  In 1995, West formed West Bar Review ("West Bar") for the purpose of competing in the relevant market here.  It then commenced operations throughout the U.S., in part by acquiring a number of pertinent then extant regional competitors in the relevant market, including BarPassers, a significant competitor in California, Arizona and Florida at the time.  West Bar Review commenced then to compete vigorously against long-time dominant competitor, BAR/BRI, still owned by Harcourt at the time.

43.  In 1996 West was acquired by Thomson.  Shortly thereafter, Thomson decided to sell West Bar, notwithstanding that it proved to be a viable competitor to

- 14 -

1  BAR/BRI. By the summer 1997 course, it had already earned a gross profit.  For

2  whatever reason West's new owner at the time Thomson wanted no part of the bar

3  review business and put West Bar Review up on the block.

4      44.    West transferred to BAR/BRI pertinent assets of West Bar Review in

5  the fall of 1997, eschewing at the time other less anticompetitive and more lucrative

6  potential acquirers.  Without substantial competition, BAR/BRI's net price per

7  student then increased steadily in most states.

8      45.    BAR/RBI also acquired West Bar Review's superior academic

9  materials and the right to provide a course to some 20-plus thousand students

10 previously signed up to take the West Bar Review course.  Also, it "bought" the

11 right to close out West Bar Review's nationwide infrastructure which was formed, in

12 part, by its having made the acquisitions referred to above.  With that one stroke,

13 BAR/BRI's monopoly was all but cast into concrete. This acquisition violated

14 Section 7 of the Clayton Act and Sections 1 and 2 of the Sherman Act (15 U.S.C. §§

15 18, 1, and 2).

16     46.    In 2001, West returned to the full-service bar review business when it

17 purchased the BAR/BRI business, for a sum believed in excess of $200 million, a

18 far higher price than BAR/BRI paid for West Bar's burgeoning, competitive, bar

19 review course assets in 1997.   The substantial price difference is due to the fact that

20 the acquisition of West Bar Review's assets by BAR/BRI eliminated the only viable

21 competitor in the market, or likely to be in the market, for the foreseeable future.

22 (Boardwalk and Park Place are, of course, worth far, far more when owned by one

23 player than by two in the Monopoly game. This economic truism readily explains

24 the greater value attached to the consolidated bar review course business acquired

25 by West to re-enter this market.)

26     47.    Notwithstanding West's claim of its erstwhile bar review course

27 business' purported lack of "fit" within Thomson's "long term strategic direction,"

28

- 15 -

1   as of 1997, BAR/BRI is now an extremely profitable business of West, with recent

2   net profits approximating 40 percent of its sales.

3        48.    **Kaplan.**  On or about July 31, 1997, Kaplan entered into a letter of

4   intent with West to purchase the assets of West Bar.  However, within the next 10

5   days, executives of Kaplan and BAR/BRI secretly communicated.  As a result of

6   these communications, Kaplan withdrew its bid for West Bar, instead entered into a

7   so-called "co-marketing" agreement with BAR/BRI in which BAR/BRI secretly

8   paid to Kaplan up to $750,000 per year, but on the condition that Kaplan secretly

9   agree to stay out of the full-service bar review course market.  BAR/BRI and Kaplan

10  also further agreed to "strategically" work together in the future to promote their

11  complementary businesses.

12       49.    Around the time the Kaplan/West Bar acquisition fell through, West

13  announced it was closing West Bar, purportedly because it did not fit within its

14  "long term strategic direction."  As noted above, it then divested its operative bar

15  review assets to BAR/BRI, including the commitments of more than 20,000 students

16  to purchase and complete its bar review course.  Also around that time, BAR/BRI

17  quietly wound down, at least, its LSAT preparation course. (Part of its agreement

18  with Kaplan was that BAR/BRI would not compete in the LSAT course market

19  against Kaplan.)  BAR/BRI's combination with Kaplan violated Sections 1 and 2 of

20  the Sherman Act (15 U.S.C. §§ 1 and 2).

21       50.    Prior to its 1997 Agreement with BAR/BRI, Kaplan sought to enter

22  into the full service bar review business course business.  To date, however, neither

23  Kaplan nor PMBR has entered the market, nor has BAR/BRI resumed sale of a

24  separate supplemental MBE course.  Every indication then is that BAR/BRI

25  continues its PMBR conspiracy with Kaplan, its new owner.

26       51.    **Louisiana.**  For many years in Louisiana there were two courses, one

27  operated by BAR/BRI out of Tulane University (part of the West Bar acquisition)

28

- 16 -

and another independently operated by Louisiana State University in Baton Rouge. In 2003, BAR/BRI acquired the right to provide the LSU course for a three-year period, and for that paid the sum of $100,000 to LSU.  LSU then withdrew from the market and BAR/BRI became a monopolist there.  Within three years, the price charged for the Louisiana bar review course tripled!  At least one faculty member of its Louisiana course has a contract extending through 2007, beyond the ostensible three-year term of the agreement.  The agreement, in fact, appears to continue to the present.  In any event, no new bar review course has emerged in Louisiana since 2003. The agreement, therefore, eliminated all competition from Louisiana and violated at least Section 1 of the Sherman Act (15 U.S.C. § 1).

52.     **Supreme Bar Review.**  Supreme Bar Review ("Supreme") operates a full-service course in Ohio.  It is one of BAR/BRI's very few competitors anywhere. Although Supreme is limited to Ohio, BAR/BRI has taken steps to rid the course even from that state.  BAR/BRI has used, at least, one improper device to accomplish this task.  Throughout the country, in conjunction with the American Bar Association ("ABA"), BAR/BRI offers various scholarship programs providing assistance to needy students.  However, it has misused this program in, at least, Ohio and Washington (see Rigos below).

53.     In Ohio, BAR/BRI's so-called "Tuition Assistance Plan" has been offered to students who intend to take the Supreme course.  The secret purpose of the plan is to provide those students an amount of money, at least equal to the price difference between the Supreme course and the BAR/BRI course, whether or not they need financial support.  The ABA never authorized its name to be associated with the anticompetitive use of this assistance program.  The effect is to improperly divert business from Supreme to BAR/BRI.

54.     BAR/BRI has undertaken other acts to suppress Supreme and eliminate it from the market.  Among other things, it started a rumor that Supreme would be

1  going out of business soon, i.e., not in the market to provide courses years later for
2  nervous students who might sign up with it.  It also made comparative
3  representations about its passing percentages which were misleading, if not outright
4  false.  In addition, it filed a federal lawsuit against Supreme seeking to have it shut
5  down.  After two years of costly litigation, that meretricious lawsuit fortunately
6  failed to achieve that objective, as Supreme continues to struggle to remain in
7  business to the present time.

8      55.    Within various law schools in Ohio, BAR/BRI has also effectively co-
9  opted so-called "Student Bar Association" executives who are responsible for
10  bulletin board advertising space and the like.  In many law schools the student
11  government is referred to as the SBA (for Student Bar Association).  Important to
12  the promotion of a bar review course, particularly a new bar review course, is the
13  right to post flyers on bulletin boards within the law schools. As it happens, in many
14  law schools the management of those bulletin boards and other public access spaces
15  of the same sort have been ceded by the administration to the SBA.  BAR/BRI has
16  made it a practice, at least in Ohio, of approaching "executives" of such SBAs,
17  persuading them to become BAR/BRI reps, by offering them free BAR/BRI
18  courses. Then, BAR/BRI either requires or incentivizes such executives not to
19  approve the posting of flyers on bulletin boards of competing bar review courses.

20      56.    Thus, Supreme has been restricted in law schools in Ohio from posting
21  advertising about its course because a number of SBA executives, so co-opted by
22  BAR/BRI, have refused to permit such flyers to be posted.  As there are few other
23  places to promote bar review courses than in a law school (where the bulk of
24  potential and actual consumers reside), the restriction on such advertising is a
25  substantial restraint on competition imposed on Supreme by BAR/BRI in Ohio.

