DANIEL GREENBERG (AR BAR 2007-193)
email: dngrnbrg@gmail.com
*Pro se*
**CENTER FOR CLASS ACTION FAIRNESS LLC**
**GREENBERG LEGAL SERVICES**
55 Fontenay Circle
Little Rock, AR  72223
(501) 588-4245



FILED
CLERK, U.S. DISTRICT COURT

JUN 15 2011

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| STEPHEN STETSON, SHANE LEVIGNE, CHRISTINE LEIGH BROWN-ROBERTS, VALENTIN YUI KARPENKO, and JAKE JEREMIAH FATHY, individually and on behalf of all others similarly situated,<br><br>    *Plaintiffs,*<br><br>v.<br><br>WEST PUBLISHING CORPORATION, a Minnesota Corporation dba BAR/BRI, and KAPLAN, INC.,<br><br>    *Defendants.*<br><br>Daniel Greenberg,<br>    *Objector.* | Case No. CV-08-00810-R *(Ex)*<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OBJECTION TO SETTLEMENT**<br><br>Judge:    Hon. Manuel L. Real<br>Date:     June 20, 2011<br>Time:     11:00 a.m.<br>Courtroom:  8<br><br>**CLASS ACTION** |

**NOTICE IS HEREBY GIVEN** that, on June 20, 2011, at 11:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 8 of the above-entitled Court located at 312 North Spring Street, Los Angeles, California 90012, Objector Daniel Greenberg will request that the Court take judicial notice of the following document pursuant to Federal Rule of Evidence 201:

May 17, 2011, Transcript of Final Fairness Hearing in *Sobel v. Hertz Corporation*, District of Nevada, Case No. 3:06-cv-545-LRH-RAM, as transcribed by Court Reporter Donna Davidson, a true and correct copy of which is attached hereto as Exhibit 1.

This Objector will request that this Court take judicial notice of that document, and in particular portions of the following three pages described below, all of which record the remarks of the presiding federal judge from the bench in that case:

a.  Statements of the Court at pp. 77-78 on its decision and future opinion in *Sobel*, namely: "I'm going to follow with a written decision"; that "I don't have any question in my mind what I'm going to do"; and that "I'm going to reject the settlement that has been proposed."

b.  Statement of the Court at p. 79 on its evaluation of the merits of Greenberg's advocacy in *Sobel*, namely: "I, frankly, am in complete agreement with Mr. Greenberg's argument."

Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of "matters of public record" as long as the facts are not "subject to reasonable dispute." *Wheeler v. City of Oakland*, 2006 U.S. Dist. LEXIS 27680 at *15 (N.D. Cal. Apr. 28, 2006) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)). Federal court hearing transcripts are properly noticed under Rule 201.

Dated: June 15, 2011

Respectfully submitted,

*/s/ Daniel Greenberg*
Daniel Greenberg (AR BAR 2007-193)
**GREENBERG LEGAL SERVICES**
**CENTER FOR CLASS ACTION FAIRNESS LLC**
55 Fontenay Circle
Little Rock, AR  72223
DnGrnbrg@gmail.com
(501) 588-4245

Appearing *pro se*

1

## CERTIFICATE OF SERVICE

2

3     I hereby certify that on this day I filed the foregoing with the Clerk of the Court, and
served true and correct copies upon class counsel and defendants' counsel via first class

4     mail at the addresses below, per the instructions of the Settlement Notice.

5     Clerk of Court

6     Stetson v. West Publishing Corp. Settlement Administrator
c/o Gilardi & Co. LLC

7     Box 8090

8     San Rafael, CA 94912-8090

9     Alan Harris or David Zelenski

10    HARRIS & RUBLE
6424 Santa Monica Boulevard

11    Los Angeles, CA 90038

12

13    Perrin F. Disner
1855 Camden Avenue, Suite 3

14    Los Angeles, CA  90025

15

16    James Tallon
SHEARMAN & STERLING LLP

17    599 Lexington Avenue
New York, NY  10022

18

19    James F. Rittinger
SATTERLEE STEPHENS BURKE BURKE

20    230 Park Avenue

21    New York, NY  10169

22    Stuart Senator

23    MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor

24    Los Angeles, CA  90071

25    DATED this 15th day of June, 2011.

26

27                                              (s) Daniel Greenberg

28                                              Daniel Greenberg

# EXHIBIT 1

1

1    UNITED STATES DISTRICT COURT
         DISTRICT OF NEVADA
2    BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE
                 --oOo--
3

4

    JANET SOBEL, DANIEL DUGAN,      :
5   PhD., and LYDIA LEE,            :
    individually and on behalf of   :
6   all others similarly situated,  :
                                    :
7          Plaintiffs,              :
                                    :
8                                   :
                                    :
      vs.                           : No. 3:06-cv-545-LRH-RAM
9                                   :
    THE HERTZ CORPORATION, a        :
10  Delaware corporation, et al.,   :
                                    :
11                                  :
           Defendants.              :
12  _____:

13          TRANSCRIPT OF FINAL FAIRNESS HEARING

14

15                    May 17, 2011

16

17                   Reno, Nevada

18

19

20

21

22  Court Reporter:     Donna Davidson, RDR, CRR, CCP, CCR 318
23                      Official Court Reporter
                        400 South Virginia Street
24                      Reno, Nevada 89501
                        (775) 329-0132
25

2

1  APPEARANCES:

2  For the Plaintiffs:      ARTHUR STOCK
                            DAVID B. ZLOTNICK
3                           G.DAVID ROBERTSON
                            Attorneys at Law
4

5
   For the Defendants:      PETER HECKER
6                           WILLIAM E. PETERSON
                            JANINE L. SCANCARELLI
7                           DAN C. BOWEN
                            RICHARD MCEVILY
8                           Attorneys at Law

9  For the Objectors:       DANIEL GREENBERG
                            GEOFF GILES
10                          THOMAS L. COX (By telephone)
                            Attorneys at Law
11                          ANTHONY L. DEWITT(By telephone)
                            Pro Se
12
   For the Intervenors:     JOEL J. EWUSIAK (By telephone)
13                          HALEY R. MAPLE (By telephone)
                            Attorneys at Law
14

15

16

17

18

19

20

21

22

23

24

25

3

1      RENO, NEVADA, MAY 17, 2011, 10:05 A.M.

2                      --oOo--

3              P R O C E E D I N G S

4

5         THE COURT:  Good morning.  Have a seat, please.

6         THE CLERK:  Today is the date and time for a

7    final fairness hearing in 3:06-cv-545-LRH-RAM, Janet Sobel,

8    and others, versus Hertz Corporation, and others.

9         Counsel on the phone, if you could please

10   state your appearances for the record.

11        MR. COX:  This is Tom Cox for Paige Nash, an

12   objector.

13        MR. EWUSIAK:  Joel Ewusiak for objector Scott

14   Schutzman, along with my colleague Haley Maple.

15        THE COURT:  All right.  Go ahead, Dionna.

16        THE CLERK:  Counsel in the courtroom, if you

17   could please state your appearances for the record.

18        MR. ZLOTNICK:  Good morning, Your Honor.  David

19   Zlotnick for plaintiff Janet Sobel and the settlement class.

20        MR. ROBERTSON:  Good morning, Your Honor.  David

21   Robertson also for Janet Sobel and the settlement class.

22        MR. STOCK:  Arthur Stock also for the plaintiffs

23   and the settlement class.

24        THE COURT:  Defense counsel, please.

25        MR. HECKER:  Good morning, Your Honor.  Peter

DONNA DAVIDSON, RDR, CRR, CCP, CCR #318
(775) 329-0132

4

 1   Hecker for defendant the Hertz Corporation.

 2               MR. PETERSON: William Peterson, Your Honor,

 3   also for Hertz Corporation.

 4               MS. SCANCARELLI: Janine Scancarelli, Your

 5   Honor, for defendants Enterprise and Vanguard.

 6               MR. BOWEN: Dan Bowen, Your Honor, also for

 7   Enterprise and Vanguard.

 8               MR. GREENBERG: Daniel Greenberg, Your Honor,

 9   for objectors Bill Andrews and Walter Weber.

10               THE COURT: All right. Thank you,

11   Mr. Greenberg. All right.

12               MR. GILES: Jeffrey Giles on behalf of objectors

13   Christopher Burke and Davy Burke.

14               THE COURT: All right. And is one of your

15   clients also present, Mr. Giles?

16               MR. GILES: Yes, Mr. Burke is present.

17               THE COURT: All right.

18               MR. BURKE: Your Honor, I'm an attorney. I

19   co-counsel with Mr. Giles.

20               THE COURT: All right. Thank you.

21               MR. BURKE: Thank you.

22               THE COURT: All right. Have we covered everyone

23   who is either connected telephonically or personally here in

24   the courtroom?

25               MR. HECKER: Your Honor, Peter Hecker. I had a

5

1   question as to whether Mr. DeWitt was intending to appear by

2   telephone. I know that he was trying. I don't want anybody

3   to be excluded or not part of this that wanted to be part of

4   it.

5           THE COURT: That was partly why I asked the

6   question, because I know Mr. DeWitt had earlier expressed a

7   desire and interest to participate telephonically. But he

8   was given the conference number and so forth. And he has not

9   yet appeared.

10          I assume that if he appears during the course of

11  the hearing -- or if any of you should hear something that

12  would suggest he may have come online and you believe I

13  didn't, please let me know, and we'll introduce him on the

14  record.

15          MR. HECKER: Thank you, Your Honor.

16          THE COURT: But as of this time, Mr. DeWitt has

17  not yet joined in the telephonic conference.

18          All right. This has been scheduled for a

19  final fairness hearing this morning. And of course there

20  have been numerous filings and numerous objections. And

21  there's been some related motions that I'm not sure that

22  we'll need to address here this morning.

23          But, counsel, let me give you an outline of

24  what I see as our day here.

25          I don't know how long we will go, but I'm

6

1    prepared to go into the afternoon.  I do have a judge's

2    meeting at noon, and so I'll have to adjourn shortly

3    before the noon hour if we're still going at that time,

4    and we would reconvene at 1:30.

5           And I assume -- and I would invite

6    plaintiffs's counsel to go forward first and then defense,

7    and then we would hear from the objectors.

8           So if there are any objectors who are

9    connected telephonically and they would like to rejoin at

10   a later time, we could probably accommodate that.  But

11   it's difficult for the Court to tell you when that would

12   likely be.

13          So counsel for the plaintiff, are you prepared

14   to go forward at this time?

15          MR. ZLOTNICK:  Yes, Your Honor, we are.

16          THE COURT:  Go ahead, please.

17          MR. ZLOTNICK:  Thank you, Your Honor.  David

18   Zlotnick again representing plaintiffs Janet Sobel, et al.,

19   and the settlement class.

20          Your Honor, there are three distinct motions

21   pending today, three distinct motions that plaintiffs have

22   filed, I should say.  The first, motion for final approval

23   of the settlement; the second, motion for an award of

24   attorneys' fees and costs; and the third, motion for

25   incentive awards to the four representative plaintiffs.

1          Both logically and because of its importance,

2   we think that the settlement approval motion should be

3   argued first.  And we suggest that -- you know, subject to

4   the Court's views on the matter, that the -- that all

5   arguments from all parties be heard on the settlement

6   approval motion because the other two motions, the motions

7   for fees and for the incentive awards, are really

8   derivative; if the settlement is not approved, those

9   motions are moot.

10          So that's our suggestion.  But we're prepared

11   to proceed however the Court wants us to.  If you want to

12   hear from plaintiffs on all three motions, we're happy

13   to --

14          THE COURT:  No.  The heart of this matter is

15   certainly the acceptance or approval is being sought of the

16   settlement as a final settlement, so let's hear on that

17   first.

18          And if I want to then proceed to arguments on

19   the attorneys' fees and incentive awards, I'll so advise you.

20          MR. ZLOTNICK:  Thank you, Your Honor.

21          Your Honor, the proposed settlement should be

22   approved as fair and reasonable.  Does this settlement obtain

23   all of the relief that plaintiffs and class counsel hoped and

24   attempted to obtain?  Absolutely not.  But the settlement was

25   negotiated in good faith by experienced counsel after a

8

1  thorough examination of the legal and factual issues.