26      57.    **DeVry.** Like Becker and Kaplan, DeVry (which has also owned
27  Becker for many years) is a provider of a variety of courses for post-secondary

28

- 18 -

examinations.  Among the most significant of its offerings is the preparatory course for the CPA exam.  Until July 1999, BAR/BRI profitably operated a CPA preparation course, along with its bar review course.  In that year, BAR/BRI sold its so-called Conviser Duffy CPA Course to DeVry.  Like Kaplan and Becker before it, DeVry, too, has been a most likely entrant into the bar review course business.  Plaintiffs are informed and believe that incident to BAR/BRI's sale to DeVry of said CPA course, each party has agreed not to compete in the market of the other, i.e., BAR/BRI, not to initiate another CPA preparation course and DeVry comparably not to initiate a bar review course. This market division also violates section 1 of the Sherman Act (15 U.S.C. § 1).

58.  **Rigos.**  Rigos is a course operated in, and for, Washington State.  Like Supreme in Ohio, it is one of the few surviving competitors of BAR/BRI.  Rigos has been the victim of substantial anticompetitive activity by BAR/BRI in Washington State, including defamation about its principal and trade libel about its course, misstatements about BAR/BRI's passing percentages versus Rigos', contamination of Rigos' customer relations, and more.  Most notable about Rigos here, however, is the declaration its principal has filed in connection with the repeated breaking and entering into his offices and theft of its bar review course records just after he was listed as a witness in the case *Rodriquez* v. *West Publishing Corporation* CV 05-3222R. (A true copy of Mr. Rigo's declaration is attached hereto as Exhibit 1, and incorporated herein by this reference).

59.  The Rigos declaration recites a lengthy list of predatory acts inflicted by BAR/BRI and calculated to eliminate the Rigos threat to its monopoly. They include employing faculty of Washington law schools to promote BAR/BRI while teaching, repeatedly chilling free speech by baselessly threatening Rigos' student reps *personally* with lawsuits claiming their false advertising and defamation, repeatedly threatening Rigos with litigation for passing percentage representations

1  (which were accurate), but refusing to submit its own supporting records to an audit,

2  and starting rumors that Rigos was about to go out of business.

3      60.    As in Ohio, BAR/BRI also attracts those considering Rigos by offering

4  them "scholarships" to take the BAR/BRI course. BAR/BRI also effectively "blood-

5  dopes" its own performance, should passing percentages ever be required or

6  otherwise discernible, by providing scholarships to law review and similar high

7  achieving students at various law schools in Washington. These are students who

8  are almost certain to pass the bar exam, whatever course they take.

9      61.    Regarding the burglaries, Rigos' office was recently broken into or

10  otherwise electronically invaded four times (the only such acts in 26 years of Rigos'

11  occupying said offices). During those burglaries, all that was taken were

12  competitive marketing materials for its course and information about BAR/BRI.

13  BAR/BRI employs on its staff a reputed former FBI agent in San Francisco who, on

14  information and belief, would think little before causing such activities to occur,

15  having engineered a similar break-in at the Santa Monica offices of erstwhile

16  competitor BarPassers some years earlier.

17      62.    The first Rigos burglary occurred just four days after it was listed by

18  the Plaintiffs in *Rodriguez, et. al v. West Publishing Corp., d/b/a BAR/BRI, and*

19  *Kaplan, Inc.*, Case No. CV-05-3222 R, as a possible witness. The electronic

20  hacking of its replaced hard drive occurred just days later. The final burglary

21  occurred just a few days after Rigos' owner was contacted by BAR/BRI counsel for

22  the first time and hung up on said counsel, as they endeavored to interrogate him.

23  This Court will be requested to assist in efforts to get to the bottom of the unusual

24  events that so coincidentally surrounded Rigos just after he was listed as a witness in

25  that case, so that such palpable witness tampering does not impact this case too.

26      63.    **Bar Secrets.** Dennis P. Saccuzzo and Nancy E. Johnson essentially

27  built a "better mousetrap," i.e., a course, Bar Secrets, which served to be a far more

28

- 20 -

1  successful vehicle for improving the passage rates of its attendees, particularly for
2  lesser performing law school graduates.  Saccuzzo and Johnson, licensed
3  psychologists and lawyers with years of collective teaching experience, apparently
4  concluded that there was a substantial psychological component affecting many of
5  those who failed the bar exam.  By blending their knowledge of psychology with the
6  law, they were able to achieve substantially improved passing results in two second-
7  tier law schools in the San Diego area (California Western School of Law and
8  Thomas Jefferson School of Law).  For example, it was recently announced that at
9  the Thomas Jefferson School of Law, the students who took Bar Secrets had a 16
10  percent higher pass rate than those who took the "other" course.

11      64.    When BAR/BRI learned of this superior course, one that could
12  presumably threaten its entire existence, if rolled out by a new competitor across the
13  country via a joint venture or license, it took steps to immediately destroy it.  On
14  December 30, 2001, Defendant BAR/BRI sent a derogatory and misleading letter,
15  signed by one Karen Reimus, to all students who had signed up with BAR/BRI in
16  their first year of law school, but switched to Bar Secrets collectively for the
17  February 2002 bar exam.  Saccuzzo and Johnson were working only at one school at
18  the time – California Western School of Law.  BAR/BRI contributed substantial
19  resources to that school to divert business from them to BAR/BRI.  Then, various
20  student representatives and faculty members at that school were co-opted to
21  badmouth Bar Secrets, notwithstanding it was indisputably superior to BAR/BRI's
22  in terms of passing percentages, ultimately the only relevant marketing criterion.
23  BAR/BRI substantially interfered with Saccuzzo and Johnson's relationship with
24  California Western School of Law, and eventually ran them out of that law school.

25      65.    Another BAR/BRI employee, Tara Shaw, went so far as to write letters
26  to potential Bar Secrets customers advising them of the purported superiority of its
27  course, in part by making misleading, if not outright false, representations about the

28

- 21 -

passing percentages of Bar Secrets.  Shaw is a former student of Saccuzzo, who attended two of his Bar Secrets programs at California Western School of Law, and whom he personally helped prepare for the bar.  BAR/BRI hired and used her in a continuing effort to destroy Bar Secrets, after their earlier attempts did not prove effective in terms of enrollments in his program at California Western School of Law.  Shaw has now worked her way into an influential position on the California Western School of Law Alumni Board and Bar Secrets is now on the outside looking in there.

66.    As their latest effort, BAR/BRI planted a mole, one Jon Baumunk, to work for and *help* Saccuzzo and Johnson. Baumnk attended their full program at least three times over a period of two years, after they hired him to grade and teach, and obtained for him an adjunct position at Thomas Jefferson School of Law to assist them there.  After showing Saccuzzo that he had taken copious notes for each of the three Bar Secrets 72-hour lecture programs, Baumunk went to California Western School of Law and was hired, along with BAR/BRI, as Director of Bar Programs at the law school.  Baumunk then admitted to Saccuzzo that he had been hired by BAR/BRI to learn as much as he could about the Bar Secrets course, then to discredit it! Thereafter, California Western School of Law failed to renew its contract with Saccuzzo and Johnson.  Baumunk now openly works with BAR/BRI, teaching the curriculum once taught by Saccuzzo, even though he is ill equipped to do so.

67.    Although Saccuzzo and Johnson are now contracted with just Thomas Jefferson School of Law, BAR/BRI gives a free course to everyone on that school's law review. Those students are open and vocal in their criticism of Bar Secrets, making Saccuzzo's efforts there too all the more difficult.