2            As Your Honor is well aware, we litigated this

3  case for over four years in the court and for some period

4  of time researching the issues before it was ever filed.

5  We litigated the case through discovery and through

6  summary judgment motions, competing cross-motions for

7  summary judgment.

8            So this is not a case that was filed and

9  settled a month later. This was a case that -- where

10  there was -- that was fought hard by counsel on all sides,

11  including motions to dismiss, substantial discovery

12  practice and then motions for summary judgment.

13            So counsel on all sides had the opportunity to

14  become thoroughly versed, as the Court did, with the legal

15  and factual issues before reaching this settlement.

16            Of course the ultimate question before the

17  Court is is the settlement fair and reasonable under all

18  the circumstances? We believe, plaintiffs believe, that

19  it absolutely is fair and reasonable and should be

20  approved.

21            First, the presumption of the adequacy of the

22  settlement that numerous courts have recognized is

23  applicable here. The settlement was negotiated at arm's

24  length, as I've just mentioned, after four years of

25  litigation.

9

1          Counsel are very experienced.  Mr. Robertson
2    will go into that in a little more detail when he
3    addresses the attorneys' fees motion.  But I have
4    practiced and Mr. Robertson has practiced for
5    approximately 30 years; Mr. Stock has practiced for 20
6    years.

7          I and Mr. Stock have worked primarily in the
8    field of complex class action litigation.  Mr. Robertson,
9    as the Court is likely aware, has also worked in the field
10   of complex litigation, including some class action work.

11         Counsel are experienced.  They know what
12   they're doing.  They fought the case and went through
13   discovery, went through briefing both on motion to dismiss
14   and then summary judgment motions, and then negotiated at
15   arm's length before a respected mediator.

16         We attempted in those settlement negotiations
17   to obtain a large cash recovery for the class.  That was
18   our desire going into those negotiations.  Unfortunately,
19   that wasn't possible.

20         It was clear to us after -- during the course
21   of the mediation, that the defendants were not willing to
22   entertain a substantial cash payment.  And we concluded
23   after some soul-searching and discussing among ourselves
24   and after considerable negotiations -- with the help of a
25   very experienced and respected retired jurist who was

1   acting as the mediator, we concluded that the present

2   settlement was the best one that was obtainable and that

3   it was fair and reasonable for the class and that we

4   should submit it to the Court for approval.

5           I'd like to add a few words, just commenting

6   on retired Judge Sabraw who was the mediator.  He was the

7   head of the complex litigation department in the Alameda

8   Superior Court for many years.  In that regard -- in

9   California, of course.  In that regard he handled numerous

10  class actions and other complex cases.  He is a very

11  widely respected jurist and a very well-regarded mediator

12  as well.

13          He certainly helped all the parties reach the

14  settlement that's presently before the Court.  And his

15  help was instrumental in obtaining the settlement.

16          We mediated before him for approximately 11

17  hours on one day.  We did not actually finalize the

18  settlement that day.  It took several weeks thereafter,

19  including phone calls among counsel and further

20  communications with Judge Sabraw, before we finally

21  reached the settlement.  This was a true arm's length

22  settlement.

23          Why this coupon settlement is fair is the next

24  issue I'd like to address.  And we have to start by

25  looking at the statutory remedies that are applicable here

1   under Nevada Revised Statute section 482.31585. The

2   statute provides that a short-term lessee, a car renter,

3   may bring an action against a short-term lessor of the car

4   rental companies for the recovery of damages and

5   appropriate equitable relief for any violation of the

6   substantive provisions of the statute that were at issue.

7           Now, there were two fundamental problems, if

8   you will, or issues that were raised as this case

9   progressed. One is that the change in the statute by the

10  Nevada legislature eliminated the possibility of

11  injunctive relief and also affected the dynamics of the

12  case. Although Your Honor found, and we believe

13  correctly, that the legislature changed the statute and

14  was not simply clarifying the statute, there was still

15  some risk on appeal, obviously, that the court of appeals

16  could find otherwise.

17          More importantly, the more important and

18  critical problem is that the -- we learned during the

19  discovery process -- I mean, when we filed the case,

20  obviously, our hope and intent -- plaintiffs' hope and

21  intent, was to obtain a full restitution of the concession

22  recovery fees that they had paid to Hertz and the other

23  car rental companies that are defendants.

24          But as we progressed through discovery and

25  briefing the issues, it became clear to us that the

1   availability of meaningful damages was questionable.

2              Why was it so difficult to prove significant

3   damages?  The objectors assume, and we assume incorrectly,

4   that we could obtain restitution of the full amount of the

5   concession recovery fee.  But the availability of

6   restitution is doubtful under the law, as became clear to

7   us as we researched the applicable principles and, of

8   course, primarily at the summary judgment briefing.

9              And Your Honor will note, as the statutory

10  language that I read earlier, that the statute refers to

11  appropriate equitable relief.  Obviously, we lost the

12  possibility for injunctive relief as the Court concluded.

13  And we also concluded, after doing substantial research,

14  that it would be difficult to obtain full restitution

15  under that statutory standard of appropriate equitable

16  relief.

17             And that was true for several reasons which I

18  will get to.  But we are entitled to damages under the

19  statute.

20             What also became clear through the course of

21  the case, through the course of discovery and briefing,

22  was that it would be very difficult to establish

23  substantial and material damages.

24             This case involves the unbundling of a roughly

25  10 percent concession recovery fee surcharge which

1   occurred in 1996, the unbundling.  The amount of that

2   charge, you know, ranges, generally, from approximately $5

3   to $100 per rental.  It's 10 percent, roughly, of the

4   total rental amount.

5           All of the rental car companies had similar

6   unbundled charges.  So they have all charged the fees in

7   the same manner.

8           The reason why damages as opposed to

9   restitution would be difficult to prove is that it became

10  clear that defendants could simply bundle all their

11  charges together and raise their rates by the 10 percent

12  concession recovery fee.

13          This is a competitive industry, and rates are

14  based primarily on competitive factors, what the

15  competition is charging, and on supply and demand of

16  vehicles at any given location.

17          There were very serious questions whether we

18  could show that the continued unbundling of the concession

19  recovery fee caused measurable harm.  To be sure in 1996,

20  you know, it did cause such harm when the car rental

21  companies -- and I'm not speaking for all of them, but

22  primarily Hertz, who was the primary defendant during the

23  period that the case was litigated, when they unbundled

24  their charges, they did not reduce their rates.  So, in

25  effect, there was a 10 percent bump in what consumers were

1  paying at that time.

2          But because -- as we learned through the

3  discovery in the case and through working with our own

4  experts -- because the rates are set by competitive

5  factors and over the years that bump that they got in 1996

6  gradually declined, so that the effect of the unbundling

7  of the fee on the total charge to the consumers by 2003,

8  which is when the class period begins, was really very

9  difficult to ascertain.

10          In other words, because Hertz, as well as the

11  other car rental companies, certainly could charge

12  whatever they like and could -- and this case only

13  involved the presentation of their rates rather than the

14  total amount of the charge, it was very, very difficult to

15  prove any material damages that the class had sustained.

16          THE COURT:  But let me ask you a question here.

17  I don't have evidence before me to indicate that the

18  comparable commission recovery fee was being included either

19  in a bundled or unbundled state by competitor on-airport

20  rental agencies, do I?

21          MR. ZLOTNICK:  Your Honor, there is none in the

22  records of this motion that I'm aware of.

23          I think in the summary judgment motion there is

24  some evidence in the record which I would be glad to dig out

25  and point to the Court if the Court wants me to.  I'm not,

 1   offhand, able to refer the Court to it.

 2           THE COURT:  And taking it a step further,

 3   there's also no evidence before the Court concerning

 4   off-airport rental agencies, which would not have -- not have

 5   been paying the concession recovery fee, and it would appear,

 6   at least a reasonable assumption would be, that their rates

 7   would be at least 10 percent less -- -

 8           MR. ZLOTNICK:  Your Honor --

 9           THE COURT:  -- aren't they also competing for

10   the same market of tourists who are getting off in the

11   various airports in Reno and Las Vegas?

12           MR. ZLOTNICK:  Your Honor is absolutely right,

13   and that is an issue that we looked at in the case and that

14   we examined.

15           And the conclusion that we reached, with some

16   discovery -- efforts through discovery, as well as counsel

17   consulting with our own experts, was that there is a limited

18   degree of competition between the on-airport and off-airport

19   firms.

20           But many people, because of the convenience

21   associated of renting at an airport rather than having to

22   take a cab or some other form of transportation to get to an

23   off-airport firm, prefer to rent at the airport, and so they

24   are somewhat distinct markets.

25           And it is -- the second factor that's critical

1 there, though, Your Honor, is that the off-airport firms

2 charge what's known as an access fee, which is the

3 comparable or similar to the concession recovery fee.

4      It's not the same thing because they don't

5 have a concession at the airport. But they are

6 required -- those who pick up passengers at the airport

7 and transport them to the off-airport rental locations are

8 required to pay an access fee by ordinance -- or

9 regulation.

10      And Your Honor may recall that that really was

11 the underpinning of the exception in the statute that

12 defendants argued applied to the concession recovery fee;

13 we argued only applied to the access fee that was set by

14 ordinance.

15      Now, that access fee originally was only $3

16 per rental. But it has increased substantially. I

17 cannot -- as I stand here today, I have not looked that

18 recently to see the amount of that access fee, but it is

19 much closer to the concession recovery fee.

20      So the fact that the access fee has grown,

21 that's charged to the off-airport firms, means that

22 there's much less -- there is still some price competition

23 there, but not as much as there once was.

24      THE COURT: But, again, I don't have any

25 evidence concerning that in front of me, do I?

1           MR. ZLOTNICK:  That is correct, Your Honor.  As

2  far as I'm aware, other than the evidence relating to the

3  statutory changes and the fact that there was an access fee

4  as far back as 1989, when the statute was passed, that

5  evidence is in the record.  But I'm not aware of any evidence

6  of the present amounts of the access fee or the amounts

7  during the class period.

8           So looking at these various factors, because

9  the defendants were and are able to bundle the concession

10  recovery fee into their total charge and because the

11  practices are similar, if not identical, among the various

12  on-airport firms, we concluded that it would be very, very

13  difficult to prove damages of such.

14           Now, to go back to the issue of restitution.

15  There were several reasons why we concluded that that was,

16  likely, not available to plaintiffs in the class here.

17  And that was largely -- or in significant part, of course,

18  an issue in the summary-judgment briefing.

19           And as Your Honor will recall, although Your

20  Honor did not reach the issue in terms of a firm decision,

21  you -- we did ask that the Court award restitution to

22  plaintiffs, and the Court declined to do so.

23           More importantly, we had more than just an

24  unvarnished abstaining from the issue by the Court because

25  the Court found that the unbundled charges at issue were

1  not unfair.

2           And the Court also found that the legislation

3  in question was vague and that defendants' conduct did not

4  intentionally mislead the public.

5           Now, as Your Honor is aware, restitution is an

6  equitable remedy, just like injunctive relief is.  The

7  statute allows damages and appropriate equitable relief.

8           Given the Court's finding that the unbundled

9  charges were not unfair, which the Court specifically

10  found in the summary judgment ruling, and that the

11  defendants' conduct did not intentionally mislead the

12  public, we concluded that it was very unlikely -- and

13  adding the further fact that all of the airport --

14  on-airport firms charge -- unbundled their charges

15  similarly, we concluded that it was highly unlikely that

16  we would ever get full restitution of these charges.

17           Given these issues relating to damages, given

18  the length of the litigation, the exploration of the other

19  issues raised in the case, the possibility of appeal, we

20  were faced, essentially, with two alternatives at the time

21  of the mediation.  Continue the litigation through a trial

22  on damages and likely appeal involving significant

23  additional work and significant delays, probably in the

24  range of three years, given the rate at which the Ninth

25  Circuit disposes of matters.

1            We also concluded that the likely outcome of

2     pursuing that course was that we would obtain a modest

3     amount of damages ranging from, perhaps, a dollar on a,

4     you know, one-day rental to perhaps $20 for an extended

5     weekly rental.

6            And I think that's a generous estimate, Your

7     Honor, based on what we were able to obtain.  I think

8     defendants will argue to the Court that that is a very

9     generous estimate of the damages that we likely could

10    prove.