68.    **LexisNexis.** LexisNexis ("Lexis") is West's principal competitor.  In approximately 2001, Lexis purchased a variety of courses and related assets from

1  Harcourt, which included the BAR/BRI business.  Shortly thereafter, it sold

2  BAR/BRI and various other assets to West.  On information and belief, the various

3  agreements entered into at the time do not reflect any written non-compete

4  agreements with Lexis, the type that might be incident to the sale of an asset and

5  might even have been legitimate if made at the time, though they have not competed

6  since in the relevant market.

7      69.    However, there is joint marketing activity between Lexis and West

8  outside the U.S., in Hong Kong, in connection with the BAR/BRI bar review course

9  offered there.  There, apparently, for expatriates or others who wish to take an

10  American bar exam, BAR/BRI offers a course that purports to be a "Lexis/Nexis…

11  course."  In addition, prior to purchase of BAR/BRI by Lexis, the two companies

12  had entered into a marketing agreement.  On information and belief, West and Lexis

13  have entered into an agreement wherein, among other things, Lexis will not compete

14  against BAR/BRI in the United States.  Upon the taking of discovery, Plaintiffs

15  expect to learn West's *quid pro quo* for this understanding.  Such a market division

16  agreement violates section 1 of the Sherman Act (15 U.S.C. § 1).

17      70.    **Other Acts.**  BAR/BRI unreasonably insists on, and has routinely

18  obtained, numerous agreements from faculty and staff prohibiting their working for,

19  or otherwise assisting, any other bar review course provider should they depart

20  BAR/BRI.

21      71.    BAR/BRI has engaged in the continuing practice of tearing down,

22  otherwise removing, or preventing the posting of, the signs, placards and related

23  promotional materials of local bar review course competitors at various law schools

24  in the U.S., including by the means set forth in paragraphs 54-56 and 64-65 above.

25      72.    BAR/BRI has paid so-called "consulting" fees to various law school

26  administrators personally, at least, in part, to assure that BAR/BRI maintains

27  preferential, if not exclusive, access to the use of such law schools' assembly and

28

1   common areas for marketing and related purposes, and to further assure that any

2   potential competitors will be unable to obtain such access.

3                      **ADVERSE EFFECT ON COMPETITION**

4          73.    BAR/BRI's overall scheme to monopolize the bar review market

5   adversely affects competition and the competitive process in, at least, the following

6   ways:

7          (a)    Plaintiffs and members of the claimed Classes have paid, or will pay,

8   far more for the course(s) they purchased, or will purchase, than they would have

9   paid, or pay, in the absence of such wrongful acts, frequently in excess of $1,000

10  above a competitive price;

11         (b)    Competitors that promoted price and quality competition have been

12  eliminated;

13         (c)    Plaintiffs and members of the claimed Classes have been and will be

14  too often left with BAR/BRI as the only choice for a bar preparation course; and

15         (d)    Plaintiffs and members of the claimed Classes are more likely to fail

16  the bar examination as a result of the decreased quality of services BAR/BRI

17  provides to its customers.

18                          **INJURY TO PLAINTIFFS**

19                     **MEMBERS OF CLAIMED CLASSES**

20         74.    During the period covered by this Complaint, Plaintiffs and members of

21  the claimed Classes have either purchased from, signed up for, or intend to

22  purchase, at least one bar review preparation course from BAR/BRI.  As a direct

23  result of Defendants' combination, conspiracy and monopolization, Plaintiffs and

24  members of the claimed Classes paid, or will pay, far more for the course(s) they

25  purchased or will purchase than they would have paid or pay in the absence of such

26  wrongful acts, frequently substantially in excess of $1,000 above a competitive

27  price.

28

                                    - 24 -

75.    In the recent past, BAR/BRI's course has cost each consumer about the following amounts:  $3,550 in California, $2,745 in Florida, $2,595 in Illinois, $2,625 in Maryland, $2,850 in New York, $2,600 in Pennsylvania, $2,495 in Texas, $2,725 in Virginia, and comparably supra-competitive price levels elsewhere in the United States, except in those few states where state bar or similar rules put a cap on BAR/BRI's pricing (e.g., Iowa) or isolated and independent, but viable local competition remains (such as in Indiana, where a bar review course is offered by a local bar association there).  In addition, BAR/BRI imposes an effectively non-refundable book charge, repeat fees, add-on (second state preparation) fees, plus other penalties and charges that have increased substantially over the last several years and now average hundreds of additional dollars of extra cost per student per year.  What BAR/BRI will charge for its course, wherever and whenever some Plaintiffs will take it, is unknown.  Thus, its illegal overcharge is also immeasurable at this point in time.

76.    Alternative and superior competitive and copyrighted course materials and instructional approaches have been acquired by BAR/BRI, which have then been suppressed by it, then unavailable to, and unused by, others.  The effect of this is that the claimed Classes have suffered, or will suffer, irreparable injury since they have been deprived, or will be deprived, of the right to choose among such alternative materials and approaches.  Plus, a potential competitor faces a possible copyright infringement claim from BAR/BRI if it prepares such materials for its own use, as it must.  This has further suppressed competitive choices to members of the claimed Classes.

77.    Consistent with its monopoly status and the behavior of other monopolists, BAR/BRI has also reduced the quality of the course services it provides to its customers, for example, increasingly replacing live lectures with video lectures, then curtailing student questions even at such live lectures.  The

1 | members of the Classes have suffered, or will suffer, irreparable injuries since they
2 | are reasonably more likely to fail the bar as a result of BAR/BRI's antitrust
3 | violations.

4 |    78. By reason of the violations of the federal antitrust laws alleged herein,
5 | Plaintiffs and members of the Classes have been, or will be, irreparably injured in
6 | their business and property and suffer substantial damages in an amount presently
7 | undetermined, a significant and material threat to their business and property unless
8 | the injunctive relief sought here is granted.

9 | **CLASS ACTION ALLEGATIONS**

10 |    79. Plaintiffs bring this action on their own behalf and as a Class Action
11 | under the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil
12 | Procedure on behalf of all members of the following classes:

13 |     **A.** All persons who have purchased a bar review course from
14 |     Defendant BAR/BRI after July 1, 2006, including those who
15 |     may purchase at least a second BAR/BRI bar review course
16 |     in the future.

17 |     **B.** All law students who intend to purchase a bar review
18 |     course from Defendant BAR/BRI, but have not purchased
19 |     such a course prior to the implementation of any injunctive
20 |     relief ordered herein.

21 |    80. At the present time, Stetson and LaVigne are designated the class
22 | representatives of Class A, and Brian-Roberts, Karpenko, and Fathy are designated the
23 | class representatives of Class B.

24 |    81. Plaintiffs do not know the exact number of claimed Class members, but
25 | believe it, on information and belief, to exceed 120,000. Due to the nature of the trade
26 | and commerce involved, the claimed Class members here are sufficiently numerous
27 | and geographically dispersed throughout the U.S, so that the joinder of all claimed

28 |

1   Class members is impracticable.

2        82.    There is considerable commonality here among the claimed Class

3   members in Class A in that each has purchased, or will have purchased, a BAR/BRI

4   bar review course in a monopolistic market prior to the implementation of any

5   injunctive relief ordered herein.

6        83.    Each claimed Class member in Class B seeks to purchase a bar review

7   course with competition among course offerings, including materials, format and

8   time.

9        84.    Each claimed Class member in Class B desires to pay a price consistent

10   with a competitive market instead of a monopoly market, i.e., a lower versus a

11   higher price.

12       85.    Each claimed Class member in Class B desires to purchase a course of

13   sufficient quality that they will not be impaired in the slightest in their quest to pass

14   the bar exam that follows.

15       86.    In connection with the foregoing, Plaintiffs in Class B have a common

16   interest in assuring that the market for bar review for the purpose of bar review

17   courses they intend to purchase will be occupied not just by BAR/BRI, but also by

18   reasonable competition thereto.