11           The second alternative, as it developed during

12    the course of the mediation, was that we could negotiate

13    the best possible settlement involving a voucher or coupon

14    or certificate, as it's called here, which we did.  We

15    decided during the course of the mediation that we would

16    pursue that type of negotiation.

17           We ultimately obtained a minimum $10 discount

18    off of a future rental and, in addition, the agreement by

19    defendants to pay all of the costs of class notice and

20    administration.  Given the fact that this class is about

21    2.5 million people, that is a substantial benefit to the

22    class that the defendants have agreed to bear all of those

23    costs.

24           Now, there are several factors that make the

25    coupon or certificate at issue here -- that give it real

1 | value.  Most importantly, it is usable with other
2 | discounts.

3 |       For example, ABA members and many other
4 | members of groups are entitled to what's called an
5 | affinity discount with Hertz, just by being members of an
6 | association like the ABA or the Travel Club.

7 |       Unlike many coupons that the defendants issue
8 | routinely in the course of their business, this coupon is
9 | usable with those affinity discounts.  It's also usable
10 | anywhere in the United States.  It's usable over an
11 | 18-month period from when they are issued.  And it is
12 | transferrable to family members within a household.

13 |       We negotiated for these provisions, Your
14 | Honor, in particular the fact that the coupons or
15 | certificates would be usable with other discounts, because
16 | it was important to us to make sure that these
17 | certificates did have real value.

18 |       We think that they do.  We recognize that less
19 | than -- to date, less than 90,000 of the 2.5 million class
20 | members have registered for the settlement.

21 |       Putting aside the fact that there are
22 | several -- about two months left for them to continue
23 | registering, the reality is, as Mr. Greenberg pointed out
24 | in his papers, that is normal in a low, you know, modest
25 | recovery class action.  That's just the fact.  Many people

1   do not want to bother registering for a settlement, even

2   though we made the process as easy as possible.

3            That was another factor that we insisted upon,

4   was that the registration process be very easy.  Consumers

5   were not required to come up with any proof of their

6   rentals; for example, they simply entered their name and

7   some cases their address and a registration number that

8   was on the notice that was mailed to them.  It took about

9   two minutes at most.

10           So the reality is, though, notwithstanding the

11  fact that we made it as easy as possible, most people, you

12  know, when you're offering them 10 or $20 certificate just

13  don't bother.  And that's normal.

14           And even in more substantial class action

15  settlements most people do not participate.  It's the

16  nature of people's reaction to these legal notices.

17           We did make the notice here as consumer

18  friendly as possible, in our judgment, and the whole

19  process as consumer friendly as possible.  And that was an

20  important element of the settlement.

21           Any settlement, Your Honor, involves --

22  requires the parties and counsel to give up their fondest

23  hopes and to face the realities of the litigation.  We had

24  hoped for a substantial cash recovery.  But that was

25  simply not obtainable.  That became clear during the

22

1   mediation; and, to some extent, the summary judgment

2   briefing and decision by this Court made it clear that it

3   would be very difficult for us to establish substantial

4   damages.

5           The proposed settlement before the Court

6   achieves a prompt resolution of this dispute. It's not

7   going to drag on for the years that would be required by a

8   trial of damages and an appeal; it eliminates any risk of

9   an adverse ruling on appeal; and it provides meaningful

10  relief to the class members who register.

11          The response by the class has been

12  overwhelmingly favorable. Yes, there have been

13  approximately 60 objections. Interestingly, some of them

14  take the position that the whole lawsuit was frivolous and

15  others take the position that the relief was inadequate.

16  So the objections come from opposite angles, to some

17  extent.

18          But the reality is, this is a very large

19  class. This is not a class of a hundred or a thousand

20  people, this is a class of 2.5 million people. And 60

21  objections out of a class of 2.5 million people, probably

22  a couple hundred thousand of which consist of members of

23  the ABA, we think is not at all surprising.

24          And the fact that approximately 90,000 people

25  have registered for the settlement shows that the great

23

1 | majority of class members do find -- who have responded,

2 | the great majority who have responded, have responded

3 | favorably.

4 | We have had thousands of calls from people who

5 | have asked counsel to assist them in completing the

6 | settlement forms or explaining matters to them. And the

7 | overwhelming response has been favorable.

8 | But, most importantly, the response of the

9 | class is not the critical factor. The critical factor is

10 | that this settlement is fair and reasonable. It's not

11 | everything we wanted when we filed suit, but it is

12 | reasonable, and it should be approved by the Court.

13 | THE COURT: I don't believe I was provided with

14 | a breakdown of -- among those who responded, what the

15 | breakdown was between 10 and $20 coupon applications.

16 | MR. ZLOTNICK: That may be, Your Honor. And,

17 | again, I'm sorry, but I do not have that information on the

18 | top of my head.

19 | As Your Honor may be aware, or may recall, the

20 | settlement is structured so that persons who rented on

21 | multiple occasions were entitled to -- from a particular

22 | company, were entitled to a $20 coupon from that company.

23 | One thing I would want to point out is that if

24 | someone rented from National and Hertz, they would get

25 | coupons or be entitled to get coupons from each company.

1   So there may be a substantial number of people who rented

2   from different companies and will be getting more than one

3   coupon, whether for 10 or $20.

4           But putting that aside, the $20 coupons go to

5   persons who rented on multiple occasions from a particular

6   brand during the relevant period.  How that breaks down in

7   terms of the claims that have been filed, I'm not aware at

8   this point, Your Honor.

9           We can find that information and provide it to

10  the Court, of course.

11          THE COURT:  All right.

12          MR. ZLOTNICK:  Thank you.

13          THE COURT:  Thank you, Mr. Zlotnick.

14          MS. MAPLE:  This is Haley Maple.  I'm having

15  trouble hearing the judge.

16          THE COURT:  Who is speaking?

17          MS. MAPLE:  Haley Maple, counsel for Scott

18  Schutzman.

19          THE COURT:  All right.  Can you hear me now?

20          MS. MAPLE:  That's a little bit better.  Thank

21  you.

22          THE COURT:  All right.  Thank you.

23          Are there other counsel for plaintiffs who

24  desire to speak?

25          MR. ROBERTSON:  Your Honor, David Robertson.  I

25

1  would be addressing the attorneys' fees motion, and Mr. Stock

2  would be addressing the incentive awards.

3          Based upon the Court's prior ruling, we would

4  postpone our presentation at this point.

5          THE COURT:  All right.  Thank you,

6  Mr. Robertson.

7          All right.  Mr. Hecker?

8          MR. HECKER:  Thank you very much, Your Honor.

9  Peter Hecker for Hertz Corporation.

10         This -- to take Your Honor's last question

11 first, I guess let me start there, since I know it's on the

12 Court's mind.

13         Our understanding is that approximately 90

14 percent of the Hertz settlement class members only rented

15 once or twice.  So I can't tell you, because we didn't go

16 back to look as to each filer of an objection or other paper

17 with the Court, how those people fell within that analysis.

18         But the lion's share, the very, very high

19 majority of class members that belong to Hertz, only rented

20 once or twice.  And then it goes down quickly from there.

21 Those who rented three times or four times, theirs may be

22 several percent of those.  And then more than that is just

23 miniscule.  And that was one of the reasons why the

24 settlement was negotiated the way it was with the

25 certificates indicating what -- the denominations that they

1   have.

2                    THE COURT:  Thank you.

3                    MR. HECKER:  Okay.  This matter has been very

4   exhaustively briefed.  And I tend to talk too much, so I will

5   try to be brief myself.  But it's not easy because it's just

6   my personality.  I have a lot to say, and I will try to boil

7   it down.

8                    Your Honor has briefs from the plaintiffs,

9   briefs from Hertz, and briefs from Enterprise and Vanguard

10  that not only made the motion but also, at length, responded

11  to the objections, as well as a very detailed chart that was

12  attached to the defense briefs describing each filing,

13  whether they sought to appear, and then summarizing the

14  responses to each and every one of the many, many different

15  kind of objections.

16                   So I'm not going to stand here and repeat

17  those to Your Honor because I don't think it would be

18  helpful.  I'm sure the Court has read those materials and

19  is prepared and would not really add much to the picture.

20                   THE COURT:  No.  And I apologize for not stating

21  earlier.  I do appreciate the quality of the briefing.  I

22  mean, this clearly has been a heavily litigated issue

23  throughout.  But, most importantly, with regard to the

24  issues pending before the Court I feel it has been well

25  briefed by --

1    MR. HECKER. Thank you, Your Honor.

2    THE COURT: -- everyone concerned.

3    MR. HECKER: Thank you. And I would also say

4    that the briefs by the objectors and proposed intervenor were

5    creative and hard hitting, and they raised important issues

6    that are worth airing, obviously, to the Court; and we think

7    we have responded to them more than adequately.

8    But the bottom line for us in this case is

9    that this really is a weak case as to which no injunctive

10    relief became available, and we think no damages or

11    equitable monetary relief such as disgorgement,

12    restitution, unjust enrichment would be available either.

13    The key variable when Your Honor -- as Your

14    Honor knows from all the cases that we've cited, is the

15    strength of the plaintiffs' case.

16    There are other factors, such as the amount of

17    discovery, the duration that litigation would have through

18    appeal, the reaction of the class, et cetera. But the

19    strength of plaintiffs' case is the most important factor

20    when compared against what's offered in settlement.

21    So just a few more words on the strength of

22    plaintiffs' case. And maybe this is as much for the

23    benefit of the objectors who are here and on the telephone

24    as it is, of course, for Your Honor; although Your Honor

25    is familiar with much of this from earlier briefing. And

1  so we did not put in additional evidence on these things

2  because it's in the briefing on the motion to dismiss and

3  in the cross-motions for summary judgment that, as Your

4  Honor will recall, are exhaustively briefed with probably

5  two or three feet of paper that Your Honor had to wade

6  through.

7          But this is a very odd case, an odd statute.

8  Yes, they filed it to get monetary relief and injunctive

9  relief as a so-called consumer protection lawsuit.

10          But the wind is completely taken out of their

11  sails by the legislature in this case during the pendency

12  of the litigation.  The legislature basically caught up to

13  the reality of what was happening at Nevada airports and

14  by the airport authorities and the industry.

15          The legislature decided that since the

16  disclosures that were being made were so fair and full, as

17  Your Honor also found, that conditioned upon those kinds

18  of disclosures continuing, and that's all part of the

19  legislation, these types of charges could be separately

20  charged and fully disclosed as they always were.

21          And so in a consumer protection lawsuit, when

22  the legislature basically blesses and approves the

23  practice that's being challenged, that really changes the

24  dynamic of the case.

25          And I know Mr. Zlotnick is an advocate, he

1   represents the plaintiffs, and he can't stand here and say

2   this; but we just don't see how they could recover

3   anything in this case, not only after the legislation but

4   after this Court's findings that there was full and fair

5   disclosure given to all customers, all consumers.

6          Nobody was ripped off here. This is a

7   no-damage case from the start. There's no blood on the

8   floor. There's nothing wrong. There's no injustice that

9   ever happened in this case.

10          And just a little bit of a history, which

11   perhaps all the counsel aren't aware of, this statute was

12   passed, I believe, in 1989, and was on the books. And it

13   got to the point where the airports prohibited the

14   separately charging of these charges in the contracts with

15   the industry. And so it wasn't being charged.

16          But then they got hold of some law, and they

17   read the statute more carefully, and they got a legal

18   opinion -- this was all given to this Court -- and they

19   determined, just like Your Honor did, that the statute was

20   poorly drafted and ambiguous; and, in fact, they

21   determined that the statute might require the separate

22   charging and unbundling of these charges.

23          So you know what they did? They got rid of

24   those prohibitions in the contracts, and all the industry

25   was permitted to charge these charges which, of course,

1  they proceeded to do.

2              And then, later on, there was legislation that

3  tried to change the law to take out the exception for any

4  fees paid to airports, which would have outlawed these

5  charges.

6              And as Enterprise, I think, described in

7  detail in its brief, that legislation was rejected.  Even

8  though the Attorney General of Nevada, Frankie Sue De

9  Papa, said in a correspondence, quite clearly, that these

10  charges were lawful and they should be made unlawful.  And

11  it never happened.  Legislature didn't pass that law.