19       87.    Plaintiffs in both classes also have a common interest in determining

20   the following:

21       (a)    whether Defendants unlawfully restrained trade and/or monopolized the

22   full-service bar review course market;

23       (b)    whether the alleged wrongful acts violate Section 1 and Section 2 of the

24   Sherman Act;

25       (c)    the adverse effect of Defendants' wrongful acts on the reasonable

26   availability of bar review courses to be sold in the U.S. in the future; and

27       (d)    that Plaintiffs and other members of the claimed Classes have been, or

28

1    are substantially likely to be, damaged by Defendants' wrongful acts.

2         88.    Plaintiffs are members of one of the two claimed Classes. Plaintiffs'

3    claims are typical of the claims of all Class members. Plaintiffs will fairly and

4    adequately protect the interests of the Classes. Plaintiffs are or will be typical

5    purchasers of bar review courses sold BAR/BRI throughout the United States,

6    absent the assistance of this Court. Their interests are coincident with, and not

7    antagonistic to, those of the other members of the Classes. In addition, Plaintiffs are

8    represented by counsel who are competent and experienced in the prosecution of

9    antitrust and class action litigation.

10        89.    The prosecution of separate actions by individual members of the

11   Classes would create a risk of inconsistent or varying adjudications, establishing

12   incompatible standards of conduct for Defendants.

13        90.    The questions of law and fact common to the members of the Classes

14   predominate over any questions affecting only individual members, including legal

15   and factual issues relating to liability injunctive relief.

16        91.    A class action is superior to other methods for the fair and efficient

17   adjudication of this controversy. Treatment as a class action will permit a large

18   number of similarly situated persons to adjudicate their common claims in a single

19   forum simultaneously, efficiently, and without the duplication of effort and expense

20   that numerous individual actions would engender. Class treatment will also permit

21   the adjudication of claims by many Class members who could not afford

22   individually to litigate an antitrust claim such as is asserted in this Complaint. The

23   Class is readily ascertainable. Finally, this class action likely presents no difficulties

24   in management that would preclude maintenance as a class action.

25   ///

26   ///

27   ///

28

- 28 -

**CLAIM ONE**
**CONSPIRACY TO RESTRAIN TRADE; VIOLATION OF SECTION 1 OF THE SHERMAN ACT (AGAINST BOTH DEFENDANTS)**

92.    Paragraphs 1-91 are incorporated by reference herein.

93.    Defendants combined, conspired, and contracted among themselves and with co-conspirators to eliminate competition in the full-service bar review course market throughout the U.S., a transaction which was kept secret from the public and thereby was fraudulently concealed from the Classes, among others.

94.    In furtherance of this conspiracy, the Defendants agreed to the aforementioned market division, the effect of which, *inter alia*, eliminated the only viable actual competitor in the sale of full-service bar review courses throughout the U.S., and also a substantial competitor in the LSAT course market in the U.S., in which Defendant Kaplan was, and remains, dominant.

95.    This action violates 15 U.S.C. § 1 et seq., in that it serves to restrain trade and to fix, raise, maintain or stabilize, at least, the retail price of full-service bar review courses sold in the United States during the Class Period.

96.    Plaintiffs and the other members of the Classes have been injured, or injury is substantially threatened, in their business or property, by reason of Defendants' antitrust violations, at least, as follows:

      (a)    The prices of the full-service bar review courses they purchased, or will purchase, were, or will be, far higher than they would have been, or will be due to BAR/BRI's violation of the antitrust laws;

      (b)    Opportunities to choose among various courses, each with its own unique attributes, that would have been available in the absence of the unlawful course of conduct alleged herein, were or will be lost to Plaintiffs and the members of the Classes; and

      (c)    They are more likely to fail the bar examination in whichever jurisdiction they decide to practice law; and

1    (d)    They have been required to retain the law firms of The Disner

2  Law Corporation and Harris & Ruble to prosecute these claims and to suffer all the

3  burdens that accrue from the prosecution of this case.

4    97.    Plaintiffs and the other members of Class A, as a result of the

5  foregoing, have been damaged at least to the extent they have expended sums, or

6  will expend sums, for the full-service bar review courses they purchased, or will

7  purchase, from BAR/BRI, far in excess of what they would have paid or would pay

8  in a market uncontaminated by the wrongful acts of BAR/BRI, asserted

9  hereinabove.  They have sustained or will sustain damages in a sum presently not

10  ascertained, but which is, in any event, in excess of $1,000 each, and which will be

11  proven with greater exactitude, as the record permits, at the time of trial, such sum

12  to be trebled, pursuant to 15 U.S. C. § 15(a).

13    98.    Should the Classes, or either of them, prevail herein, they are also

14  entitled to a reasonable multiple of the lodestar of the reasonable attorney fees and

15  costs accrued by them herein, pursuant to 15 U.S.C. § 15(a).

16  **CLAIM TWO**

17  **UNLAWFUL MONOPOLIZATION; VIOLATION OF**
**SECTION 2 OF THE SHERMAN ACT (AGAINST DEFENDANT WEST)**

18

19    99.    Paragraphs 1 to 98 are incorporated by reference herein.

20    100.    BAR/BRI has monopolized the full-service bar review course market in

the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

21

22    101.    BAR/BRI has unlawfully acquired and/or maintained a monopoly of

the full-service bar review course market through the ways and means set forth

23

above.

24

25    102.    As a direct and proximate result of BAR/BRI's egregious conduct and

abuse of its monopoly power, competition in the full-service bar review course

26

market has been adversely affected, and meaningful new entry is substantially

27

unlikely to occur.

28

- 30 -

103.   Unless BAR/BRI's anticompetitive acts, as alleged herein, are enjoined by this Court, there is a reasonable probability that it will continue to monopolize the full-service bar review course market and will continue to unreasonably restrict and eliminate competition therein.

104.   BAR/BRI's monopolization of the full-service bar review course market will irreparably injure Plaintiffs in at least the following ways:

(a)   The prices of the full-service bar review courses they have purchased, or will purchase, were, or will be, far higher than they would have been, or be, but for its violation of the antitrust laws; and,

(b)   Opportunities to choose among various courses, each with its own unique attributes, that would be available in the absence of the unlawful course of conduct alleged herein, have been lost to Plaintiffs and the members of the Class; and;

(c)   Plaintiffs are more likely to fail the bar in whichever jurisdiction they decide to practice law; and

(d)   They have been required to retain the law firms of The Disner Law Corporation and Harris and Ruble to prosecute this claim and to suffer all the burdens that accrue from the prosecution of this case.

105.   The members of the Class B will be substantially damaged unless the Court orders appropriate injunctive relief herein, including but not limited to the creation of a fully-operational, competitive, full-service bar review business capable of competing successfully against it throughout the U.S, pursuant to 15 U.S.C. § 26.

## CLAIM THREE
## CONSPIRACY TO MONPOLIZE (AGAINST DEFENDANT WEST)

106.   Paragraphs 1 to 105 are incorporated by reference herein.

107.   Defendant West has engaged in combinations and conspiracies through which they have actually monopolized the relevant market as described here and

- 31 -

above in paragraphs 35 through 71, including with Defendant Kaplan, in violation of Section 2 of the Sherman Act.  Said conspiracies have had a high degree of probability of successful monopolization of said relevant market.

108.   The effect of West's conspiracy to monopolize has adversely affected competition in the relevant market.

109.   Plaintiffs and the other members of the Classes have been injured or injury is substantially threatened in their business or property as a direct and proximate result of West's conspiracies to monopolize in an amount to be proven at trial.