12              And not only did the airport authorities

13  permit these charges -- it's not like the industry was out

14  on a lark of its own doing some naughty trick, the

15  airports -- the Reno -- Reno Airport mandated this charge.

16              There was an agreement with Hertz, and I

17  believe the other car rental companies, that mandated the

18  separate charging of these charges with good disclosures

19  from 1997 to 2005.

20              And so for a consumer protection lawsuit to be

21  protecting anybody when there's good disclosures being

22  given and the official airport authorities are --

23  quasi-governmental groups are not only permitting these

24  things, these charges, but requiring them in some cases,

25  is just a very unusual situation.

1     I think Your Honor recognized that in his

2   ruling on summary judgment where Your Honor said that

3   these were requirements that may have been foreign to the

4   industry.

5     And, Your Honor, when you decided summary

6   judgment motion and you decided that Hertz had not

7   violated the Deceptive Practices Act on page 17 of

8   document 111, in Your Honor's ruling of March 17, 2010,

9   when you were analyzing the -- whether Hertz could have

10   violated the Deceptive Practices Act, and you talked about

11   the knowing requirement of intent and knowing violation --

12   and this is what Your Honor said:

13     "In light of the substantial uncertainty

14   surrounding section 482.31575's requirements, it would be

15   difficult to establish that Hertz intentionally

16   circumvented the requirements of the statute.  Indeed,

17   plaintiffs have failed to present evidence suggesting that

18   Hertz knowingly violated --" and then you repeat the name

19   of that statute.

20     So I guess the bottom line here is that

21   everybody seems to have recognized, both the executive

22   branch and the judicial branch, Your Honor, and to some

23   extent the legislative branch, that there was a lack of

24   clarity here and that what the industry was doing --

25   remember, this is a charge that started in 1996, after the

1    prohibition was removed.  So this charge had been going on

2    for about 10 years before the suit was brought, and it's

3    now been going on for 15 years.  Nothing has ever changed.

4           So the settlement of this case against that

5    backdrop -- and I'm not going to repeat the arguments we

6    made about why damages and unjust enrichment can't be

7    recovered, because I think those are clear.  And nobody,

8    nobody, not a single objector took on our arguments about

9    that except Jordana Cooper from Florida.  She made a stab

10   at saying that the damages would automatically be

11   recoverable.  And we responded to that.  So I'm not going

12   to rehearse that again.

13          But all these other objectors who are on the

14   telephone today and who are in this courtroom, not a

15   single one of them has acknowledged or taken into account,

16   at least overtly, in their briefing the very serious

17   weaknesses in this case, not only on liability but also on

18   any monetary recovery, whether it be damages or equitable

19   monetary relief.

20          The notice was given to 50 state attorneys

21   general under the Class Action Fairness Act, so-called

22   CAFA, where you have to notify all the AGs of the

23   settlement.  Not a single one of them has objected or come

24   before this Court or made any presentation about any

25   infirmities in the settlement.

1          In fact, I believe from Mr. Zlotnick that

2    there was inquiry made by several attorneys general who

3    have a committee under the so-called NAG, National

4    Association of Attorneys General.  That committee was in

5    official touch with plaintiffs' counsel to discuss the

6    settlement and assure themselves that it was fair or not

7    problematic.  And their silence here speaks for itself.

8          This is not a case -- a lot of cases are

9    settled where there are structural changes and you make

10   better disclosures and you put better documents on the

11   rental record.  This is the converse.  The legislature,

12   the world has caught up to what the industry has already

13   been doing.  The best practices have been in effect for

14   many years.  And so that part of the lawsuit made no sense

15   to us.

16         Turning to the objections.  The thrust of the

17   objections, most of them -- I mean, there are many, many,

18   and we dealt with them on paper, but is that aside from

19   the fees they're all -- most of them are challenging the

20   fees, and we're not speaking to that, obviously.

21         They're basically saying it's a bad coupon

22   settlement.  And it's like reading the very elegant and

23   well-written brief by -- the Little Rock Class Action

24   Fairness Center, I believe is the name of it, goes on and

25   on.  And it reads like a primmer on what's wrong with

1  so-called coupon settlements, which have been subject to

2  serious abuse and which got -- the word coupon got a bad

3  name.

4          Yes, we avoided using the name coupon,

5  Mr. Greenberg, yes, we didn't use it, because this is not

6  a settlement that's abusive.  We need another word that

7  doesn't have that pejorative connotation.  And they wrote

8  a cute footnote about how skirting around coupon shows

9  that we're afraid of something.

10         We're not.  This is not a settlement.  For

11  instance, the worst kind of coupon is one where you get a

12  couple hundred dollars -- I was just reading in the

13  California Lawyer magazine -- and I'm not criticizing that

14  settlement.  They had a 50-day bench trial, and there are

15  lots of other facts that I don't know about.

16         But that settlement had a $300 or $500 coupon.

17  You could use it to buy a car for 30, $50,000.  And I

18  think they had like a few hundred or a thousand people

19  sign up for that settlement.  It just wasn't very

20  attractive.

21         Now, again, I'm not saying that's an unfair,

22  unreasonable settlement, because I don't know all the

23  facts in that case, but it's very, very different from

24  what we have here, where we have a $10 or $20 certificate

25  usable against a transaction that might be as little as

1   50, 60, $80, maybe $100, $150. That's a substantial

2   percentage off. You can add it to your ABA affinity

3   discount, as Mr. Zlotnick said. So this is not that kind

4   of settlement.

5          And we didn't just get -- by the way, Your

6   Honor, we didn't just get a few hundred or a thousand

7   people signing up for these benefits. We have to date

8   about 87,000 people, collectively, who have signed up for

9   these benefits, registration.

10         Reasonably, you use the word registration

11  instead of the word claim. Claim has become a dirty word

12  for some people because of these ridiculous 20-page claim

13  forms, where there are big hurdles and you have to answer

14  a lot of questions.

15         This is a simple registration, where you just

16  basically fill in two or three fields of information that

17  everybody knows about themselves, like their name and the

18  number that's on your settlement notice. And, bingo,

19  you're in. So we had 87,000 people signing up for that.

20         Now, of course that's a small percentage of

21  two and a half million. But that's not the proper

22  comparisons. You know, most people don't even read

23  messages that come on their computer or that appear to be

24  from people they don't know. It's too bad. We tried to

25  send these out in batches and avoid spam filter problems

1  and all that.

2           But, you know, 87,000 people, it's about --

3  going to be three or four percent. It's above the kind of

4  one percent, two percent levels that are criticized in

5  Mr. Greenberg's brief.

6           It's a fair settlement, especially when

7  compared to the lack of merit and lack of recoverability

8  in the case. All of them want a better coupon. That's

9  essentially -- they all want a longer expiration period.

10 They want a greater transferability. They want a higher

11 amount, face amount.

12          Well, you know, that wasn't the deal. We were

13 in the trenches for five years, the counsel, and we had an

14 experienced mediator who was a neutral. We sat in

15 different rooms. There was no collusion. Anybody who'd

16 use the word collusion, that's just out in the ozone for

17 me.

18          That has nothing to do with this case.

19 There's not a shred of evidence about that, which is

20 another reason this was briefed why discovery -- the one

21 intervenor objector wanted discovery. That's not

22 reasonable in this situation.

23          The fact is that 18 months is a lot longer

24 than a number of settlements that have been approved,

25 which we cited to the Court. Ten or twenty dollars is a

1  very substantial amount for these kind of transactions.

2  That speaks for itself.  Anybody who has rented a car

3  knows that.

4          And the transferability.  That was negotiated.

5  We wanted people to -- settlement class members, to get

6  their certificates, and they wanted, you know, complete

7  and full transferability.  So we negotiated, okay,

8  everybody in your family lives at the same address -- so

9  we can check on it and have some control over fraud.  You

10  know, we don't want to see it on eBay and other exchanges.

11  It cheapens the brand.

12          And that's just settlement compromise

13  negotiation.  There's no rule that comes down ex cathedra

14  from the case law or anyplace else that says that you have

15  to have any particular kind of term for the face amount or

16  the expiration or the transferability.  These are all the

17  compromises, and fair ones, I think, under the

18  circumstances of the lack of merit of this case.

19          There's no requirement that the full value of

20  the certificates be valued and that leftover go to

21  charity, all of that business that's great for law review

22  articles.

23          The judges sitting in the courts of this

24  country haven't bought those arguments, for the most part,

25  and certainly haven't -- and in the Ninth Circuit, haven't

38

1    required it.

2           Your Honor has the Fleury case cited by Judge

3    Chen, Magistrate Judge Chen, who was just confirmed of the

4    Article III judge, goes into a lot of these issues.

5           Your Honor has the Cuisinart case and the

6    Western Union case that have approved settlements of this

7    type time and again and that collect the cases where those

8    kind of settlements are approved.

9           So I think I will close with that.  I win a

10   personal award for the court reporter not stopping me and

11   telling me slow down because I've had that happen almost

12   every time I get up to speak.  And so I'm very proud for

13   today's performance.

14          And I'll just say that Hertz believes that

15   this settlement deserves approval.  The very thoughtful

16   and intellectually interesting objections that have been

17   lodged here have nothing to do with the realities of this

18   case and the fairness of this settlement.  That's the way

19   we see it.  Thank you.

20          THE COURT:  Thank you, Mr. Hecker.

21          Other defense counsel on behalf of the parties?

22          MS. SCANCARELLI:  Thank you, Your Honor.  Janine

23   Scancarelli for Enterprise and Vanguard.  I'll be brief.

24          You asked a question earlier about the

25   distribution, the relative number of $10 and $20

1  certificates. I don't have that information for the

2  people who have registered for benefits, but of the total

3  number of class members for Enterprise and Vanguard, the

4  vast majority would qualify for $10 certificates. They

5  had rented once or twice, something on the order of 95

6  percent.

7          I also want to provide the Court with some

8  updated information about the registrations. In the

9  declarations that Enterprise, Vanguard and Hertz presented

10  to -- filed with the Court a couple of weeks ago, the

11  total number of registrants at that time was about 85,000.

12          And since then, as counsel have indicated,

13  there have been additional registrations. The current

14  number -- the latest number I have from a couple of days

15  ago is about 87,700. And as Mr. Zlotnick noted, the class

16  registration period remains open until the middle of July.

17          THE COURT: All right. Thank you.

18          MS. SCANCARELLI: I wanted to emphasize the fact

19  that in evaluating any settlement it is crucial to focus on

20  the strength of the case here. And, of course, Mr. Hecker

21  has talked about that. I'd like to speak about that very

22  briefly.

23          In order to get any recovery in this case at

24  all, if the case continues to be litigated, the plaintiffs

25  would have to overcome a number of hurdles. And those

1   hurdles include the certification of a class.  Although we

2   have a settlement class that the Court has approved here,

3   settlement classes are evaluated under a standard that's

4   different from the standard for a litigated class.  And

5   questions of manageability, which were not at issue in

6   considering the settlement class, would have to be

7   considered if the case were to go forward in litigation.

8           So there's the class certification issue.

9   Another hurdle is the liability hurdle.

10          Now, I recognize that -- respectfully, that

11  Your Honor has found liability.  But those rulings for

12  Hertz are subject to appeal.  And that appeal is an

13  uncertain process and also a lengthy process.

14          Moreover, the third hurdle, even if liability

15  stands, there's the question of causation and damages,

16  which Mr. Zlotnick and Mr. Hecker have addressed.

17          Mr. Zlotnick referred to the question of

18  whether significant or material damages are available.

19          We believe no damages are available at all.

20  And we note that there is no statutory damage provision

21  and also that the plaintiffs would have a high causation

22  barrier to overcome as well in proving damages.  They must

23  prove causation as well as amount.

24          The equitable relief issue has been discussed

25  by Mr. Zlotnick and Mr. Hecker.

1          I want to emphasize the fact that the statute

2    at issue here is one that the Court found was ambiguous

3    and poorly written, and that is a -- that, plus the fact

4    that all of the defendants made full disclosures of the

5    amounts charged, is a substantial hurdle to the recovery

6    of any equitable relief.