110.   BAR/BRI's conspiring to monopolize  the full-service bar review course market will irreparably injure Plaintiffs in at least the following ways:

(a)   The prices of the full-service bar review courses they have purchased, or will purchase, were, or will be, far higher than they would have been, or be, but for its violation of the antitrust laws; and,

(b)   Opportunities to choose among various courses, each with its own unique attributes, that would be available in the absence of the unlawful course of conduct alleged herein, have been lost to Plaintiffs and the members of the Class; and;

(c)   Plaintiffs are more likely to fail the bar in whichever jurisdiction they decide to practice law; and

(d)   They have been required to retain the law firms of The Disner Law Corporation and Harris and Ruble to prosecute this claim and to suffer all the burdens that accrue from the prosecution of this case.

111.   Should the Classes, or either of them, prevail herein, they are also entitled to a reasonable multiple of the lodestar of the reasonable attorney fees and costs accrued by them herein, pursuant to 15 U.S.C. § 15(a).

1    **WHEREFORE**, Plaintiffs pray for judgment as follows:

2        1.    As to their claim for violation of Section 2 of the Sherman Act (15

3   U.S.C. § 2) that West be held liable pursuant thereto;

4        2.    As to their claim for violation of Section 1 of the Sherman Act (15

5   U.S.C. § 1) that West and Kaplan be held liable pursuant thereto;

6        3.    Regarding Plaintiffs in Class A, that Plaintiffs obtain damages plus

7   interest and treble damages, all to be provided pursuant to 15 U.S.C. § 15;

8        4.    Regarding Plaintiffs in Class A and B, that appropriate injunctive relief

9   be entered, including but not limited to, an order creating at least one fully-

10  operational, competitive, full-service bar review business capable of competing

11  successfully against BAR/BRI throughout the United States, and other equitable

12  relief needed to ameliorate its wrongdoing here, all to be provided pursuant to 15

13  U.S.C. § 26;

14       5.    That Plaintiffs obtain their reasonable attorney fees and costs, to be

15  determined according to pertinent case law authority (15 U.S.C. § 15); and

16       6.    That Plaintiffs obtain the costs of suit incurred herein by them and such

17  other further relief as the Court deems just and proper.

18

19  DATE:  February  6 , 2008          **THE DISNER LAW CORPORATION**

20

21

22  **By:** _____

23              Eliot G. Disner

            A Professional Corporation

24          Attorneys for Plaintiffs

            Stephen Stetson, Shane LaVigne, Christine

25          Leigh Brown-Roberts, Valentin Yuri

            Karpenko, Jake Jeremiah Fathy, and all

26          others similarly situated

27

28

- 33 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TRIAL BY JURY

Please take notice that a trial by jury is hereby requested.

DATE:  February _6_, 2008          THE DISNER LAW CORPORATION

By: _____
          Eliot G. Disner
A Professional Corporation
Attorneys for Plaintiffs
Stephen Stetson, Shane LaVigne, Christine
Leigh Brown-Roberts, Valentine Y.
Karpenko, Jake Jeremiah Fathy, and all
others similarly situated

EXHIBIT 1

The Honorable Robert S. Lasnik
Noted for Consideration: August 11, 2006
ORAL ARGUMENT REQUESTED

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| RYAN RODRIGUEZ, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Nos. 06-cv-1096L |
| | ) | |
| v. | ) | DECLARATION OF JAMES |
| | ) | RIGOS IN SUPPORT OF |
| WEST PUBLISHING CORPORATION, a | ) | RESPONSE TO MOTION TO |
| Minnesota corporation dba BAR/BRI, and | ) | COMPEL |
| KAPLAN, INC., a Delaware corporation, | ) | |
| | ) | |
| Defendants. | ) | |

I, James Joseph Rigos, declare under penalty of perjury as follows.

1.      I am an adult over the age of 18 and competent to testify concerning all matters in this Declaration.

2.      I am the owner-operator of Rigos Professional Education Programs, Ltd. ("Rigos"), a Washington state corporation headquartered in Seattle, Washington. Since 1980, Rigos has created, published, and marketed professional publications, including bar review programs, CPA review programs, CMA-CFM review programs (for accountants

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 1

SEA 1848294v1 49757-4

*EX. 1*

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1   and financial professionals in business), and a series of professional ethics programs for

2   corporations, attorneys and CPA's.

3       3.      I have been subpoenaed against my will as a witness by West Publishing

4   d/b/a BarBri ("West-BarBri"), a Defendant in this lawsuit. West-BarBri's students are

5   now suing BarBri for damages under two theories: alleged illegal conspiracies used to

6   create and maintain West-BarBri's monopoly and abuse of the monopolistic power to

7   eliminate competition and thereby artificially raise prices. I do know that West-BarBri

8   discriminates in pricing, depending upon the extent of competition in local markets and

9   that Washington is priced substantially below other states such as California. West-BarBri

10  apparently alleges that Rigos's survival is proof the market is still competitive.

11      4.      My company and I are not a party to this case and have no direct stake in

12  this case whatsoever. In the past, we have been seriously damaged by both the West-

13  BarBri students and their course administrators. We have asked both sides of this case to

14  excuse Rigos from any participation in this suit or, in the alternative, limit me to a mere

15  witness at trial. Both sides have refused. In twenty-six (26) years of operations our

16  organization has never sued or been sued by a student or competitor. Formal litigation

17  would destroy our review organization. For us, this may be the first battle of the final war

18  with Thomson-West-BarBri.

19      5.      Based upon past events spanning many years, I have a well-founded fear

20  and belief that West-BarBri will retaliate against me and my company after they pay

21  money to settle this student class-action lawsuit if I cooperate in any way in this case with

22  the Plaintiffs. The Defendants' lawyers suggest they will not retaliate if I state I have no

23  knowledge of any predatory acts by their clients. They would use such a statement against

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 2

SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
1600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1  me in any subsequent litigation involving my company. I am thus forced against my will

2  to itemize some, but not all, of the most egregious anti-competitive practices they have

3  used against us. The purpose of making this Declaration is to state what I currently have

4  and currently do not have knowledge of, so the Court may quash the subpoena and deny

5  West-BarBri discovery from me and my company altogether.

6          6.      My fear of retaliation is based upon three past factors. The first is the past

7  savage, predatory attacks we have suffered from West-BarBri, which are described in some

8  detail below. The second involves my sincere belief that some individuals connected to

9  the defense of this lawsuit have broken the law and burglarized my office, stolen my files

10  and memoranda and hacked into my computer system. I realize this latter suggestion may

11  appear unbelievable, but when fully described, I hope the Court will come to appreciate the

12  reasons for this belief.

13          **The November 2005 Burglaries and Hacking of Rigos's Offices:**

14          7.      As described below, I have had a number of problems with West-BarBri as

15  a competitor, particularly related to advertising by that company. For a period of several

16  years I have been collecting copies of bulletins, fliers and other advertisements West-

17  BarBri circulates throughout the law schools and related contemporaneously-prepared

18  detailed hand drawn memoranda. Their advertisements have frequently contained false

19  and misleading claims about the pass rates of BarBri students and false and disparaging

20  claims about me, my wife, my other employees, my program, and my students.

21          8.      On November 8, 2005, the Plaintiffs, without my knowledge or consent,

22  designated me as a person with possible knowledge on their Supplemental Rule 26

23  Disclosures. Approximately four days later – over the weekend of November 12, 2005 to

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 3

SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1    November 13, 2005, my office was burglarized. Two clean cut individuals – a man and a

2    woman – broke into my business office in downtown Seattle. They avoided surveillance

3    cameras throughout the office, though they missed one and each was captured on

4    videotape. They took the hard drive connected to my computer in my personal office. The

5    hard drive was locked and secured. They did not take a valuable, highly marketable,

6    laptop which had been left unlocked and unsecured on a table in the office. They did not

7    take numerous other items of value within the office.

8         9.    I promptly replaced the hard drive.

9         10.   Unbeknownst to me at the time, on November 17, 2005, after the hard drive

10   had been replaced, a hacker accessed documents on my hard drive from outside of the

11   office. Several letters I had written in 1997 and 1998 to individuals at the then West bar

12   review were accessed and converted from their Word Perfect format to a Word format.