7          And I want to note also that the -- there is

8    evidence in the record from the summary judgment motions

9    as to the practices of various companies.  And they

10   include the fact that when customers rent cars and reserve

11   cars, they are provided with the total amount of the

12   rental as well as the amount of the various airport

13   concession recovery fees and other incidentals.

14         And if you look at any travel website, which,

15   of course, is the way that many people now are making

16   their reservations, the comparisons are made by full

17   price.  And, in fact, a number of objectors wrote in and

18   in their objections stated:  I knew what I was paying for.

19         And that's one of the reasons they say they

20   don't believe there's a case.

21         Thank you, Your Honor.

22         THE COURT:  All right.  Thank you very much.

23         All right.  Do we have any further appearances

24   by counsel on behalf of the parties?  I don't think so.

25         All right.  I'd like to go to counsel for the

42

1    objectors first.

2              And, Mr. Greenberg, you are present here in

3    the courtroom.  You were first identified.  And I'll allow

4    you to go forward at this time.

5              MR. GREENBERG:  Thank you, Your Honor.  May it

6    please the Court.  My name is Dan Greenberg.  I represent two

7    objectors.  And I only want to speak, of course, on the

8    fundamental question of the settlement and not on the

9    attorneys' fees, which I suppose we might deal with later.

10             But it seems to me that there are two very

11   large questions about the fairness of this settlement, and

12   those questions are how, if at all, has the class been

13   harmed; and how, if at all, is the class being

14   compensated.

15             I think we have to answer both of those

16   questions basically with dollars.  And we have to compare

17   those two dollars to each other.  If we're going to comply

18   with Rule 23, there's no way to figure out whether we're

19   complying with Rule 23 unless we compare how the class has

20   been harmed with how the class is being compensated.

21             And, of course, as I addressed in my brief,

22   it's very difficult to figure out from the information

23   that we've gotten how much in dollar figures the class has

24   been harmed and how much these coupons are going to

25   compensate the class.

43

1        In fact, we've now gotten more information

2   just in this courtroom about the percentage of 10 and $20

3   coupons just in the last few minutes than the class has

4   had in a long time.

5        We gave an estimate in our briefs that the

6   appropriate answers to these questions are something like

7   that each class member has been damaged something like 10

8   or $20 and that each class member receives on average in

9   compensation about 20 cents.  And that disparity is very

10  troubling.

11       There's a reason that that disparity is

12  troubling, which is there's a series of cases in another

13  circuit -- and we, of course briefed this -- there's a

14  series of cases in another circuit, *Murray versus GMAC*,

15  and they say that whenever you have a settlement agreement

16  that has gigantic disparities between the relief that's

17  requested or called for and the relief that's received by

18  means of settlement, then there's reason for very strong

19  scrutiny.

20       And if the parties have each been harmed by a

21  dollar and are compensated by a dollar, I don't know that

22  I would have a lot of objections to this.  But this is not

23  that case.

24       This is a case where it looks like the parties

25  have been harmed by, you know, approximately -- to keep

44

1   the ratios constant, this is a case where the parties have

2   each lost $100 and they're being compensated by one

3   dollar. And when there's a settlement that compensates

4   people for one percent of the injuries that they've

5   suffered, there's a serious problem.

6           And according to *Murray versus GMAC*, one of

7   the cases, you might think about looking at one of two

8   alternatives. One is that the class is being radically

9   undercompensated, that the class is really only receiving

10  one percent of the harms that it's suffered. And in that

11  case, if the classes are only getting one percent of the

12  harms that it suffered, then it kind of looks like it's a

13  possibility that the class counsel has violated its duty

14  to the class.

15          And there's another possibility that in the

16  case where class -- where the class is only getting one

17  percent of what it's been harmed, another possibility is

18  that class counsel really thinks that there's something

19  like a one percent chance of winning the suit.

20          Well, if there's only one percent chance of

21  winning a suit, then there's a possibility, I would say,

22  that this Court might see that action as pretty frivolous.

23  And either way, things should not have reached the

24  settlement stage. Either way, something has gone terribly

25  wrong.

1            And so I would respectfully request that the

2  Court take notice of this huge disparity between the

3  class's injury and class's compensation.  And it's hard

4  for me to see what the explanation for it would be that

5  reflects very well on the settlement.

6            But, fundamentally, the reason that we filed

7  this objection and made this point is that, you know, we

8  don't know.  We, as objectors, really have not been given

9  the kind of information we need to figure out what the

10  realistic aspect is of what the harms are per class member

11  and what the compensation is per class member.

12            But what we do know is that the settlement is

13  going to extinguish every plaintiffs' claim.  We do know

14  the coupon settlements are going to -- in general, are

15  going to benefit two parties.

16            The first party is that class counsel is going

17  to walk away with a pretty large fee; and the second party

18  that benefits is that the defendants are going to have all

19  their claims extinguished.

20            And the class members are going to be left

21  with coupons.  And it's very hard to say, because we don't

22  know -- again, we don't have enough information to say

23  whether these coupons really benefit or harm the car

24  companies.

25            You know, it's hard to say whether it's a

1    court-ordered promotional campaign for these corporations.

2    It's hard to say whether they lose money or gain money by

3    the use of these coupons. Nobody knows because we haven't

4    been given transparency in damages, we haven't been given

5    transparency and what the real value of these coupons is.

6    And until we have that, it's very, very hard to say

7    whether this complies with Rule 23.

8         Now, I appreciate very much Mr. Hecker's kind

9    words about my brief. And I want to say, in closing, I

10   was kind of reminded by his remarks of something -- well,

11   I was really struck by this. This has kind of been one of

12   the main lessons of my life when I worked with

13   universities a while back.

14        I want to tell a brief story about a

15   chancellor that I once knew, Chancellor Lawrence Davis,

16   who is chancellor of a university back in Arkansas. And

17   he had a meeting with several people. They were very

18   concerned about how well the university was doing.

19        And these consultants came to him and they

20   said: You know, you need to change the language that you

21   use. You need to describe things very differently than

22   you do because this university has strong public relations

23   problems. We need to fix those. And so you need to

24   change all the words that you're using.

25        And it's sort of similar to these statements

1    that -- you know, that we've heard from counsel already

2    that, you know, this is why we don't call them coupons we

3    call them certificates.  This is why we don't call it a

4    claims process, we call it a registration process.

5            And Chancellor Davis, when he heard this

6    method of dealing with these problems, he said:  You know,

7    there's another way that we might fix these problems that

8    you're talking about, and that's this.  To change the

9    image, let's change the reality.  Let's worry a little bit

10   less about the labels that we're going to use.

11           And, respectfully, Your Honor, as long as

12   these coupons, on average, are benefitting class members

13   at 20 cents a pop, yeah, coupon settlements are going to

14   have a bad image.  And I think that the reason that they

15   have a bad imagine is that there's a bad reality.

16           I hope that we can address the reality by

17   looking at the fundamental unfairness for the settlement

18   under Rule 23.

19           Thank you very much for your time.

20           THE COURT:  Thank you, Mr. Greenberg.

21           All right.  Mr. Giles.  You're present in the

22   courtroom.  On behalf of objectors Burke, please go

23   forward.

24           MR. GILES:  Good morning, Your Honor.  Thank

25   you.  I won't repeat anything that has been said nor anything

1    that's in my brief.

2              But I think that the figures put forth today say

3    it all.  You've got a class of two and a half million.

4    90,000 have come forward and had their say.  That's three to

5    four percent.

6              I think it's a meaningless settlement for these

7    coupons to be sent out there; and the parties to this would

8    be much better off with a check from Hertz.

9              Certainly, the residual amount, the 95 percent

10   of the claimants who don't come forward, the money that would

11   go to them, whether it's 10 or $20 cash or whether it's the

12   actual cash value of these coupons -- and I think there's

13   probably some way that Hertz can figure out what the actual

14   cash value is -- that money should be made in a Cy Pres award

15   to some institution like Nevada Legal Services or Washoe

16   County Legal Services or, perhaps, even the National Consumer

17   Law Center.  They do work all cross the country.

18             Certainly, if Hertz has done something wrong,

19   they should be made to pay.  On the other hand, if they

20   haven't -- and I could see from the arguments today that's a

21   big issue -- they shouldn't pay anything.  That's clear.

22   They shouldn't just settle this to get rid of it.

23             But, you know, if there's been some wrongdoing

24   here, then it should be cash that they have to pay.  These

25   coupons are meaningless, and the claimants have told us that.

49

1           Thank you.

2           THE COURT: All right. Thank you, Mr. Giles.

3           All right. Mr. Ewusiak.

4           MR. EWUSIAK: Yes, Your Honor. This is Joel

5   Ewusiak and Haley Maple on behalf of the objector Scott

6   Schutzman. Thank you for allowing us to appear this morning.

7   And I'll keep it brief.

8           The key here is quantification. And what I mean

9   by that picks up on the theme raised by Mr. Greenberg, and

10  that is in the DHS Express decision, which is outlined in our

11  objection, the Court reversed the coupon settlement, and I'm

12  quoting here, "because the trial court did not attempt to

13  quantify the value of the plaintiff's case or even the

14  overall value of the settlement offered to class members."

15          And so what have we heard here today? We have

16  heard counsel for the parties talk about how weak the case

17  is and, therefore, this settlement is weak.

18          That's not good enough. And it's also not

19  good enough to submit that the coupons have a purported

20  case value -- I'm sorry, purported face value of 10 or $20

21  and that a certain number of members, albeit a low number

22  of approximately 87,000, have registered for them.

23          The coupon settlement must be quantified

24  following an analysis by the Court that considers various

25  factors, the first of which would be the terms and

1   restrictions of the coupons themselves.  As we've outlined

2   in our objection as you've heard today from counsel for

3   the parties, they've talked about the terms about submit

4   to the Court, which we have outlined in our objection,

5   that those terms and restrictions reduce the value of the

6   coupons.

7           One, they must be used in connection with

8   business with the defendants.  They're not convertible to

9   cash, albeit even at a discount which would be better

10  than -- even if you couldn't redeem them for a full face

11  value, at least that a discount would be appropriate.

12          Secondly is the restriction on the

13  transferability.  There seems to be a suggestion that

14  these are freely transferrable, but the reality is they're

15  limited to immediate family members only residing at the

16  same address.  And as we've outlined in our objection,

17  that severely restricts the ability of individuals to use

18  them.

19          Also the duration of the coupon is limited to

20  18 months.  And there's really no discussion in the

21  settlement agreement, or otherwise, as to how these

22  coupons are to be presented, other than they can be used

23  in conjunction with other ones.

24          So in order for the Court to determine and

25  quantify the value of the settlement, the Court has to not

1 only analyze the actual terms and conditions of the

2 certificates, coupons, whatever you want to call them,

3 themselves, but also beyond the number that have

4 registered for them, the actual redemption of those

5 certificates.

6 And so why we've asked, on behalf of objector

7 Schutzman, to take narrowly tailored discovery is so that

8 in addition to considering the terms and restrictions

9 placed upon the certificates themselves, which would

10 impact the valuation, but also to get into this issue of

11 redemption.

12 And what I'm asking the judge to do is to

13 allow us to take discovery on historical redemption rates

14 for the defense coupons. Certainly, they keep those

15 records. And they could present the Court with the

16 statistics that they have in terms of the number of

17 coupons dispersed and the number that are actually used.

18 Additionally, we would want discovery on the

19 transferability restrictions that the defendant places on

20 their other coupons that they provide to the consumers.

21 And the Court can then make a comparison and

22 evaluation of the fairness of the coupons themselves by

23 looking at the transferability of other coupons and other

24 settings, not just this coupon that has been provided to

25 the class members.

1        Additionally, under CAFA, which counsel has

2   referenced before, in its discretion the Court, and its

3   per statute, can consider expert testimony on the actual

4   value to class members of coupons that are redeemed.

5        I would submit to the Court that until there's

6   value of the settlement has been quantified -- and, as

7   Mr. Greenberg had suggested and stated, that's putting an

8   amount on the value of the coupons, the Court cannot

9   assess the fairness of them.

10       And, again, that would be taking into

11  consideration all the facts and circumstances surrounding

12  the restrictions and terms of the coupons and,

13  additionally, the redemption rates that are associated

14  with these.