13   These letters were connected to my efforts to purchase bar review courses run by West

14   Publishing or invite their instructors to join my company after West sold out.

15        11.   Between November 26, 2005 and November 27, 2005, my office was

16   burglarized again. The individuals were again captured on a surveillance camera. The

17   tape revealed it was the same individuals involved in the earlier November break in. The

18   hard drive attached to my computer in my personal office was again taken. It had again

19   been locked and secured. Numerous others items of value were not taken.

20   **The June 2006 Burglary of Rigos' Offices:**

21        12.   In early June 2006, I was called one day by two attorneys from New York

22   who said they represented the Defendant West in this action. They were from the

23   Shearman & Sterling firm. They called me on speaker phone and attempted to interrogate

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 4
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1  me over the phone about what I knew about this lawsuit. When I asked why they were

2  calling me, the woman attorney said I had been designated as a witness by the Plaintiffs in

3  November 2005. I asked her to send me a copy of the designation, as I had never seen it. I

4  then told the woman I was not willing to speak to them and I hung up the phone. These

5  lawyers never asked me if I was represented by counsel even though I told them I had to

6  hire a law firm to defend my business from their client in the past. I found it surprising

7  that they even contacted me since I was certain they knew I was represented. West-BarBri

8  through its attorneys had exchanged several letters with my lawyers at Davis Wright

9  Tremaine related to the many threats of lawsuits BarBri has made against my company

10  over the years.

11       13.    In a letter dated June 7, 2006, Rebecca Trent of the Shearman & Sterling

12  firm sent me a copy of the Plaintiffs' Supplemental Rule 26 Disclosures. I noted for the

13  first time that I was listed in that disclosure as a person likely to have discoverable

14  information.

15       14.    On June 10, 2006 or June 11, 2006, my office was burglarized a third time.

16  This time a laptop was stolen. The laptop computer contained all of our marketing

17  information including our enterprises' future plans and strategies.

18       15.    On June 26, 2006, West-BarBri attorney Alan Gruber of Shearman &

19  Sterling called my office attempting to talk to me. I was not available, and he left a

20  message. I understand that the Shearman & Sterling lawyers – or the other lawyers for the

21  Defendants -- did not ask my lawyer for permission to contact me prior to calling and

22  trying to interrogate me.

23

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 5
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

**Files Missing After Burglaries:**

16.     When I received the supplemental disclosures, the coincidence in dates immediately raised my suspicion. I have since gone to look for the paper files of old BarBri litigation, law school and advertisement controversies. I then realized these were all missing. The files were in plain sight in manila expandable file folders in and alongside my desk and credenza. In addition, other materials related to West-BarBri and several other files I know I had prior to November 2005 now appear to be missing. I believe all of these records were taken in connection with one or more of the three break ins described above. No one in my organization took them or discarded them. No non Thomson-West-BarBri related files appeared to have been stolen.

**Burglaries Documented in Police Reports:**

17.     The three burglaries are documented in police reports to the Seattle Police Department under Seattle Police case numbers 05-439134, 05-466595, and 06-267003. The videotapes of the thieves are also on file with the Seattle Police Department. The Seattle Police have stated that these burglaries were very well executed by professional burglars with lock tumbling experience. The apparent actors were not on their local roster suggesting an out-of-area contract.

**Sole Copies of Responsive Records Taken:**

18.     While I have made a practice over the years of keeping back up tapes of the records on my hard drive, I am not certain my back up tapes contain all of my records. Particularly since my hard drive was stolen twice in a short time period, I suspect no back up exists for many of the records. I also cannot trust the accuracy of what is now on my computer since a hacker accessed relevant records from outside my office in November

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 6

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

SEA 1848294v1 49757-4

1    2005 and may have altered my copies. No back up files exist for the many important

2    missing hand-drafted memoranda.

3    **Office Never Before Burglarized in 26 Years:**

4       19.    I have been in business at my current location in the Skinner Building for

5    more than twenty years. Never before have we been a victim of burglary or theft. Yet,

6    within days of being disclosed as a witness and days of refusing to cooperate with the

7    Defense, my office was burglarized three times and documents specifically requested in

8    the subpoena at issue here were accessed by a hacker.

9    **Subpoena Issued:**

10      20.    On June 28, 2006, I was served with a Subpoena and record request in this

11    action. The subpoena asks for the very records which were accessed by a hacker in

12    November 2005 – specifically my writings to West related to my efforts to purchase

13    West's bar review course or employ their former employees and serve their students. (See

14    document requests 3(g).and (i).) The subpoena also calls for the paper files which were

15    stolen – *i.e.* the false, misleading or defamatory advertisements published by West-BarBri

16    over the years. Some of the requested documents involved matters West-BarBri would

17    have no knowledge of unless they were the beneficiary of the theft.

18      21.    The subpoena demanded that I produce records on July 12, 2006 and that I

19    appear for an all-day deposition on July 13, 2006. As the Defendants know, the bar exam

20    in Washington State was administered on July 25, 2006 through July 27, 2006. The week

21    of July 12th was a very busy week for all of our people. I was teaching and our employees

22    were in classes all day preparing our students for the bar examination and/or grading their

23    practice exams to give them feedback.

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 7

SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

22.     I instructed my attorney to file an objection to the subpoena and to serve a copy on the parties. She did so, and was issued a cause number of MS 6-112 by this Court for matters related to the subpoena.

23.     On July 27, 2006, the Defendants filed a Motion to Compel before this Court. They initiated their own action under cause number MS 06-119 rather than file the motion to compel in the action containing my objection to their subpoena. We noticed this by happenstance shortly before this Court made the same discovery and consolidated the two actions into one.

24.     I have already spent more than forty-hours of my own time – time taken away from my business -- trying to confirm which records are now gone which have been sought through the subpoena. I have incurred thousands of dollars in legal fees related to this subpoena. I will spend thousands more related to this motion to compel. If I am required to search for and produce records or produce the detailed withholding index demanded by the Defendants, I will be forced to place at least two employees on this task full time for a period of approximately two months at a cost to me of several thousand additional dollars. My employees and I will be forced to compare line by line any records we can locate on back up tapes and compare them against records contained on hard drives to see if records have been altered. We will have to review hundreds of paper files and assess whether records in those paper files are responsive to the subpoena. We will have to try and resurrect files of the false and misleading advertisements and other records from our student representatives and other contacts. The handwritten memos are not recoverable and most importantly our whole company will be forced to turn our attention away from our regular business – as one of the last surviving direct competitors of the

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 8
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1  Defendants – to work without compensation at the behest of the Defense. This will

2  destroy our program and my company.

3       **Well-Founded Fear of Retaliation:**

4       25.   I have been subjected to predatory attacks by West-BarBri for many years.

5  As described below, West-BarBri has been attempting to put me out of business for nearly

6  a decade. I believe the timing and circumstances of the three burglaries and hacking

7  suggest someone connected to the Defense in this case was involved. Many of the

8  documents requested in the subpoena appear to have come directly from those records

9  stolen.

10      26.   I am somewhat afraid for my personal safety, as I have never experienced

11  this degree of predatory competition. I feel that the burglaries and this subpoena as well as

12  the contacts by West-BarBri's attorneys are meant to send a message to me. I believe I am

13  being warned by West-BarBri not to cooperate and not to reveal what I know or risk being

14  singled out even more for an aggressive attack. Further, the material requested by West-

15  BarBri – asking us to reveal our business plans and weaknesses – exposes Rigos to more

16  retaliatory attacks without us having any reciprocal discovery right at all.

17      **Relevant Knowledge of Predatory Behavior:**

18      27.   I understand there is a student allegation in the Complaint that West-BarBri

19  conspired with Kaplan Review to allocate the operation of the separate LSAT and bar

20  review markets. Kaplan does offer a national CPA review course but does not operate a

21  national bar review course. Beyond the obvious — they both operate only in one market

22  and cross-promote/sell for the other — at this time I have no direct knowledge of the

23  veracity of this claim.