15       Because I think what you're going to find,

16  Your Honor, is that currently we have 87,000, you know,

17  which is roughly three or four percent of the class that

18  has been registered for the coupons -- certainly not all

19  of those -- in light of the restrictions of the coupons

20  and historical redemption rates, are not going to use

21  them, what I think that the objector and the position

22  we're going to take here is, you're going to find that the

23  value of this coupon settlement is very low.

24       And then what you can access from that is once

25  you can evaluate the value of the settlement, you've got

1 | to evaluate and quantify the value of the case.

2 | And, yes, we've heard that it's weak and, yes,

3 | we've heard all these arguments it's a liability and

4 | damages, but we haven't heard anyone quantify it.

5 | We've heard plaintiffs' counsel say that the

6 | recoverable damages are anywhere from one to $20 per

7 | member if they go forward with trial. We've heard counsel

8 | for the defense say that there's no damages.

9 | Certainly it's an inexact science. But the

10 | Court has to quantify the value of this case, quantify the

11 | value of the coupons and compare the two to determine

12 | whether or not this is a fair settlement.

13 | I know that we're not going to get into fees.

14 | I just mention very briefly, though, however, that

15 | quantification of the value of the coupons is very

16 | important in relation to the fee analysis.

17 | There's been some suggestion that because they

18 | want their loadstar and it's not based on a common fund

19 | theory that somehow the valuation of the coupons is not

20 | necessary. I completely disagree with that.

21 | The Fleury case, in fact the HP Inkjet case,

22 | specifically provide that even if a loadstar analysis is

23 | undertaken with respect to counsel's fee, that the Court

24 | still needs to make an evaluation of the benefits

25 | conferred in order to determine whether or not that

54

1 | loadstar is accurate.

2 | And in this recent HP Inkjet case which cites

3 | to Fleury, which is relied on by the parties, the court

4 | goes through this analysis. It puts an evaluation and

5 | quantification on the amount of coupon settlement and then

6 | determines that the loadstar is too high and hacks it down

7 | to the value of the settlement.

8 | So I would submit to the Court that this

9 | analysis has not been done and that this is not a fair and

10 | reasonable settlement; and until these issues are

11 | addressed that it should not be approved.

12 | Thank you very much.

13 | THE COURT: All right. Thank you, Mr. Ewusiak.

14 | I believe we also have on the telephone

15 | conference Mr. Cox on behalf of objector Nash; is that

16 | correct?

17 | MR. COX: This is Tom Cox, Your Honor, for

18 | objector Paige Nash.

19 | THE COURT: All right. You may go ahead,

20 | please.

21 | MR. COX: The only thing I wanted to add, I

22 | won't comment or repeat what's already been said on the

23 | objections, Paige Nash did have multiple rentals; eight. I

24 | think that's been partially addressed.

25 | We do think it's unfair that the people that had

1 | multiple rentals are only getting a $20 coupon.

2 | And the other point that we did address is what

3 | percent of class is actually getting notice of this

4 | settlement?  In our objection we felt that it should be 70 to

5 | 95 percent was a fair target.  And I've not heard anything as

6 | to the amount of the class that this plan believes is

7 | receiving notice.

8 | Other than that, I would direct the Court to the

9 | objection.

10 | Thank you, Your Honor.

11 | THE COURT:  All right.  Thank you, Mr. Cox.

12 | All right.  Did Mr. DeWitt ever join us by

13 | telephonic conference?  I don't hear him.

14 | All right.  Are there any other counsel,

15 | present or available by telephone, representing an

16 | objector?

17 | It appearing that there are none, I'll give

18 | plaintiffs' counsel an opportunity for a brief reply.

19 | MR. ZLOTNICK:  Thank you, Your Honor.  David

20 | Zlotnick again for plaintiffs Sobel, et al., and the class.

21 | I will briefly reply to the issues raised by

22 | the objectors.

23 | And I'd like to start with the interesting

24 | position that Mr. Greenberg puts forward, that there are

25 | two possibilities; one that the class is being radically

56

1    undercompensated, and the other one that the case is

2    frivolous.

3                 Well, I think -- you know, the idea that the

4    case would be frivolous is totally unwarranted, given the

5    fact that the Court had granted summary judgment in favor

6    of plaintiffs on the primary claim that was asserted here.

7    This is not a frivolous case; it never was a frivolous

8    case.

9                 But we have to face the reality that, from its

10   interception, an important element of the case was to

11   change defendants' practices to get injunctive relief.

12   And the legislature took that away from us. And it --

13   it's -- you know, the case was never frivolous, but the

14   dynamic necessarily changed when the legislature revised

15   the statute.

16                The other point that really answers that

17   question is there is another possibility, besides the

18   class being undercompensated and the case being frivolous,

19   and that is that there's a good claim but there are low

20   damages, very low damages.

21                Now, that is precisely the type of case that

22   the class action mechanism was designed, in part, to

23   address, Your Honor. People who have valid claims but

24   small ones are allowed to group together under Rule 23 to

25   form a class. And that is this case, Your Honor.

57

1            Obviously at the inception, we believed that

2    we could, hopefully, get restitution of the full amount of

3    these charges, and that was our -- our goal.  But even

4    there you're dealing with damages typically of 10 or 20 or

5    $30 because you're dealing with 10 percent of a car

6    rental.  At its best, this is a case of modest damages.

7            And that's part of the reason too that the

8    injunctive relief was an important element of the relief

9    we were seeking.

10           The law changed and Your Honor's rulings

11   changed.  The case wasn't frivolous, but we have to adapt

12   to changes in the law and to the Court's rulings on the

13   merits of the claims as well as the lack of merits of some

14   of the claims that Your Honor found in the summary

15   judgment motions.

16           We had to face the reality that it was highly

17   unlikely that we would get restitution of the full amount

18   of these charges and that our damages case, as we

19   developed it with our experts, was a difficult one to make

20   out.

21           And defendants claim that there are no

22   damages.  We think we could establish some modest damages.

23   But it would be very modest.

24           I do take issue with Mr. Greenberg's

25   mathematics on one respect.  And he says that each class

1  member receives 20 cents on average. Well, I mean, I

2  guess if you count the 2.5 million class members and

3  you -- I don't know how he comes out exactly to that

4  number. But it's based on the fact -- the primary factor

5  in there is that most of the people don't submit claims in

6  low monetary -- low damage cases where the awards are

7  modest.

8           And that's a reality. That is a reality.

9  That doesn't mean that the 90,000 people or 87,700 people

10 who have already submitted claims, you know, regard this

11 as of no value or don't see value in the settlement. They

12 obviously do. They have taken the time, albeit a modest

13 amount of time, to read the notice and register for

14 claims.

15          So there is real value. And the use of the

16 fact that 90-some percent of the people will never

17 register to change the value of what's being offered and

18 given in the settlement is really not fair, Your Honor.

19          The people are getting -- the people who

20 register for this settlement are getting a coupon for 10

21 or $20 off of a -- as Mr. Hecker pointed out, a modest

22 transaction, a car rental transaction that typically may

23 cost a total of 100 or $200.

24          This is not analogous to the cases where

25 people get a small discount or a relatively modest

59

1   discount off of a major transaction that they do only

2   rarely.  This is a common transaction for many people, and

3   they are getting a substantial percentage discount off of

4   the total transaction price, which is what gives it real

5   value.

6           The -- in addition to the fact, as we noted

7   earlier, that it can be -- the coupons or certificates can

8   be used in conjunction with other discounts, which the

9   typical coupons that Hertz and other rental companies

10  issue cannot.  So that distinguishes -- I know one of the

11  objectors raised the point that we should look at

12  historical redemption rates on coupons.

13          Well, they send out coupons all of the time.

14  But the reality is that the coupons are off of some base

15  rate that's no better than the rate that one could --

16  that's worse or more expensive than the rate one

17  ordinarily gets or is for a weekend rental which has a

18  restriction that -- you know, when they have excess cars

19  in their inventory.  These coupons do not have such

20  restrictions and they have -- therefore, have real value.

21          Mr. Cox raised the question as to the

22  percentage of people getting the notice and correctly said

23  that it should be, you know, at least 70 to 90 percent.

24  We agree.  And the notice here was sent primarily by

25  direct mail.

1          Hertz sent e-mail notice to a certain portion

2     of people for whom it has regular e-mail addresses, people

3     who belong to the Hertz Number One Club and who had given

4     Hertz their e-mail addresses.

5          The other people were all sent notice by mail,

6     standard mail.  And, therefore, we are confident that the

7     notice did reach well above 70 percent, and probably 80 to

8     90 percent of the class members.

9          Certainly, the fact that almost 90,000 people

10    have responded, which is well above historical norms that

11    Mr. Greenberg cites in his brief in terms of low dollar

12    amount certificate settlements shows that the notice

13    program was fair.

14          Your Honor, some of the objectors have

15    implied, at least, that the Court has to mathematically

16    quantify the value of the case and the terms of the

17    settlement.  That is not required by the case law.  The

18    Court does have to assess those factors.  The Court has to

19    come to a reasonable judgment about those factors.

20          But I am familiar with this case.  Our expert

21    is familiar with this case.  It is impossible to come to a

22    firm mathematical quantification of the value of the

23    claims.  And, you know, it would be nice if we could, but

24    we can't.

25          What we can conclude and what we have

61

1 concluded, Your Honor, is that there are valid claims

2 here, but a very modest amount. And that is why this

3 settlement, which afford certificates of a reasonable

4 percentage off of a rental transaction, is a fair and

5 reasonable resolution of this case.

6          Thank you, Your Honor.

7          THE COURT:  Thank you, Mr. Zlotnick.

8          Mr. Hecker?

9          MR. HECKER:  Thank you, Your Honor.  I'm still

10 Peter Hecker for the Hertz Corporation.

11          Just very briefly.  I agree with most of what

12 Mr. Zlotnick said about the problems with the objectors'

13 arguments.

14          The premises of Mr. Greenberg's analysis -- I

15 was never very good at math, but I know that these are

16 wrong.  Each class member gets -- is damaged 10 to $20.

17 But if there was no wrongdoing and there was full

18 disclosure and nobody was harmed, then people weren't

19 damaged 10 to $20.

20          His whole basis, the whole underlying

21 foundation for the house of cards of the law review

22 article that's wrong with coupon settlements is missing

23 here because this is not a case where there was any

24 wrongdoing or any need to punish the defendant or anything

25 else.  In fact, the law simply caught up with what the

62

1  industry had been doing.

2          And the idea that they're each getting 20

3  cents, and then he changed it to $100 of damage and one

4  dollar of compensation, started out with 10 or $20 of

5  damage and 20 cents, I don't know where he gets 20 cents

6  out of a certificate that gives you maybe 10 or 20 percent

7  off of your rental.  It's worth a lot more than 20 cents.

8  It says 10 or $20.

9          If he's putting the denominator as being the

10  entire amount of all the two and a half million people

11  and -- that's not reality here.  That's not -- frankly, I

12  think most of the two and a half million people aren't

13  registering in this case because they don't think that

14  they were wronged, and they don't really care to.

15          We got all these letters -- I got private

16  e-mails that didn't even go to plaintiffs' counsel saying,

17  you know:  Go fight this thing because I rented from

18  Hertz, I saw what the charges were, I'm a big person, and

19  I knew what the rules and regulations were.  I've had a

20  contract with Hertz, and they didn't breach it, and they

21  told me what the terms were.

22          So I have a feeling, you know, from our point

23  of view -- and I know that's a cliche for defense counsel

24  to say it, but from our point of view, this is a case

25  where it's very credible that a lot of people had that

1   feeling inside of them.

2            There is absolutely no need to mathematically

3   quantify anything here.  Mr. Zlotnick is correct about

4   that.

5            This is not a marketing campaign.  This

6   lawsuit is something the defendants never wanted and felt

7   was just, and the law has now caught up with what the

8   practices are.  And the idea that they wanted to settle

9   this to get a marketing campaign, that's just not correct.

10           I thought the story was very charming about

11  the chancellor at the university.  The problem with that

12  story is they had some real problems, apparently, at that

13  university; and, of course, branding and vocabulary is not

14  the way to get to real problems and reality.

15           Here the reality is okay.  And there's no

16  injustice.  There's nothing to fix.  We're trying to find

17  words that correspond to an already existing reality that

18  we're not ashamed of.  We're not defensive -- even though

19  we're defendants, we're not defensive about our practices.