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 9

SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

43

28.    I understand there is a student allegation that West (now Thomson) bar review had other (non-BarBri) potential purchasers who expressed interest in West's bar review. I have knowledge of this because I had a number of written and oral communications with the then-West corporate people in an effort to buy West's bar review. I understood that they were selling out to avoid complaints of tying their products in the law schools. It was then still a competitive national bar review market, and West had roughly a third of the market. I was totally unsuccessful in these efforts and in the end felt they were just going through the motions to create the appearance of considering other buyers. I also learned that West arranged for its students to take the BarBri course free of charge when it canceled its courses, and that West would not allow its students to take any other bar preparation course for free. (I learned this because a student in Washington wanted to take the Rigos course, and I tried to get West to allow her to take my course instead of BarBri at whatever price had been negotiated for that service. West refused.)

29.    I understand there is a student allegation that West (now Thomson) sold its bar review course to BarBri when they were both American corporations, and the U.S. antitrust authorities approved this. Approval was given because, unlike the second transaction, the purchaser then had no other substantial law school products, so the tying objection was less apparent and compelling. At this time I have no other direct knowledge of the veracity of this claim.

30.    I understand there is a student allegation that Thomson-West (then and now a foreign corporation) acquired BarBri from Reed Elsevier (an English corporation) in a transaction involving two non-American corporations to reduce the antitrust scrutiny level by U.S. authorities. Thomson-West at that time owned many law school student

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 10

SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1  publications that were clearly susceptible to being tied to their bar review. They did not

2  make full disclosure and thus got away with doing indirectly what they could not do

3  directly. Thompson subsequently combined their West and BarBri marketing efforts.

4  Besides the obvious current cross-marketing, at this time I have no other direct knowledge

5  as to the veracity of this claim.

6      31.   I understand there is a student allegation that West-BarBri has tied their bar

7  review monopoly to increasing the domination of their Westlaw products over other

8  publishers by recruiting law students for life. This is particularly acute in recruiting law

9  students to West's online research systems, thus overwhelming LexisNexis, Loislaw, and

10  other potential electronic competitors. Beyond the obvious present law school cross-

11  marketing, discounts, and pressures that BarBri imposes on the law school students who

12  are involved with West, at this time I have no direct knowledge of the veracity of this

13  claim.

14      32.   I understand there is a student allegation that West-BarBri has operated in a

15  predatory manner with the intention of destroying other course competition and student

16  choice so West-BarBri may raise prices. I have substantial knowledge of specific incidents

17  of these predatory practices. My students, faculty, and staff have all suffered greatly from

18  their practices.

19      33.   Rigos has 20% to 25% of the Washington state bar review students. This is

20  in part because the Washington State Bar Association ("WSBA") Admission Committee

21  has a high quality all-local exam. Based upon a decade of "bar review wars" with West-

22  BarBri, it is my opinion that West-BarBri has two objectives. The first is to destroy our

23  Washington course and thereby further encourage the WSBA to drop their local exam.

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 11
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1   Second, without a viable competitor in the market, West-BarBri will almost certainly raise

2   the student price some $1,000 to a level of what they charge in states where they have

3   destroyed all substantial competition. Their predatory practices employed against Rigos

4   to achieve these dual objectives include at least the following:

5        34.    When Rigos opened the Washington bar review course in 1995, BarBri had

6   a total monopoly in our state, as it had destroyed the local course named BRAW (Bar

7   Review Associates of Washington). Rigos understands that for a small review course to

8   survive against a monopolist, it must execute much better. Merely being as good or the

9   same is insufficient; a viable competitor must achieve superior pass rates and substantively

10  distinguish itself.

11       35.    Around 2000, West-BarBri transferred in a new area director from

12  California named Melissa Shaw, who was experienced in applying West-BarBri predatory

13  practices. Shaw recruited as her "head marketer" a then-associate professor from the

14  University of Puget Sound in Tacoma (which subsequently sold its law school to Seattle

15  University) named Kelley Testy. Since then, Testy has been paid tens of thousands of

16  dollars by West-BarBri to aggressively market the West-BarBri program at all the law

17  schools in the Pacific Northwest and discourage any competition.

18       36.    Rigos early produced better pass-rate results due to a more Washington-

19  focused material and a "seamless preparation process." We began to compile and advertise

20  two pass rates: one based upon students who fulfill all our money-back guarantee

21  requirements and a second one based on all Rigos students. West-BarBri threatened to sue

22  Rigos for publishing any of our pass rate results. When this did not work, West-BarBri

23  began advertising a pass rate at or above 95% and refused to state their total pass rate (all

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 12

SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square • 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 • Fax: (206) 628-7699

1   students, not just some limited population ) or explain their pass rates or agree to a mutual,

2   audited verification process under specifically state population parameters. For example,

3   West-BarBri is rumored to advertise pass rates of its alleged "students" counting 1L law

4   students who enrolled with BarBri as 1Ls but did not actually take the BarBri law school

5   preparation course. (This includes students who instead enrolled with Rigos.) We believe

6   that West-BarBri's real pass rates are substantially below the state average, and that their

7   advertisements were and are deceptive.

8        37.    West-BarBri has on repeated occasions had their instructor-lawyer Tyna Ek

9   threaten to sue Rigos or its student representatives personally for alleged defamation or

10  false advertising. One of these occasions was based on six letters sent only to Rigos-

11  enrolled students. Ek objected to statements made in those six letters and demanded

12  information about Rigos's students and business to which she and her client were not

13  entitled. Rigos published a retraction to those six students based on Ek and BarBri's

14  instructions to avoid being sued.

15       38.    West-BarBri also sent their student representatives to ask questions at a

16  Rigos student table at the law schools and then later had Ek threaten to sue Rigos and the

17  student representatives personally for statements allegedly made to these representatives.

18  This kind of behavior greatly discourages Rigos's student representatives from serving and

19  again required Rigos to hire expensive lawyers to defend against this harassment and

20  constant lawsuit threats.

21       39.    One of the most predatory West-BarBri practices is "covering" every

22  creative feature Rigos uses to become distinctive. An example is that Rigos's materials are

23  written specifically for the unique Washington bar exam, while the West-BarBri text is

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 13

SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1   much more generic (it also has not been updated for a decade, a cost a monopolist can

2   avoid), since the generic material is what is tested in most jurisdictions using multi-state

3   bar examinations. Since state-specific materials distinguished Rigos, West-BarBri had

4   their instructors throw together some short inconsistent outlines and began advertising their

5   course as "Washington specific." Beyond being misleading to law student consumers, this

6   "covering" takes away the distinctive advantage that a local competitor must establish to

7   stay alive against a monopolist.

8       40.    Subsequently, Testy was promoted at Seattle University Law School.

9   Notwithstanding her clear conflict of interest, Testy continues to this day her very

10  aggressive marketing campaign for West-BarBri. Her efforts are to ensure that Seattle

11  University's law students enroll 100% with West-BarBri, give West-BarBri maximum

12  exposure to law students, and block Rigos from growing enrollment. She travels to other

13  law schools in the state to promote West-BarBri. Testy assists West-BarBri in "locking in"

14  new 1L's, and she personally conducts law school marketing classes for West-BarBri

15  thereby facilitating student enrollment in West-BarBri programs. This includes allowing

16  her West-BarBri colleagues to promote West-BarBri during their regular law school

17  classes and allowing West-BarBri student representatives to make unilateral class

18  presentations.