20  These were best practices that the legislature just later

21  on caught up with.

22           Mr. Giles says that a check would have been

23  better, in his opinion, for most class members.  And there

24  were a number of objections that said we should be paid in

25  cash if the lawyers are getting cash.

64

1          And the simple fact of the matter is that

2     Hertz and I believe Enterprise and Vanguard were not

3     willing to settle this case with cash.  It's as simple as

4     that.  If cash was going to be -- and we made that very

5     clear to the mediator, who I am sure told the plaintiffs,

6     if cash was the ground rule here, then we would litigate.

7          And we felt we had a very strong case on

8     appeal, a strong case of no damage, and certainly the

9     means to litigate it.  So checks were not in the offing

10    and never would be and never will be for this case.

11         There is nothing -- you know, he said, well,

12    if there's a cause -- if you did something wrong, you

13    ought to pay for it.  Well, we didn't do anything wrong

14    but we are selecting, as a compromise, to get rid of the

15    litigation cost.  From our point of view, this is a case

16    to get rid of more and more years of litigation, some very

17    tiny risk that there would be some exposure in some area

18    of the case.

19         And that reflects the settlement offered and

20    ultimately agreed to -- and, by the way, they didn't agree

21    to what we offered.  There was a lot of negotiation back

22    and forth.  It ultimately reflects fairly what the merits

23    of the case are.

24         We just disagree with counsel from Florida who

25    are suggesting that there's a requirement, certainly not

1   in the Ninth Circuit here, that you mathematically

2   quantify and measure exactly what the value of a claim is.

3                As you can tell, Your Honor, our view is that

4   the value of the claim here is near or at zero.  Very

5   close to zero.  And the value of the settlement is

6   obviously much, much more than that.

7                And not only are we providing these

8   certificates to the 80,000 plus people who have already

9   claimed, and there may be more, but we're also paying hard

10  dollars to send notice to the settlement class.  Millions

11  of e-mails and mail -- and standard mail, as Your Honor

12  knows -- and I think that the -- we gave this figure to

13  plaintiffs' counsel.  It was in his brief.  To date it's

14  in excess of $750,000.

15               So if somebody is valuing the settlement,

16  that's part of it.  The notice and administration costs to

17  date -- and we're far from finished -- is in excess of

18  $750,000, collectively, for all the defendants.

19               Mr. Cox raised the issue about notice.  And I

20  agree with Mr. Zlotnick.  And we did put in the

21  supplemental declaration of our settlement administrator,

22  Mr. Gyomber, that indicated that although we sent over a

23  million mail and e-mails, there were only 75,000 e-mails

24  that had bounced back, which means they weren't received,

25  as I understand it.  And so that's not a bad record.

1    And any -- there was a national change of
2    address analysis that was performed before the standard
3    mail was sent out. So we did all of the things that are
4    suggested and required by the case law to give a full and
5    fair notice to the settlement class.

6    Finally, I would end with this as something I
7    forgot from my original presentation, but I'll just add it
8    here. And that is that just to underline the serious
9    infirmities and uncertainty in this case, after
10   plaintiff -- after the Court ruled on our motion to
11   dismiss a few years ago, instead of immediately filing a
12   motion for summary judgment or bringing lawsuits against
13   the rest of the industry, what did plaintiff counsel do?
14   They stipulated with us to send the case up to the Ninth
15   Circuit to find out what the answer is; if we're all
16   wrong, we might as well know in the beginning.

17   And what did this Court do? This Court in
18   document number 36, on December 5th, 2007, this Court
19   certified to the Ninth Circuit under 1292(b) the question
20   of the statute section 482.31575, and I quote: The Court
21   finds that there is substantial ground for a difference of
22   opinion as to the interpretation of that statute -- of
23   that section.

24   That has always been the case from the
25   beginning. And so we think, based upon that, among other

67

1   things, the settlement that's been agreed to and offered

2   here deserves approval. It's a very fair and reasonable

3   settlement which, as I say, many, many thousands of people

4   have willingly signed up for the benefits of that

5   settlement, not just a few hundred like in the Ford case.

6           Thank you, Your Honor.

7           THE COURT: All right. Thank you, Mr. Hecker.

8           All right. Ms. Scancarelli. Is it -- give me

9   the correct pronunciation of your name. I apologize for

10  that.

11          MS. SCANCARELLI: It's Scancarellli.

12          THE COURT: I was pretty close.

13          MS. SCANCARELLI: That was very good, yeah.

14  Janine Scancarelli for Enterprise and Vanguard.

15          With regard to the question of notice, I would

16  just like to point out that in addition to the supplemental

17  declaration of Mr. Gyomber, which Mr. Hecker referred to, the

18  Court does have a declaration from Donald J. Andra, who has

19  been the settlement administrator for Enterprise and

20  Vanguard, which outlines the steps that were taken in

21  connection with our notice.

22          I also would like to note that although

23  counsel for Mr. Schutzman have quite a lot to say about

24  what the law does require and what the Court has to do,

25  the cases actually don't support that.

68

1             And I also -- and I want to specifically

2    correct what might be a misinterpretation or a

3    misapprehension based on the remarks made about the Fleury

4    case.

5             In that case the redemption of the

6    certificates was checked, but it was not checked in order

7    to -- it was checked in order to see whether the loadstar

8    would be enhanced.  The counsel in that case received

9    their loadstar.  And the court recognized:  We don't

10   know -- I don't know what the redemption is going to be,

11   and I don't know the value and that's fine.

12            However, the court did in that case provide

13   the opportunity to look at the redemption rate later and

14   then decide whether an enhancement to the loadstar was

15   warranted.  And in that case an enhancement was provided.

16            But the loadstar was provided without

17   reference to the actual redemption rate.  It's just not

18   something that the Court has to consider under CAFA.

19   Thank you.

20            THE COURT:  All right.  Thank you.

21            Mr. Greenberg, I'll give you an opportunity for

22   a brief reply, if you'd like.

23            MR. GREENBERG:  Thank you, Your Honor.  Dan

24   Greenberg for objectors William Andrews and Walter Weber.

25            Judge, it seems like there's a difference of

1    opinion between plaintiff and defendant over here.  You've

2    heard one party saying that there are small damage -- this is

3    a small damages case.  You've heard another party say that

4    there are really no damages at all.

5            I'm kind of agnostic on this because objectors

6    don't have the information we need to figure out what the

7    damages are.  And a lot of objectors I think are in this

8    position.

9            There's been no transparency.  And as I said --

10   as I suggested before, there's been a line of cases in

11   another circuit, *Murray versus GMAC*, that takes into account

12   these two possibilities.  And there's a special reason for

13   scrutiny when there's a large difference between what the

14   differences are alleged to be and what the ultimate

15   settlement agreement is.

16           And when you have that large discrepancy,

17   something like a one-hundred-to-one ratio, which appeared to

18   be true in that case and also, by reasonable assumptions,

19   appears to be true in this case, then there's reason to be

20   concerned about the fairness of the settlement.

21           I tend to disagree that this is a small damage

22   case, in that -- as I said before, when I was standing

23   here before, I wouldn't be objecting -- we wouldn't be

24   objecting, if objectors were originally damaged one dollar

25   and were going to receive one dollar, if the magnitude of

70

1   those two things were comparable, the damages versus the

2   settlement.

3           But it seems like when there's a large

4   difference in magnitude, a one-hundred-to-one difference

5   or something in that area, it seems like there's really

6   reason for concern.

7           And, you know, it's hard to do the math,

8   right, unless we have transparency what the redemption

9   members are and how much class members have been harmed

10  and so forth.

11          But it seems to me that it's perfectly fair to

12  try to figure out how much each class member is being

13  compensated by saying here's the total amount of

14  compensation and dividing it by the total number of class

15  members.

16          And I'll tell you why. We have heard before,

17  and we're going to hear again, about how the response to

18  the settlement is overwhelmingly positive. We've heard

19  before that we're going to count all the class members who

20  didn't do anything as responding positively to this

21  settlement. I think you've got papers there that say the

22  response to the class has been overwhelmingly favorable.

23          But now we've been told that it's not fair to

24  say that we're going to take into account the 2.5 million

25  dollars when we actually compute class damages. It's

1 probably wrong to have this approach to say, you know,

2 when we want to count all the class members, we're going

3 to count all the class members, and when we don't want to

4 count the class members we're going to ignore them.

5 I think in my view, and it's our position

6 that, it's quite possible to make reasonable estimates.

7 You can't have exactitude on something like this, but it's

8 quite possible to make reasonable estimates and reasonable

9 predictions about redemption rates. There's lots of

10 historical data.

11 But we, as objectors, don't have that

12 information. Plaintiffs and defendants, I imagine, have a

13 great deal of information. But the objectors, until we

14 have some sort of reasonable level of transparency, are

15 never going to have that.

16 And there's no way for us to tell whether this

17 is fair and reasonable under Rule 23. That has to be

18 demonstrated. And unless and until it's demonstrated, I

19 don't see how this can be at all reasonable or fair under

20 Rule 23. Thank you.

21 THE COURT: Thank you, Mr. Greenberg.

22 Mr. Giles, is there anything that you would like

23 to reply?

24 MR. GILES: Nothing, Your Honor. Thank you.

25 THE COURT: All right.

72

1       With regard to counsel who are appearing

2   telephonically, are there any brief replies that any of you

3   would like to raise?

4       And let me go to Mr. Ewusiak first.

5       MR. EWUSIAK:  Yes, Your Honor, very briefly.

6   This is Joel Ewusiak for objector Scott Schutzman.

7       Again, I want to emphasize that -- the necessity

8   for the Court to quantify the value of the settlement and the

9   value of the case.  And we have cited to several cases that

10  explain this concept.  The one is the DHS Express case.  It's

11  463 F.3d 646.

12      And the other one which we contend is almost

13  directly on point with what's before Your Honor, and that is

14  *Figueroa versus Sharper Image.*  And the citation is 517

15  F.Supp.2d 1292.  The pinpoint cite I'm going to give you is

16  1327.  It's outlined in our objection.  And I'm just going to

17  read from it.

18      "Certainly the Court's role is not to engage in

19  a claim-by-claim, dollar-by-dollar evaluation but, rather, to

20  evaluate the proposed settlement in its totality.

21      "And" -- and I'm conceding this -- "the fact

22  that a proposed settlement amounts to only a fraction of the

23  potential recovery does not mean the settlement is unfair or

24  inadequate."  However, this approach must be taken.

25      "In conducting the analysis, the district court

1   should begin by quantifying the net expected value of

2   continued litigation to the class."

3            The court goes on:  "To do so, the court should

4   estimate the range of possible outcomes and ascribe a

5   probability to each point on the range.  Although we have

6   recognized that a high degree of precision cannot be expected

7   in valuing a litigation, the court should nevertheless insist

8   that the parties present evidence that would enable possible

9   outcomes to be estimated, so that the court can at least come

10  up with a ballpark valuation."

11           Your Honor, that simply has not been done here.

12  And as explained by the court in Figueroa, the court

13  continued on by explaining how the parties had not presented

14  any evidence as to a ballpark valuation.

15           Again, all we've had here is -- and this is what

16  happened in the Figueroa/Sharper Image case.  Recovery in

17  that case varied from zero to nothing.

18           And no evidence or other showing was made that

19  would enable the Court to estimate possible outcomes other

20  than the two extremes noted.

21           On the one hand you have defense counsel stating

22  that the case is worth nothing and the plaintiffs stating

23  that the case is worth a certain value.

24           So we would submit to the Court that this

25  valuation not only of the case but of the settlement

74

1   itself has to be undertaken in order to determine its

2   fairness.

3           And we thank you for your time today.  Thank

4   you.

5           THE COURT:  Thank you.

6           Mr. Cox?  Do we still have Thomas Cox for

7   objector Paige Nash?  Sounds like we do not.

8           MR. COX:  This is Tom Cox, Your Honor.

9           THE COURT:  All right.

10          MR. COX:  I don't have anything further to say.

11  I would just be repeating what the other objectors have said.

12          THE COURT:  All right.  I appreciate that,

13  Mr. Cox.

14          All right.  I think we've given everyone an

15  opportunity for argument and response and brief reply.

16          I need to call a recess because I have a

17  judge's meeting.  We will return at 1:30.