19      41.    Under Testy's active leadership, West-BarBri has recruited and hired away

20  some of the best instructors Rigos has over the years trained. West-BarBri requires its

21  faculty to sign a non-compete that prevents them from teaching for any other review

22  course. So when West-BarBri hires away talented faculty, it succeeds in depriving its

23  competitors of needed employees. West-BarBri does this not just to get good teachers who

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 14

SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1  learned the bar exam process at Rigos, but more importantly, to marginalize and discredit

2  Rigos and leave Rigos short-handed. For example, Testy recently recruited long-time

3  Rigos instructor Anita Ramasastry to teach for BarBri. At the time she recruited

4  Ramasastry, Testy had full knowledge that Ramasastry was with Rigos. I objected when

5  Ramasastry told me her plans after all of our course marketing for the next cycle had gone

6  out listing her as a senior instructor. I learned that she planned to use lecture notes and a

7  script-lecture written by me and copyrighted by my company to teach the BarBri course.

8  She intended to teach the same subject for West-BarBri that she had been teaching for us

9  using my materials. When I complained about Ramasastry's use of my materials, Testy

10  gave lecture notes to Ramasastry to use to avoid violating Rigos's copyright. Even so,

11  Ramasastry's subsequent West-BarBri classes at Testy's law school used virtually all the

12  exam examples and solution approaches she learned from Rigos.

13      42.     Similarly, West-BarBri recruited and hired away a Rigos instructor Lou

14  Wolcher, a tort teacher who used the same notes for BarBri that were developed and

15  refined during the Rigos course. West-BarBri has also approached a longtime Rigos

16  instructor, Janet Ainsworth. Ainsworth was not limited by a non-compete agreement but

17  had the loyalty, integrity, and strength of character to say no, even though West-BarBri

18  offered her more than three times what Rigos can pay.

19      43.     Shortly after these hires, West-BarBri immediately advertised their "new

20  instructors" — Wolcher and Ramasastry — by name and stated that they had 15 years of

21  combined bar instruction experience. While this was accurate, they concealed the fact that

22  it was with Rigos and was thus misleading. As the word got out, it seriously demoralized

23  both the remaining Rigos instructors and all the Rigos student representatives. West-

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 15
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1    BarBri portrayed Rigos as an off-Broadway tryout for the big time opportunity of joining

2    the West-BarBri monopoly course.

3        44.    West-BarBri sets up tables at the law schools during the first weeks of

4    school and actively signs up 1L students during these first weeks for the BarBri bar review

5    course. This "lock-in" discourages students from considering other courses later in their

6    law school career and creates a "herd mentality." This is quite effective. More than half of

7    the students who eventually enroll with Rigos have already given BarBri substantial sums.

8    Converting such students is very difficult even if the merits suggest they were pressured

9    into a bad premature decision.

10       45.    Rigos's advertisements on bulletin boards at law schools have been

11   routinely taken down. This has included a special plaque awarded to Jim Rigos and Rigos

12   Review for a contribution toward the new law school building at Seattle University.

13       46.    West-BarBri gives "scholarships" for the bar preparation course but focuses

14   these "scholarships" in Washington primarily on very bright students and the students

15   intending to enroll in Rigos. This denies Rigos enrollments, especially the best and the

16   brightest law students. This makes it more difficult to produce superior pass rates.

17       47.    West-BarBri representatives routinely attend Rigos law school

18   informational meetings and orientation lectures and ask disruptive questions. An example

19   is a 2004 incident at the University of Oregon's law school, in which a West-BarBri

20   representative suggested that Rigos was insolvent and going to close up business thus

21   leaving students in the lurch.

22       48.    Rigos has recommended informally and formally that both courses engage

23   in reasoned, structured joint law school informational presentations similar to those used in

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 16
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1   CPA review courses. This would allow students to hear both sides, and thus objectively

2   compare and contrast the relative features of the two programs so students could make an

3   educated choice. Testy has barred such open dialog from her law school, and West-BarBri

4   has refused to join such an event at any other school.

5       49.   In the spring of 2006, Testy arranged and presented marketing efforts for

6   West-BarBri. Just before the review courses began, Testy's subordinate informed Rigos

7   that their large room at her law school, which we had been promised for our course, was

8   being given to West-BarBri. We were told we would be given a much smaller room.

9   Again, there was no explanation offered, except: "You could always go elsewhere if you

10   don't like it." Rigos had used the larger room in the past. Our students had enrolled for a

11   morning class at Seattle University and Testy's people knew we had more students

12   enrolled that we could accommodate in the smaller room. This meant that some Rigos

13   students who wanted a morning class at Seattle University were forced to transfer to

14   Testy's West-BarBri class (which had extra room since it was given the larger room Rigos

15   had previously been assigned).

16       50.   In an attempt to resolve these never-ending disputes and encourage

17   professional collegiality between the review courses, Rigos recommend that both courses

18   mediate all these disputes using a neutral named David Boerner. Mr. Boerner is a law

19   school professor, had previously been a senior King County Prosecutor, and has served

20   with distinction on the ethics committee of the WSBA. This suggestion was rejected by

21   West-BarBri right out of hand. They refused to suggest or agree to any other neutral that

22   could resolve some of these disputes and restore cordiality between the courses.

23

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 17
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square • 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 • Fax: (206) 628-7699

51.   It is thus made unfortunately clear that West-BarBri fully intends to destroy the Rigos Washington bar review course. This lawsuit by their students has become their latest predatory method of achieving their objective. It is sad and ironic that West-BarBri is allowed to use their own students' lawsuit against them as a vehicle to further attack Rigos, which is the little Washington state competition left.

52.   Many involved in the WSBA's local exam are very disturbed by the dangerous message West-BarBri affirmatively sends to bar takers and the recruiting and personnel departments at Seattle law firms. West-BarBri routinely states that since it has the greatest percentage of test-takers in its course, that its students are better-advantaged at getting a passing grade than other test-takers because the majority responses will control. They claim that if most West-BarBri students miss an issue on a question, the "group think" examiners will discount the importance of the issue. This discredits the important role our volunteer Washington bar exam graders provide to the state bar. It suggests West-BarBri can control the grading of exams by virtue of what it stresses in its teaching. Some students and law firm recruiters believe it.

53.   Rigos has contacted the American Bar Association ("ABA") and the National Conference of Bar Examiners ("NCBE"). Both have an ongoing financial association and loyalty to West-BarBri. Suggestions of competitive restoration actions such as sale on the ABA's web store (as they do with other authors) of competitive material that could be used by law school operated and independent review courses have been rejected. The American Institute of CPA's ("AICPA") has actively discouraged tying agreements and monopolization by Thomson in the national CPA review course market, but the ABA seems to have no such interest. The ABA and their Law Student Division

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 18
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699

1  ("LSD") seem very satisfied with the compensation and other benefits they receive from

2  allowing West-BarBri to control the entrance into the proud U. S. legal profession.

3         54.    The students' lawsuit will probably settle producing some refund.

4  However, it will not likely change the industry domination and predatory practices of

5  Thomson-West-BarBri to restrain competition.

6         55.    Since the organized legal profession institutions have no interest in reducing

7  and protecting the American law students' plight, an appeal should be made to the federal

8  government to investigate and prosecute Thomson-West-BarBri.  Foreign owners should

9  not control entrance into the American legal profession in such a manner.

10        56.    At this time, I have no direct knowledge except the above that is relevant to

11  the questions the students have raised against their West-BarBri course.

12        I declare under penalty of perjury that the foregoing is true and correct.

13  Executed in Seattle, Washington, on August 5, 2006.

14

15

16  James J. Rigos, WSBA 9659
    President, Rigos Professional Education Programs,
17  Ltd.
    Attorney at Law, J.D., LL.M.
18  Certified Public Accountant

19

20

21

22

23

DECLARATION OF JAMES RIGOS IN SUPPORT OF
RESPONSE TO MOTION TO COMPEL (No. 06-cv-
1096L) — 19
SEA 1848294v1 49757-4

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 628-7699