18          For any of you who are joining us

19  telephonically, you will need to call five minutes before

20  1:30.  And the new security code for access is 0023.

21          What I expect to do at 1:30 is to give you

22  either an indication of a ruling or a ruling with regard

23  to the value -- the essential value questions that have

24  been raised here this morning as they reflect upon the

25  question of fair, reasonable or adequate settlement.  And

75

1    I would, therefore, expect that certainly the counsel in

2    the courtroom would all be here at 1:30.

3              So at this time I'll go ahead and declare a

4    recess.  We'll see you at 1:30.

5                        (A recess was taken from

6                        11:47 a.m. until 1:32 p.m.)

7              THE COURT:  Be seated, please.

8              The record will show that we are reconvened

9    after the noon recess.  And all counsel appear to be

10   present.

11             Mr. Giles expressed to the court clerk that he

12   was not going to return after the recess, and so his

13   absence is certainly excused.

14             And I believe that we also have Mr. Ewusiak

15   and Ms. Maple.

16             Also, Mr. DeWitt, I understand that you're on

17   the phone at this time; is that correct?

18             MR. DEWITT:  Yes, Your Honor, it is.

19             THE COURT:  All right.  Well, for one reason or

20   another, we were unable to connect with you this morning

21   during the bulk of the hearing.

22             I would tell you I'm certainly well aware of

23   your objection which has been filed.  And I can -- you don't

24   have the benefit of having heard the hearing this morning,

25   but I can tell you that virtually everything you raised was

1   well covered among the remarks made by other objectors.

2           And I would tell you, for your benefit, that we

3   had counsel here on behalf of two of the objectors:

4   Mr. Greenberg, who had filed a rather extensive brief on

5   behalf of his objectors, Mr. Weber and I forget the other

6   gentleman's name; and Mr. Giles, an attorney in Reno who also

7   expressed some significant opposition on behalf of his

8   objecting client; and then telephonically we had Mr. Thomas

9   Cox for objector Paige Nash; and Ms. Ewusiak along with

10  Ms. Maple who expressed considerable objection on behalf of

11  his client, Mr. Schutzman.

12          So I think your issues have been well presented,

13  Mr. DeWitt. And I'm sorry that we weren't able to connect

14  with you this morning, but --

15          MR. DEWITT:  Well, Your Honor, if you believe

16  the issues have been well covered by --

17          THE COURT:  Go ahead.

18          MR. DEWITT:  I certainly probably have nothing

19  further to add.  I just didn't want to disrespect the Court

20  by not showing up to a hearing that I respectfully asked to

21  attend.

22          So if you feel it's been covered well enough,

23  then I would be happy to hang up and let the Court go about

24  its business, if that's what the Court would prefer.

25          THE COURT:  It's completely up to you.  You're

77

1   welcome to stay.

2           Essentially, the rest of the story is that the

3   only issue which we were effectively considering this

4   morning, because it really is the crux of the case, is

5   whether the offered settlement is fair, reasonable and

6   adequate in light of the coupon proposal which has been

7   submitted and the evidence which has been submitted in

8   support of that.

9           And other issues were not addressed because, at

10  the Court's invitation, that is the issue.  And I have

11  indicated that I would return at this time and at least give

12  an indication of what the Court's going to do.

13          So you're welcome to stay on the phone if you

14  want to listen to this, or you're welcome to get off as well.

15          MR. DEWITT:  Your Honor, with respect, if the

16  issues have been well presented, there's probably nothing

17  that I can add.

18          I appreciate the Court making the concession of

19  allowing me to appear by telephone; and I hope to have the

20  opportunity to appear in front of you in person at some

21  point, Judge, perhaps in the future.

22          Thank you very much, and I will ring off.  And

23  thank you very much.

24          THE COURT:  All right.  Thank you, Mr. DeWitt.

25          All right.  At this time, counsel, what I'm

1   going to do is tell you what I'm going to do, but I will

2   tell you, first of all, that I'm going to follow with a

3   written decision.

4           But since you're all here and you've made your

5   arguments and this has been carefully briefed and I don't

6   have any question in my mind what I'm going to do, I'm

7   going to reject the settlement that has been proposed

8   because I simply am not of the view that I can find it

9   fair, reasonable and adequate for the class members based

10  upon what has been presented.

11          Essentially, it's -- the burden is upon the

12  parties on both sides, frankly, to submit evidence to the

13  Court that will convince the Court that the proposed

14  settlement is fair, reasonable and adequate.

15          And what we have in this case is a coupon --

16  I'm sorry.  Someone is speaking and interrupting the

17  Court.  Please don't be speaking on your telephone lines.

18          What we have, essentially, here is a proposed

19  coupon settlement.  I can tell you that the Court was

20  willing to give it a preliminary approval because it was

21  clear that it followed a very careful -- a very careful

22  mediation in front of a respected mediator -- someone is

23  moving around on the telephone lines, and we're going to

24  have to shut those lines off if that continues because

25  whenever you move in your office or move papers, the noise

1  is amplified in the courtroom.

2          So, in any event, the Court's looking at a

3  coupon settlement here. And I am very influenced. I felt

4  it was a very well-written decision in the *True versus*

5  *American Honda Motor Company* case, a 2010 case from the

6  Central District in California, which focused upon

7  coupon-type settlements and -- under the CAFA, and

8  recognizes that coupon settlements are generally

9  disfavored due to the three common problems which tend to

10  arise with them; that being that they often do not provide

11  meaningful compensation to class members; they often fail

12  to disgorge ill-gotten gains from the defendant; and they

13  often require class members to do future business with the

14  defendant in order to receive compensation.

15          Clearly, the burden upon the Court in these

16  kinds of cases, particularly where there's a proposed

17  coupon settlement of a class action, is for the Court to

18  discern the value of the specific coupon settlement in

19  relation to the value of the claims surrendered.

20          All right. Dionna, would you please close

21  down the telephonic lines, and you can inform counsel

22  afterwards what became of this.

23          THE CLERK: Yes, Your Honor.

24          THE COURT: In this particular case, I, frankly,

25  am in complete agreement with Mr. Greenberg's argument.

80

1   There has been no proof presented concerning the total extent

2   of the harm experienced upon the class members; no -- I

3   realize that discovery was curtailed early on.  There was no

4   discovery, or very limited discovery, on the issue of

5   potential damages on behalf of the class as it applied to the

6   Hertz defendants.  And there was no discovery, whatsoever,

7   concerning damages of any kind or, frankly, I think anything

8   else as to the Enterprise, Vanguard defendants.

9           The underlying issue there is, obviously, what

10  was the total amount of loss to the class members in this

11  particular case, whether they qualify for that under legal

12  claims for damages or not.  I realize the damage claim was

13  carefully briefed by the parties -- I do not know where our

14  interference is coming from.

15          But, in any event, there's been no showing made

16  by the parties proposing this settlement concerning what was

17  the total amount of harm to the class in this particular

18  case.

19          Under any view, the total amount of the

20  concession recovery fees which were charged to the class

21  members is something which should be in front of this

22  Court.  There clearly is an argument that that potentially

23  could be the damages claimed.

24          There clearly are other arguments that might

25  be raised.  Those arguments have not been presented to the

1   Court.  The Court has not passed upon them legally.  And,

2   clearly, whatever that total figure is, there is a lesser

3   number which is similarly and probably more reasonably

4   material in terms of harm to the class members.

5           I don't have that information.  That evidence

6   hasn't been presented to the Court.  And how the Court can

7   consider the potential coupon offers in light of not even

8   knowing or being informed concerning what may be total

9   claims in this particular case or total likely compensable

10  claims is something that this Court would have to have

11  before it could ever pass upon the legitimacy and the

12  reliability of the proposed coupon settlement that's being

13  tendered -- proposed here.

14          The flip side of the issue, of course, is

15  what's the value of the coupons to the class members?  One

16  thing that's very obvious to the Court and obvious to

17  everyone, but it certainly bears mentioning, and that is

18  that acceptance and participation in a class, or at least

19  not opting out of the class, would result in each claimant

20  completely relinquishing and extinguishing any claim that

21  that individual might have in connection with the claim.

22          And what that person would be receiving for

23  extinguishing his or her claims is something again that is

24  simply not in front of this Court.  What's a 10 or $20

25  coupon in light of being able to open almost any tour

1   magazine in Las Vegas or Reno, or -- and other places, I

2   suppose, and see coupons are commonly offered by

3   automobile rental agencies.  And my recollection is that

4   that was a common practice during 2003 to 2009.

5          And what is the likely redemption rate of the

6   particular coupons?  What is the true dollar value that

7   might be attributed to coupons?  What is the dollar value

8   that flows to the defendants in a case like this, in light

9   of being able to continue business with people with whom

10  the Court has found the defendant has violated the law and

11  taken money from them that the defendant was not entitled

12  to take.  All of those things suggest that what's being

13  offered in this particular case is next to nothing.

14         While the Court fully respects the right of

15  the defendants to dispute and challenge the Court's

16  rulings, which the Court is fully respectful of -- as

17  you're well aware, I certainly would have certified and

18  attempted to certificate this question up to the Ninth

19  Circuit.  But recognizing, I think, the primary

20  consideration being the great amount of delay that it

21  builds into cases, that didn't happen.

22         But, in any event, the simple fact is is that

23  this Court has found that Hertz did violate the law, and

24  that under the Nevada law there is a claim on behalf of

25  any member of the public who would be a victim of an act

1    that was in violation of the law.  And the fact is that

2    the coupon proposal really reflects that the defense, at

3    least, does not value this particular case insofar as the

4    plaintiffs are concerned.

5           What has been offered is clearly token in the

6    way of offering only -- the only monetary payment being to

7    counsel, and that -- the coupons being such a fraction, I

8    think it's clearly evident to the Court that the victims

9    in this case suffered at least a 10 to $20 loss, and it

10   may well have been more, as a result of them having

11   improperly -- being charged with concession recovery fees

12   that were not properly charged at the time.  And, I might

13   add, over a six-year period.

14          This is obviously why we have two and a half

15   million claimants.  And there's obviously huge dollars

16   involved, potentially.

17          And this settlement and requiring that number

18   of people to give up and extinguish claims, when the Court

19   doesn't even have evidence in front of it to show how much

20   the total losses were or how much the value of the

21   proposed coupons are or how -- even to the point of not

22   being informed concerning the categories of claimant

23   losses by which the 10 and $20 coupons are allocated,

24   it -- the simple fact is there is nothing in front of this

25   Court that would support the Court's finding that this is

1   a fair, adequate and reasonable settlement.

2            So, for that reason, the proposed settlement

3   is going to be rejected. I do so based primarily upon the

4   lack of evidence which has been submitted. And the Court,

5   in my view, has little choice but to deny final approval.

6            I will follow up with a written decision which

7   will address other issues which have been raised, as well,

8   and which need some comment by the Court.

9            With regard to other motions that might be

10  pending, such as -- the one that occurs to me off the top

11  of my head is there was a motion to intervene on behalf of

12  Mr. Ewusiak's client. We will address that in a

13  subsequent decision to be issued by the Court.

14            And there was a similar motion somewhere.

15            But, in any event, whatever the Court has not

16  addressed we will address in the decision which will be

17  issued by the Court. That will be the Court's ruling.

18            Counsel, I do appreciate everything that

19  you've provided. I do appreciate the quality of what was

20  provided.

21            My simple problem with what's being proposed

22  here is that the Court needs evidence before it makes a

23  finding on a case such as this one, and I have not been

24  provided with the evidence.

25            The fact that less than four percent of the

85

1    total claimants have even registered, it may be shrugged

2    off as simply a matter of a coupon settlement, but I think

3    that also reflects on the lack of value of the proposed

4    settlement which is being discussed here.

5            So that's the Court's view.  Settlement is

6    denied.  And we'll address remaining issues when the Court

7    issues its order.

8            Thank you.  Court will be in recess.

9                (The proceedings were concluded at

10               1:52 p.m.)

11                        *     *     *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

86

1                              -oOo-

2          I certify that the foregoing is a correct

3          transcript from the record of proceedings

4          in the above-entitled matter.

5

6          _Donna Davidson_____    May 23, 2011

7          Donna Davidson, RDR, CRR, CCR #318     Date
           Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25