Alan Harris (SBN 146079)
David Zelenski (SBN 231768)
HARRIS & RUBLE
6424 Santa Monica Boulevard
Los Angeles, California 90038
Telephone: (323) 962-3777
Facsimile: (323) 962-3004
aharris@harrisandruble.com
dzelenski@harrisandruble.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN STETSON, SHANE LAVIGNE, CHRISTINE LEIGH BROWN-ROBERTS, VALENTIN YURI KARPENKO, and JAKE JEREMIAH FATHY, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>WEST PUBLISHING CORPORATION, a Minnesota corporation dba BAR/BRI, and KAPLAN, INC.,<br><br>        Defendants. | Case No. CV-08-00810 R (Ex)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT AND CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS**<br><br>Date: April 15, 2013<br>Time: 10:00 a.m.<br>Courtroom: 8<br><br>*Assigned to Hon. Manuel L. Real* |

**PLEASE TAKE NOTICE** that, on April 15, 2013, at 10:00 a.m., in Courtroom 8 of the above-entitled Court located at 312 North Spring Street, Los Angeles, California 90012—or at such other date, time, or place as the Court may designate—Plaintiffs Steven Stetson, Shane LaVigne, Christine Leigh Brown-Roberts, Valentin Yuri Karpenko, and Jake Jeremiah Fathy will move for an order granting preliminary approval of a class-wide Stipulation and Settlement Agreement ("Settlement Agreement") reached in the above-captioned action, as well as for conditional certification of the Class defined in the Settlement Agreement.  The Motion will be made and based upon this Notice of Motion; the Memorandum of Points and Authorities appended hereto; the Declaration of Alan Harris filed herewith; the Declaration of Mediator John Francis Carroll filed herewith; the Declarations of Plaintiffs filed herewith (appended to the Harris Declaration as Exhibit 2); the Request for Judicial Notice filed herewith; all of the pleadings, papers, and documents contained in the file of the within action; and such further evidence and argument as may be presented at or before the hearing on the Motion.

The required Local Rule 7-3 meet-and-confer took place commencing on November 15, 2012 (when the Settlement Agreement was executed), and on various dates thereafter.

DATED:  March 18, 2013                          HARRIS & RUBLE

                                                              /s/ *David Zelenski*
                                                    _____
                                                    Alan Harris
                                                    David Zelenski
                                                    *Attorneys for Plaintiffs*

## *MEMORANDUM OF POINTS AND AUTHORITIES*

### *Table of Contents*

I.     Introduction ...................................................................................... 1

II.    Statement of Material Facts and Relevant Procedural History ............... 1

     A.    Summary of Plaintiffs' Claims ................................................. 1

     B.    The Court's Initial Dismissal of this Case in Light of the
          Settlement of the Related Rodriguez Action ................................ 2

     C.    Plaintiffs' Appeal of the Dismissal of this Action to the Ninth
          Circuit ................................................................................... 3

     D.    The First Proposed Settlement ................................................. 4

     E.    Return to the Ninth Circuit ...................................................... 7

III.   Summary of the New Proposed Settlement .......................................... 8

     A.    Distribution of the Settlement Fund to Class Members .................. 8

     B.    The Estimated Recovery to Class Members ................................ 9

     C.    Notice to the Class ................................................................. 10

     D.    Release Provisions and Opting Out ........................................... 13

     E.    Incentive Awards and Attorney's Fees ...................................... 13

IV.    The Court Should Conditionally Certify the Class and Should
      Preliminarily Approve the Settlement ................................................. 14

     A.    Class Certification Is Warranted ............................................... 14

     B.    The Settlement Meets the Requirements for Preliminary
          Approval ............................................................................... 17

|   |   | i. | *Settlement Negotiations Were Conducted at Arm's Length* ........................................................... 17 |
|   |   | ii. | *The Settlement Has No Obvious Deficiencies* ....................................... 18 |
|   |   |   | a. *The Strength of Plaintiffs' Case* ..................................... 18 |
|   |   |   | b. *The Likely Duration of Further Litigation* ............................. 20 |
|   |   |   | c. *The Risk of Maintaining Class-Action Status Through Trial* ...................................... 20 |
|   |   |   | d. *The Amount Offered in the Settlement* ..................................... 21 |
|   |   |   | e. *The Extent of Discovery and the Stage of the Proceedings* ..................................... 22 |
|   |   |   | f. *The Experience and Views of Counsel* ..................................... 22 |
|   |   |   | g. *The Reaction of Class Members to the Proposed Settlement* ..................................... 23 |
|   |   | iii. | *The Settlement Does Not Grant Preferential Treatment to the Named Plaintiffs* ..................................... 23 |

*V.* *Appointment of a Claims Administrator* ........................................ 24

*V.* *Proposed Calendar* ..................................................... 24

*VII.* *Conclusion* ......................................................... 25

1

### *Table of Authorities*

2

*Cases*

3

4   Adames v. Mitsubishi Bank, Ltd.
5      133 F.R.D. 82 (E.D.N.Y. 1989) ....................................................................... 14

6   Boeing Co. v. Van Germet
7      444 U.S. 472 (1980) ............................................................................... 5, 14

8   Campbell v. First Investors Corp.
9      2012 U.S. Dist. LEXIS 155549 (S.D. Cal. filed Oct. 29, 2012) .................... 24

10  Dunleavy v. Nadler
11     213 F.3d 454 (9th Cir. 2000) ........................................................... 14, 18, 22

12  Elliott v. ITT Corp.
13     150 F.R.D. 569 (N.D. Ill. 1992) .................................................................... 16

14  Franks v. Kroger Co.
15     649 F.2d 1216 (6th Cir. 1981) ...................................................................... 24

16  Hanlon v. Chrysler Corp.
17     150 F.3d 1011 (9th Cir. 1998) ...................................................................... 18

18  In re Anthracite Coal Antitrust Litig.
19     79 F.R.D. 707 (M.D. Pa. 1978) .................................................................... 23

20  In re Cendant Corp. Litig.
21     264 F.3d 201 (3d Cir. 2001) ......................................................................... 21

22  In re Easysaver Rewards Litig.
23     2013 U.S. Dist. LEXIS 15738 (S.D. Cal. filed Feb. 4, 2013) ................ 11, 25

24  In re Nasdaq Market-Makers Antitrust Litig.
25     187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................. 20

26  In re TD Ameritrade Account Holder Litig.
27     2011 U.S. Dist. LEXIS 103222 (N.D. Cal. filed Sept. 13, 2011) ............ 11, 25

28

In re Visa Check/MasterMoney Antitrust Litig.
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ......................................................................... 20

In re Warfarin Sodium Antitrust Litig.
    212 F.R.D. 231 (E.D. Del. 2002)................................................................................. 19

Int'l Union v. Gen. Motors. Corp.
    Am., 497 F.3d 615 (6th Cir. 2007) ............................................................................. 12

Joseph v. Gen. Motors Corp.
    109 F.R.D. 635 (D.C. Colo. 1986).............................................................................. 16

Labbate-D'Alauro v. GC Servs. Ltd. P'ship
    168 F.R.D. 451 (E.D.N.Y. 1996)................................................................................ 14

Lazy Oil Co. v. Witco Corp.
    95 F. Supp. 2d 290 (W.D. Pa. 1997)........................................................................... 22

Linney v. Cellular Alaska P'ship
    151 F.3d 1234 (9th Cir. 1998) .............................................................................. 14, 22

Marshall v. Holiday Magic, Inc.
    550 F.2d 1173 (9th Cir. 1977) .................................................................................... 12

Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.
    221 F.R.D. 523 (C.D. Cal. 2004)................................................................................ 20

Negrete v. Allianz Life Ins. Co. of N. Am.
    2012 U.S. Dist. LEXIS 182796 (C.D. Cal. filed Dec. 27, 2012) ................................ 15

Nichols v. SmithKline Beecham Corp.
    2005 U.S. Dist. LEXIS 7061 (E.D. Pa. filed Apr. 22, 2005) ....................................... 22

Officers for Justice v. Civil Serv. Comm.
    688 F.2d 615 (9th Cir. 1982) ...................................................................................... 14

Palmer v. BRG of Ga.
    498 U.S. 46 (1990)................................................................................................. 15, 19

Rannis v. Recchia
    380 Fed. Appx. 646 (9th Cir. 2010)............................................................................ 15

*Rodriguez v. Disner*
    688 F.3d 645 (9th Cir. 2012) ..................................................................... 13

*Rodriguez v. West Publ'g Corp.*
    563 F.3d 948 (9th Cir. 2009) ........................................................ 3, 6, 13, 24

*Rodriguez v. West Publ'g Corp.*
    2007 U.S. Dist. LEXIS 74767 (C.D. Cal. filed Sept. 10, 2007)............................*passim*

*Sarabi v. Weltman, Weinberg & Reis Co., L.P.A.*
    2012 U.S. Dist. LEXIS 125390 (S.D. Cal. filed Aug. 27, 2012) ........................ 11, 25

*Sibert v. TV Magic, Inc.*
    2012 U.S. Dist. LEXIS 118245 (C.D. Cal. filed Aug. 21, 2012) ............................... 15

*Staton v. Boeing Co.*
    327 F.3d 938 (9th Cir. 2003) ....................................................................... 5

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*
    2005 U.S. Dist. LEXIS 9705 (E.D. Pa. filed May 20, 2005) ...................................... 21

*Torrisi v. Tucson Elec. Power Co.*
    8 F.3d 1370 (9th Cir. 1993) ..................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*
    131 S. Ct. 2541 (2011)................................................................... 15, 21, 22

*Yokoyama v. Midland Nat'l Life Ins. Co.*
    594 F.3d 1087 (9th Cir. 2010) ..................................................................... 17

*Young v. Polo Retail, Inc.*
    2006 WL 3050861 (N.D. Cal. filed Oct. 25, 2006)........................................... 17


***Statutes***

15 U.S.C. § 1 ........................................................................................... 1

15 U.S.C. § 2 ........................................................................................... 2

*Rules*

Fed. R. Civ. Proc. 23 ................................................................................ *passim*

Fed. R. Civ. Proc. 48 ................................................................................ 19

*Other Authorities*

Richard A. Nagareta
    The Preexistence Principle and the Structure of the Class Action
    103 Colum. L. Rev. 149 (2003) ................................................................ 15

William W Schwarzer, *et al.*
    California Practice Guide:  Federal Civil Procedure Before Trial (The
    Rutter Group 2012) ................................................................................ 12

1   ***I.    Introduction.***

2         Plaintiffs Stephen Stetson, Shane LaVigne, Christine Leigh Brown-Roberts,

3   Valentin Yuri Karpenko, and Jake Jeremiah Fathy have reached a class-wide settlement

4   of their antitrust claims against Defendants West Publishing Corporation ("West") and

5   Kaplan, Inc. ("Kaplan").  Plaintiffs now seek preliminary approval of that settlement.

6         This is the second proposed class-wide settlement in this case.  The first proposed

7   settlement, which was preliminarily—but not finally—approved in March 2011, would

8   have established a $5.285 million settlement fund to pay the claims of participating Class

9   Members.  The new proposed settlement—reached under the supervision of the appointed

10  Ninth Circuit Mediator and following a private mediation before John Francis Carroll, the

11  special master appointed to oversee discovery in the earlier, related <u>Rodriguez v. West</u>

12  action, Central District of California Case No. CV 05-3222 R—nearly doubles the prior

13  amount, establishing a $9.5 million settlement fund.  Approval of this new settlement, in

14  fact, has been recommended "[w]ithout reservation" by Mediator Carroll, who is

15  integrally familiar with the evidence from <u>Rodriguez</u>—evidence, *inter alia*, that Plaintiffs

16  would use in this case to prove their claims.  (Mar. 18, 2013, Decl. of Mediator John

17  Francis Carroll in Supp. of Class Action Settlement ("Mar. 18, 2013, Carroll Decl.") ¶ 4.)

18        The nearly-doubled monetary amount represents a reasonable resolution of this

19  action, particularly given that the allegedly anticompetitive decision not to purchase West

20  Bar occurred nearly a decade before the present Class Period and that the allegedly

21  anticompetitive agreement between West and Kaplan terminated over five years ago with

22  the settlement reached in <u>Rodriguez</u>.  The Court should therefore grant preliminary

23  approval of the new settlement and conditionally certify the Class.

24  ***II.   Statement of Material Facts and Relevant Procedural History.***

25        ***A.    Summary of Plaintiffs' Claims.***

26        Plaintiffs commenced this action in February 2008.  (Feb. 6, 2008, Class Action

27  Compl. for Violations of the U.S. Antitrust Laws ("Feb. 6, 2008, Compl.") at 1.)

28  Plaintiffs allege that West and Kaplan violated section 1 of the Sherman Act, 15 U.S.C.

1  § 1, by conspiring to restrain trade in the full-service bar-review-course market.  (Feb. 6,

2  2008, Compl. ¶¶ 92–98.)  Plaintiffs also allege that West (but not Kaplan) violated

3  section 2 of the Sherman Act, 15 U.S.C. § 2, by unlawfully acquiring and/or maintaining

4  a monopoly of the bar-review-course market.  (Feb. 6, 2008, Compl. ¶¶ 99–111.)

5       **B.     *The Court's Initial Dismissal of this Case in Light of the Settlement of the***

6              ***Related <u>Rodriguez</u> Action.***

7            On March 14, 2008, West filed a Motion to dismiss Plaintiffs' Complaint.  (Mar.

8  14, 2008, Notice of Mot. and Mot. to Dismiss Compl. Pursuant to Fed. R. Civ. P.

9  12(b)(6) and 12(b)(1) at 1.)  Principally, West's Motion argued that Plaintiffs' claims

10 were preempted under a settlement reached in 2007 in the related <u>Rodriguez</u> action.  (<u>See</u>,

11 <u>e.g.</u>, Mar. 14, 2008, Mem. of P. & A. in Supp. of Mot. to Dismiss Compl. Pursuant to

12 Fed. R. Civ. P. 12(b)(6) and 12(b)(1) at 2:1–5 (arguing that Plaintiffs' Complaint

13 "ignores . . . the significant market effects of the non-monetary relief provided by the

14 <u>Rodriguez</u> settlement"), 11:3–5 (stating that, "[i]n approving the <u>Rodriguez</u> settlement,

15 this Court noted that the non-monetary relief provisions of the <u>Rodriguez</u> settlement

16 removed allegedly significant barriers to entry").)

17           <u>Rodriguez</u>, as this Court is aware, was an antitrust class action brought against

18 West and Kaplan for an alleged conspiracy to restrain trade in the bar-review-course

19 market.  (<u>See</u> <u>generally</u> Mar. 18, 2013, Req. for Judicial Notice in Supp. of Pls.' Mot. for

20 Preliminary Approval of Class-Action Settlement & Conditional Certification of

21 Settlement Class ("Mar. 18, 2013, Req. for Judicial Notice") Ex. 1.)  As alleged by the

22 <u>Rodriguez</u> plaintiffs, West and Kaplan had entered an illegal arrangement under which

23 Kaplan agreed to refrain from purchasing West Bar.  (Mar. 18, 2013, Req. for Judicial

24 Notice Ex. 1 at ¶ 4.)  In addition, the <u>Rodriguez</u> plaintiffs alleged that West and Kaplan

25 had entered an agreement impacting Kaplan's offering of full-service bar-review courses.

26 (Jan. 14, 2013, Req. for Judicial Notice Ex. 1 at ¶ 4.)  <u>Rodriguez</u> was settled by the

27 parties thereto, with the Court granting final approval in September 2007.  (Mar. 18,

28 2013, Req. for Judicial Notice Ex. 2 at 1.)  As part of the <u>Rodriguez</u> settlement, West and

1   Kaplan agreed to certain non-monetary relief, including the termination of their "co-
2   marketing agreement." Rodriguez v. West Publ'g Corp., 2007 U.S. Dist. LEXIS 74767
3   at *19, 22 (C.D. Cal. filed Sept. 10, 2007), aff'd in relevant part and rev'd in part on other
4   grounds, 563 F.3d 948 (9th Cir. 2009). Such non-monetary relief was designed to foster
5   competition in, and eliminate alleged barriers to entry into, the bar-review-course market.
6   See Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *19.

7       In light of the Rodriguez settlement, this Court dismissed Plaintiffs' Complaint
8   with prejudice on April 10, 2008. (Apr. 10, 2008, Order Granting Def. West's Mot. to
9   Dismiss Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) with Prejudice at 2:13–
10  14.) According to the Court:

11          [S]ubstantively, [P]laintiffs' allegations regarding the current state of
12      the market and its effects on individual [P]laintiffs cannot be squared with
13      the provisions of the Rodriguez settlement. In [ap]proving the Rodriguez
14      settlement, this [C]ourt noted that the non-monetary relief provisions of the
15      Rodriguez settlement removed allegedly significant barriers to entry [in the
16      bar-review-course market]. . . .

17          Thus, the allegations that contradict these findings fail as a matter of
18      law.

19  (Apr. 7, 2008, Tr. of Proceedings at 4:17–5:2.)

20      **C.    *Plaintiffs' Appeal of the Dismissal of this Action to the Ninth Circuit.***

21      Following the Court's ruling on West's Motion, Plaintiffs appealed. (May 7, 2008,
22  Notice of Appeal at 1.) Among the issues addressed in the appeal, Plaintiffs pointed to
23  the distinct time period covered by the claims in their Complaint relative to the time
24  period covered in Rodriguez. (Mar. 18, 2013, Req. for Judicial Notice Ex. 5 at 12–19.)
25  Where the Rodriguez class spanned the ten-year period from August 1, 1997, through
26  July 31, 2006 (Jan. 14, 2013, Req. for Judicial Notice Ex. 2 at 6:27), Plaintiffs' claims
27  herein have been brought on behalf of individuals who purchased bar-review courses
28  *after* July 31, 2006 (Feb. 6, 2008, Compl. ¶ 79). Plaintiffs' claims, in other words,

1   concern any residual impact on the bar-review-course market of the conduct that was at

2   issue in <u>Rodriguez</u>—conduct that took place almost exclusively prior to the

3   commencement of the within Class Period.  In this regard, although Plaintiffs have

4   argued that Class Members herein are entitled to some damages, they arguably are not

5   entitled to receive as much money as <u>Rodriguez</u> class members.[1]

6         Oral argument for the appeal was heard by the Ninth Circuit on September 30,

7   2009.  (Mar. 18, 2013, Harris Decl. ¶ 7.)  In October 2009, in lieu of ruling on the appeal,

8   the Ninth Circuit issued an Order "referr[ing the matter] to the Ninth Circuit Mediation

9   Office to explore a possible resolution through mediation."  (Mar. 18, 2013, Req. for

10   Judicial Notice Ex. 6 at 1.)

11              ***D.     The First Proposed Settlement.***

12         Over the next eight months, the parties engaged in numerous settlement

13   conferences supervised by the appointed Ninth Circuit Mediator, Roxane Ashe.  (Mar.

14   18, 2013, Harris Decl. ¶ 7.)  Plaintiffs had also engaged in additional arm's length

15   negotiations with Kaplan.  During those negotiations, Plaintiffs reached a non-monetary

16   settlement with Kaplan.  (Mar. 18, 2013, Harris Decl. ¶ 8.)  Under the terms of that

17   proposed settlement, Kaplan agreed to provide Class Members with discount certificates

18   redeemable toward the purchase of future Kaplan educational courses.  (Mar. 18, 2013,

19   Harris Decl. ¶ 8.)  Because the certificates would have been usable for purchasing bar-

20   review courses, it was the parties' good-faith belief that the coupons would hasten

21   competition between Kaplan—the new entrant to the bar-review market—and West.

22   (Mar. 18, 2013, Harris Decl. ¶ 8.)

23         Thereafter, the Ninth Circuit Mediator issued a proposal that Plaintiffs settle their

24   claims against West for $5.285 million.  (Mar. 18, 2013, Harris Decl. ¶ 8.)  Plaintiffs and

25   West ultimately accepted the Mediator's proposal, and a global settlement agreement

26   reflecting the discount-certificate settlement with Kaplan and the monetary settlement

27   _____

28   [1] To the extent that there was any lingering anticompetitive impact after the alleged market-division agreement was terminated, it may be presumed that those effects will decrease over time.

1    with West was executed in October 2010.  (Mar. 18, 2013, Harris Decl. ¶ 8.)

2          In December 2010, the Ninth Circuit remanded the action for settlement-approval

3    purposes.  (Mar. 18, 2013, Req. for Judicial Notice Ex. 7 at 1.)  Plaintiffs thereafter filed

4    their Motion for preliminary approval (see Feb. 18, 2011, Pls.' Notice of Mot. & Mot. for

5    Conditional Certification of Settlement Class, Preliminary Approval of Class-Action

6    Settlement, & Appointment of Claims Administrator at 1), which Motion the Court

7    granted (see Mar. 21, 2011, Order Granting Pls.' Mot. for Conditional Certification of

8    Settlement Class, Preliminary Approval of Class-Action Settlement, & Appointment of

9    Claims Administrator ("Mar. 21, 2011, Order") at 1).  Notice was then delivered to the

10   Class, and Members were afforded an opportunity to submit claims.  (Mar. 18, 2013,

11   Harris Decl. ¶ 9.)  According to the Claims Administrator appointed by the Court, a total

12   of 184,496 notice packets were delivered to the Class.  (Mar. 18, 2013, Harris Decl. ¶ 9.)

13   From those 184,496 notice packets, a total of 47,542 timely claim forms were submitted,

14   representing 57,262 separate bar-review-course purchases.[2]  (Mar. 18, 2013, Harris Decl.

15   ¶ 9.)  Based on these figures, the approximate average gross award to each Class Member

16   who submitted a claim would have been $92.[3]

17         After the claims period had closed, Plaintiffs filed a Motion for final approval.

18   (See generally May 31, 2011, Pls.' Notice of Mot. & Mot. for Final Approval of Class-

19   Action Settlement.)  The Court denied that Motion (see July 1, 2011, Order Denying

20   Final Approval of Class-Action Settlement & Req. for Reimbursement of Attorney's Fees

21   & Costs at 2:5–7), holding that the average recovery amount did not reasonably compare

22

23         [2] The per-Class Member computation under the earlier settlement—as under the
     present Settlement Agreement—was a function of the total amount that each Class
     Member paid for bar-review courses.  Accordingly, the 57,262 figure should be used
24   instead of the 47,542 figure to estimate the average recovery.

25         [3] The gross-recovery amount is inclusive of attorney's fees and claims-administration
     expenses, both of which constitute benefits to the Class.  See Boeing Co. v. Van Germet,
26   444 U.S. 472, 478 (1980) (explaining that, under the "common-fund" doctrine applicable
     to class-action settlements, attorney's fees are properly considered a class benefit, as
     "persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly
27   enriched at the successful litigant's expense"); Staton v. Boeing Co., 327 F.3d 938, 975
     (9th Cir. 2003) (stating that "[t]he post-settlement cost of providing notice to the class
28   can reasonably be considered a benefit to the class").

to that in <u>Rodriguez</u> or to that in another then-recent antitrust settlement against West: <u>Park v. Thomson Corp.</u>, Southern District of New York Case No. 05 Civ. 2931 (WHP).[4] (<u>See</u> June 20, 2011, Reporter's Tr. of Proceedings at 14:15–25.)

In <u>Rodriguez</u>, a gross settlement fund of $49 million was established on behalf of over 376,000 class members. <u>Rodriguez</u>, 563 F.3d at 957. Of the 376,000 members, approximately 88,000 submitted claim forms,[5] representing approximately 130,000 bar-review courses.[6] (Mar. 18, 2013, Harris Decl. ¶ 11.) Based on the 130,000 figure, the average gross award to each class member who submitted a claim in <u>Rodriguez</u> was approximately $377.

In <u>Park</u>, a gross settlement fund of $13 million was established on behalf of approximately 280,000 class members. (Mar. 18, 2013, Req. for Judicial Notice Ex. 4 at 2–3.) Of the 280,000 members, approximately 70,259 submitted claim forms, representing approximately 107,109 courses.[7] (<u>See</u> Mar. 18, 2013, Req. for Judicial

---

[4] <u>Park</u> did not involve the conduct at issue in this case. <u>Park</u> involved a tying claim asserted against West alone, and no purported conspiracy between actual or potential horizontal competitors was at issue. (<u>See</u> Mar. 18, 2013, Req. for Judicial Notice Ex. 4 at 1.) The <u>Park</u> class period was also different from the class period in this case.

[5] The Ninth Circuit noted a smaller participation rate reflecting only 52,000 submitted claim forms. <u>Rodriguez</u>, 563 F.3d at 967. This lower figure appears to have been taken from the district court's opinion, which had counted submitted claim forms only through August 2007. <u>Rodriguez</u>, 2007 U.S. Dist. LEXIS 74767 at *33.

[6] As with the present Settlement Agreement, the per-class-member computation under the settlement in <u>Rodriguez</u> was a function of the total amount that each <u>Rodriguez</u> class member paid for bar-review courses. Accordingly, the 130,000 figure should be used instead of the 88,000 figure to calculate the average gross <u>Rodriguez</u> recovery.

[7] Class members could participate in the <u>Park</u> settlement either by submitting a claim form in <u>Park</u> itself or by submitting a claim form in <u>Rodriguez</u>. (<u>See</u> Mar. 18, 2013, Req. for Judicial Notice Ex. 4 at 4 (stating that "[t]he [a]mended [s]ettlement also obviates the need for any <u>Rodriguez</u> class member who submitted a claim form in that case to submit one in this action [<u>i.e.</u>, in <u>Park</u>] as well, in order to receive a payment").) In other words, claim forms submitted in <u>Rodriguez</u> were deemed to have been submitted in <u>Park</u> as well. (<u>See</u> Mar. 18, 2013, Req. for Judicial Notice Ex. 4 at 9 (stating that "the [a]mended [s]ettlement allows claimants from the <u>Rodriguez</u> class . . . to receive funds regardless of whether they submitted a claim form"). According to the <u>Park</u> claims administrator, 55,649 claim forms were submitted in <u>Park</u> itself, and an additional 14,610 claim forms were submitted by <u>Park</u> class members claiming only through <u>Rodriguez</u>, for a total of 70,259 claim forms. (Mar. 18, 2013, Req. for Judicial Notice Ex. 3 at ¶¶ 7, 15.) Also according to the <u>Park</u> claims administrator, the 55,649 claim forms represented 75,271 separate courses, and the 14,610 additional claim forms represented 31,838 additional courses, for a total of 107,109 separate courses. (Mar. 18, 2013, Req. for Judicial Notice Ex. 3 at ¶¶ 7, 15.)

Notice Ex. 3 at ¶¶ 7, 15.)  Based on the 107,109 figure, the average gross award to each participating class member was approximately $121.

Putting Park and Rodriguez to the side, the Court also expressed concerns with the discount-certificate portion of the initial settlement.  According to the Court, the coupons represented only "nominal value" to Class Members; additionally, approving such a non-cash settlement would, in the Court's view, simply "encourage[] further business with Kaplan rather than disgorge[e] ill-gotten gains."  (June 20, 2011, Reporter's Tr. of Proceedings at 13:19, 14:11–12.)  Based on these additional concerns, the Court declined granting final approval of the initial settlement.

### E.    *Return to the Ninth Circuit.*

Following the Court's denial of final approval of the initial settlement, jurisdiction returned to the Ninth Circuit for a ruling on the Order granting West's Motion to dismiss. (Mar. 18, 2013, Req. for Judicial Notice Ex. 8 at 1.)  In November 2011, the Ninth Circuit reversed the dismissal, holding that, "[b]ecause the Stetson [P]laintiffs' interests in a monetary recovery were not represented by the plaintiffs in Rodriguez, they are not now barred from filing a claim for damages."  (Mar. 18, 2013, Req. for Judicial Notice Ex. 9 at 2.)  Instead of immediately issuing its mandate, the Ninth Circuit again "refer[red matters] to the Ninth Circuit Mediation Office to explore a resolution through mediation."  (Mar. 18, 2013, Req. for Judicial Notice Ex. 9 at 4–5.)  The parties thus resumed active, arm's length negotiations before Ms. Ashe, the appointed Ninth Circuit Mediator.  (Mar. 18, 2013, Harris Decl. ¶ 12.)  The parties also participated in a private mediation before John Francis Carroll.  (Mar. 18, 2013, Harris Decl. ¶ 12; Mar. 18, 2013, Carroll Decl. ¶ 2.)  Mr. Carroll was the special master appointed to oversee discovery in Rodriguez, see Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *30 (noting Mr. Carroll's role in Rodriguez), and he is "particularly knowledgeable of the underlying facts which ultimately gave rise to the bringing of the within matter" (see Mar. 18, 2013, Carroll Decl. ¶ 1).  Ultimately, after mediation with Mr. Carroll had concluded, and under the Ninth Circuit Mediator's supervision, the parties agreed to settle this matter for $9.5

million.  (Mar. 18, 2013, Harris Decl. ¶ 12.)  This is $4.215 million more than the face amount of the earlier proposed settlement, and it is all cash as to both West and Kaplan, meaning that there are no discount certificates.  Plaintiffs now move for preliminary approval of this new settlement.

**III.   Summary of the New Proposed Settlement.**

   **A.   Distribution of the Settlement Fund to Class Members.**

   Under the new Settlement Agreement, the Class consists of the same 184,496 Members under the prior proposed settlement:  all persons and entities who paid for a BAR/BRI full-service bar-review course provided by West from August 1, 2006, through March 21, 2011.[8]  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 30.)  Pursuant to the new Settlement Agreement's terms, Defendants will pay $9.5 million for the benefit of the Class.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶¶ 25, 33.)  Again, the settlement is all cash, and no discount certificates are involved.  Defendants will deposit the cash into an interest-bearing account within ten business days of the Court's order granting preliminary approval of the Settlement Agreement.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 33.)  The interest earned shall inure to the Class' benefit.  (See Mar. 18, 2013, Harris Decl. Ex. 1 at ¶¶ 13, 33.)  The $9.5 million Settlement Amount, with all interest earned thereon, constitutes the Gross Settlement Fund.[9]  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶¶ 13, 33.)

   The Gross Settlement Fund will be used to pay the costs of settlement administration and of providing Notice to the Class, as well as a Fee Award and an Expense Award to Class Counsel, both as approved by the Court.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 36.)  In addition, subject to the Court's approval, Incentive Awards of $4,000 to each of the five Plaintiffs will be paid from the Gross Settlement Fund.  (Mar.

---

[8] The present Settlement Agreement inadvertently specifies an end date of February 28, 2011, instead of March 21, 2011, which latter date was the cut-off date under the earlier settlement.  (Mar. 21, 2011, Order ¶ 4.)  The Proposed Order granting preliminary approval that is lodged herewith amends the present Settlement Agreement's Class definition by specifying an end date of March 21, 2011.

[9] Capitalized terms have the same meaning as used in the Settlement Agreement.

1  18, 2013, Harris Decl. Ex. 1 at ¶¶ 36, 50.)

2          After the above-noted deductions have been made from the Gross Settlement Fund,

3  the balance (the "Net Settlement Fund") will be distributed to those Members of the Class

4  who have submitted valid and timely Claim Forms ("Authorized Claimants"). (Mar. 18,

5  2013, Harris Decl. Ex. 1 at ¶¶ 3, 4, 36.)  The Net Settlement Fund will be distributed to

6  Authorized Claimants pursuant to an agreed-upon Plan of Allocation.  (Mar. 18, 2013,

7  Harris Decl. Ex. 1 at ¶¶ 19, 46–47.)  Under the terms of the Plan of Allocation, the Net

8  Settlement Fund will be distributed *pro rata* based on the relative amount that each

9  Authorized Claimant paid for his or her full-service BAR/BRI courses.  (Mar. 18, 2013,

10  Harris Decl. Ex. 1 at Ex. B at ¶¶ 1–2.)  For example, if the amount paid for bar-review

11  courses by an Authorized Claimant equals 1/50,000 of the aggregate of such amounts

12  paid by all other Authorized Claimants, then the Authorized Claimant will receive

13  1/50,000 of the Net Settlement Fund.

14          Defendants are not entitled to a reversion of any amounts in the Net Settlement

15  Fund.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 37.).  No amounts, in fact, should remain

16  after all payments are distributed to Authorized Claimants.  Nonetheless, if any funds do

17  remain (on account of, say, uncashed checks), Class Counsel will apply to the Court for a

18  suitable *cy pres* residual distribution.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 38.)

19      **B.    *The Estimated Recovery to Class Members.***

20          Given that the Class under the proposed Settlement Agreement covers the same

21  class defined in the earlier proposed settlement, it is reasonable to assume that the same

22  number of Class Members will submit Claim Forms under the new settlement.  The total

23  number of Authorized Claimants is therefore estimated to be 47,542, representing

24  approximately 57,262 bar-review courses.[10]  Based on this participation rate, the

25  estimated per-Claimant gross recovery is $166.  This nearly doubles the $92 gross cash

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [10] This number reflects a participation rate by Class Members of approximately 26%.
    This comports with the participation rate in Rodriguez, where approximately 88,000
28  claims were submitted from a class of 376,000, reflecting a 23% participation rate. (Mar.
    18, 2013, Harris Decl. ¶ 11.)

recovery under the earlier proposed settlement.

## C.   Notice to the Class.

The costs of Notice and settlement administration will be paid for from the Gross Settlement Fund.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 36.)  The Settlement Agreement contemplates that a copy of the Notice and Claim Form will be delivered via first-class mail to the last-known postal address of each Class Member.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 39(a).)  In addition, a Summary Notice will be published in *The National Law Journal*, *Lawyers Weekly USA*, and *USA Today*.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶¶ 28, 40(a).)  The Summary Notice will contain a toll-free phone number for inquiry purposes and a website address that Class Members can use to obtain copies of the Notice and Claim Form.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 40(a).)  The website will include a copy of the Settlement Agreement, the Notice, the Summary Notice, contact information for the Claims Administrator, and answers to frequently asked questions. (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 40(b).)

Since the execution of the Settlement Agreement, the parties have been informed by the proposed Claims Administrator—Gilardi & Co., LLC ("Gilardi")—that significant administration expenses can be saved (i) if e-mail and/or postcard notification is used as the "first step" of notification instead of first-class mail and (ii) if Class Members are permitted to submit their Claim Forms online.[11]  (Mar 18, 2013, Harris Decl. ¶ 16.) Gilardi has utilized this procedure in prior class-action settlements with favorable results. (Mar. 18, 2013, Harris Decl. ¶ 16.)

Gilardi has e-mail address for more than 96% of the Class; of the remaining 4%, most appear to be law-firm Class Members whose e-mail addresses would be easy to locate at minimal expense.  (Mar. 18, 2013, Harris Decl. ¶ 16.)  The parties thus recommend that Gilardi deliver an e-mail to each Class Member containing the language

---

[11] While the cost of delivering the long-form Notice to the Class is presently estimated to be $175,000, plus an additional $2.50 for manually processing each submitted Claim Form, the cost of delivering an e-mail to each Class Member, followed up by a postcard containing the language of the Summary Notice, would be only $12,500, plus only an additional $1.00 for processing each claim online.  (Mar. 18, 2013, Harris Decl. ¶ 16.)

of the Summary Notice.  (Mar. 18, 2013, Harris Decl. ¶ 17.)  For all e-mails that "bounce back" as undeliverable, Gilardi will mail to the relevant Class Members a follow-up postcard also containing the language of the Summary Notice.  (Mar. 18, 2013, Harris Decl. ¶ 17.)  Again, the Summary Notice will direct Class Members to a website where the long-form Notice may be reviewed and downloaded, and it will provide a telephone number for inquiry purposes that can be used by those Class Members who, for whatever reason, do not have computerized access to the website.  At the website, Class Members will be able to submit their Claim Forms electronically.  Those cases that have considered this specific settlement-notice procedure—namely, an initial e-mail notice directing class members to a settlement website where the long-form notice can be reviewed and where claim forms can be submitted online, followed up by a second round of postcard notice also directing them to the website to those individuals whose e-mails were undeliverable—have held that it complies with due process, so long as the long-form notice to which class members are directed contains the information required by Federal Rule of Civil Procedure 23.  See, e.g., In re Easysaver Rewards Litig., 2013 U.S. Dist. LEXIS 15738 at *42–43 (S.D. Cal. filed Feb. 4, 2013); Sarabi v. Weltman, Weinberg & Reis Co., L.P.A., 2012, U.S. Dist. LEXIS 125390 at *7–8 (S.D. Cal. filed Aug. 27, 2012); In re TD Ameritrade Account Holder Litig., 2011 U.S. Dist. LEXIS 103222 at *27–28 (N.D. Cal. filed Sept. 13, 2011).

Here, the long-form Notice includes the information required by Rule 23. Specifically, the Notice describes the nature of the action, the definition of the Class, and the Class claims; it explains that Class Members may enter an appearance through an attorney and that the Court will exclude those Members requesting exclusion; and it specifies the time and manner of requesting exclusion, as well as the binding effect of a class-wide judgment.  (Compare Mar. 18, 2013, Harris Decl. Ex. 3 at 1–6 with Fed. R. Civ. Proc. 23(c)(2)(B) (stating that "[t]he notice must clearly and concisely state in plain, easily understood language:  (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an

appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).").)  Although Rule 23 does not require that notices inform class members of their objection rights, see Int'l Union v. Gen. Motors Corp., 497 F.3d 615, 630 (6th Cir. 2007), the Notice herein also explains that Class Members may object (Mar. 18, 2013, Harris Decl. Ex. 3 at 2, 6).  Furthermore, (i) the Notice indicates the time and place of the hearing to consider final approval of the Settlement Agreement, (ii) it displays the address and telephone number of Class Counsel and the procedure for making inquiries, and (iii) it provides information regarding the attorney's fees to be requested by Class Counsel and the Incentive Awards to be requested for the named Plaintiffs.  (Mar. 18, 2013, Harris Decl. Ex. 3 at 1–7.)  See William W Schwarzer, et al., California Practice Guide:  Federal Civil Procedure Before Trial ¶ 10:824 (The Rutter Group 2012) (specifying the content of settlement notice).

    In addition, the long-form Notice explains the procedures for allocating and distributing the Settlement Fund to Class Members.  (Mar. 18, 2013, Harris Decl. Ex. 3 at 4.)  Although the Notice does not specify the exact amount that any Class Member will receive—something that cannot be known until it is determined how many Class Members submit claims—it does specify the formula for computing individual recoveries.  (Mar. 18, 2013, Harris Decl. Ex. 3 at 4.)  "Nothing more specific is needed." Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1177–78 (9th Cir. 1977).

    Finally, as noted above, the Notice explains the procedure for Class Members to request exclusion from the Class.  See Fed. R. Civ. Proc. 23(e)(4) (stating that, "[i]f the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion").  The Notice explains that a Class Member simply sends a written request to the Claims Administrator stating that he or she wishes to be excluded.  (Mar. 18, 2013, Harris Decl. Ex. 3 at 2, 6.) / / / / /

1

      ***D.    Release Provisions and Opting Out.***

2              If the Court grants final approval of the Settlement Agreement, then, in exchange

3  for the consideration described above, Class Members will be deemed to have released

4  Defendants from those claims that were or could have been asserted in the Complaint

5  stemming from the conduct alleged therein.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 56.)

6  If a Class Member opts out pursuant to the procedures outlined in the Notice, then he or

7  she will not release any claims that he or she may have against either Defendant.  (Mar.

8  18, 2013, Harris Decl. Ex. 1 ¶¶ 56–57 (explaining that the Release applies only to those

9  Class Members who do not properly exclude themselves).)

10        ***E.    Incentive Awards and Attorney's Fees.***

11              Under the terms of the Settlement Agreement, Class Counsel will apply for

12  Incentive Awards for the named Plaintiffs of $4,000 each for their efforts in bringing and

13  prosecuting the case.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 50.)  See <u>Rodriguez</u>, 563

14  F.3d at 958–59 ("Incentive *awards* are fairly typical in class action cases.  Such awards

15  are discretionary and are intended to compensate class representatives for work done on

16  behalf of the class, to make up for financial or reputational risk undertaken in bringing

17  the action, and, sometimes, to recognize their willingness to act as a private attorney

18  general.") (emphasis in original) (internal citations omitted), <u>vacated on other grounds</u>,

19  688 F.3d 645, 660 (9th Cir. 2012).  In contrast to the settlement reached in <u>Rodriguez</u>, the

20  Incentive Awards are far less than the $75,000 per-plaintiff amounts sought in <u>Rodriguez</u>.

21  <u>Rodriguez</u>, 563 F.3d at 957.  Also in contrast to the settlement reached in <u>Rodriguez</u>,

22  none of the named Plaintiffs herein executed *ab initio* incentive agreements tied to the

23  settlement amounts recovered, which agreements both this Court and the Ninth Circuit

24  held were inappropriate and contrary to public policy.  <u>Id.</u> at 959.

25              In addition to applying for Incentive Awards, Class Counsel intend to apply for an

26  award of attorney's fees from the Gross Settlement Fund, as well as for an amount to

27  reimburse Class Counsel for litigation expenses.  (Mar. 18, 2013, Harris Decl. Ex. 1 at

28  ¶ 50.)  Principles of equity permit the fees to come from the fund as a whole.  See, <u>e.g.</u>,

1   Boeing Co., 444 U.S. at 478 ("[T]this Court has recognized consistently that a litigant or

2   a lawyer who recovers a common fund for the benefit of persons other than himself or his

3   client is entitled to a reasonable attorney's fee from the fund as a whole.  The common-

4   fund doctrine reflects the traditional practice in courts of equity, and it stands as a well-

5   recognized exception to the general principle that requires every litigant to bear his own

6   attorney's fees.  The doctrine rests on the perception that persons who obtain the benefit

7   of a lawsuit without contributing to its cost are unjustly enriched at the successful

8   litigant's expense.  Jurisdiction over the fund involved in the litigation allows a court to

9   prevent this inequity by assessing attorney's fees against the entire fund, thus spreading

10  fees proportionately among those benefited by the suit.").

11  **IV.    *The Court Should Conditionally Certify the Class and Should Preliminarily***

12  ***Approve the Settlement.***

13       **A.    *Class Certification Is Warranted.***

14       There is authority to the effect that a pre-certification settlement is subject to a

15  somewhat higher level of scrutiny than one negotiated post-certification.  See, e.g.,

16  Dunleavy v. Nadler, 213 F.3d 454, 458 (9th Cir. 2000).  However, concerns about the

17  rights of absent Class Members can be dispelled by the Court's review of the Settlement

18  Agreement and by the procedural protections provided by Rule 23.  Officers for Justice v.

19  Civil Serv. Comm., 688 F.2d 615, 624–25 (9th Cir. 1982), cert. denied, 459 U.S. 1217

20  (1983).  A trial court has wide discretion in certifying a class for settlement purposes and

21  will be reversed "'only upon a strong showing that [its] decision was a clear abuse of

22  discretion.'"  Dunleavy, 213 F.3d at 461 (quoting Linney v. Cellular Alaska P'ship, 151

23  F.3d 1234, 1238 (9th Cir. 1998)).

24       Class actions are favored, and Rule 23 is to be given a broad, rather than a

25  restrictive, interpretation in favor of maintaining class actions.  Adames v. Mitsubishi

26  Bank, Ltd., 133 F.R.D. 82, 88 (E.D.N.Y. 1989); Labbate-D'Alauro v. GC Servs. Ltd.

27  P'ship, 168 F.R.D. 451, 454 (E.D.N.Y. 1996).  Rule 23 contains four certification

28  requirements:  (i) The class must be so numerous "that joinder of all members is

1  impracticable," (ii) there must be "questions of law or fact common to the class," (iii) the
2  claims of the representative plaintiffs must be "typical of the claims of the class," and (iv)
3  the class representatives must show that they "will fairly and adequately protect the
4  interests of the class."  Fed. R. Civ. Proc. 23(a).

5  Here, the numerosity requirement is met, as the number of Class Members exceeds
6  150,000.  (Mar. 18, 2013, Harris Decl. ¶ 9.)  Given that "courts will typically find the
7  numerosity requirement satisfied when a class includes 40 or more members," Sibert v.
8  TV Magic, Inc., 2012 U.S. Dist. LEXIS 118245 at *4 (C.D. Cal. filed Aug. 21, 2012)
9  (citing Rannis v. Recchia, 380 Fed. Appx. 646, 651 (9th Cir. 2010), and given that the
10  joinder of all Class Members would obviously be "impracticable," the Class is
11  sufficiently numerous to justify certification.

12  Likewise, the commonality requirement is met.  In this regard, a plaintiff is *not*
13  required to show that there is commonality on *every* factual and legal issue; instead, "for
14  purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do."  Wal-Mart
15  Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2556 (2011) (brackets in original) (quoting
16  Richard A. Nagareta, The Preexistence Principle and the Structure of the Class Action,
17  103 Colum. L. Rev. 149, 176 n.110 (2003)).  See also Negrete v. Allianz Life Ins. Co. of
18  N. Am., 2012 U.S. Dist. LEXIS 182796 at *32–33 (C.D. Cal. filed Dec. 27, 2012)
19  (explaining that, "[e]ven after Dukes, the commonality inquiry does not require plaintiffs
20  to demonstrate the 'predominance' of common issues over individualized ones, nor the
21  'cohesion' of the class").  With respect to the present matter, there is considerable
22  commonality among Class Members, as they have each purchased a BAR/BRI bar-
23  review course in a market suffering from the residual impact of Defendants' allegedly
24  anticompetitive agreement.  As the U.S. Supreme Court has noted, the residual impact of
25  a monopoly may continue after the illegal conduct itself has been exposed.  See Palmer v.
26  BRG of Ga., 498 U.S. 46, 50 n.7 (1990) (stating that "antitrust conspiracies may continue
27  in time beyond the original conspiratorial agreement until either the conspiracy's
28  objectives are abandoned or succeed").  Whether Defendants' now-terminated agreement

constitutes an unlawful restraint of trade is a common issue for the entire Class, as is whether its effects have continued after its termination under <u>Rodriguez</u>.  These issues predominate over issues that affect only individual Class Members (for example, the individual amounts owing to each Class Member on account of Defendants' alleged anticompetitive activity).  Moreover, even if it should turn out that the Class definition includes Members who have not been injured or who do not wish to pursue claims, that is not a bar to certification.  <u>See</u> <u>Elliott v. ITT Corp.</u>, 150 F.R.D. 569, 575 (N.D. Ill. 1992).  <u>Cf.</u> <u>Joseph v. Gen. Motors Corp.</u>, 109 F.R.D. 635, 639–40 (D.C. Colo. 1986).

Plaintiffs also meet the typicality requirement, and they are adequate Class representatives.  The fact-pattern for Plaintiffs is similar, if not identical, to the fact-pattern for other Class Members:  Plaintiffs and Class Members purchased a BAR/BRI bar-review course in an allegedly anticompetitive market and so paid a price higher than they otherwise would have.  Plaintiffs also have no conflicts of interest with Class Members, as they share the Members' likely desire to be reimbursed for having paid prices higher than should have.[12]  (See Mar. 18, 2013, Harris Decl. Ex. 2.)  Additionally, Plaintiffs are committed to pursuing the claims of the Class, and Plaintiffs' motivation in retaining counsel and pursuing this action has been to seek reimbursement for themselves and for Class Members.  (See Mar. 18, 2013, Harris Decl. Ex. 2.)

In addition to the above-described four requirements, the action must meet one of the non-exclusive factors in Rule 23(b).  Rule 23(b) authorizes class certification if a court determines that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. Proc. 23(b)(3).  As noted with respect to the commonality requirement, questions of law and fact predominate over questions affecting only individual Members.  In fact, the central individual determination is the quantification of damages for each Class Member, and such an individual determination does not defeat

_____

[12] Plaintiffs' Declarations are attached as Exhibit 2 to the Harris Declaration.

class certification.  *See* <u>Yokoyama v. Midland Nat'l Life Ins. Co.</u>, 594 F.3d 1087, 1089 (9th Cir. 2010) (stating that "[t]he potential existence of individualized damage assessments, however, does not detract from the action's suitability for class certification," and explaining that "[o]ur court long ago observed that '[t]he amount of damages is invariably an individual question and does not defeat class action treatment'").  Because the quantification of each Class Member's damages can be calculated by verifying the price that he or she paid—which is precisely how the Net Settlement Fund will be allocated under the Settlement Agreement—and because the alternative to settlement and conditional class certification is that the large majority of Class Members might *never* have their claims determined on the merits, the Court should grant preliminary approval.

### B.    The Settlement Meets the Requirements for Preliminary Approval.

If a proposed settlement appears to be the product of "'serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to the class representatives or segments of the [c]lass, and falls within the range of possible approval, then the court should direct that notice be given to the class of a formal fairness hearing.'"  <u>Young v. Polo Retail, Inc.</u>, 2006 WL 3050861 at *5 (N.D. Cal. filed Oct. 25, 2006) (quoting <u>Manual for Complex Litigation</u> (Second) § 30.44 (1985)).  The proposed Settlement Agreement satisfies these requirements.

### i.    Settlement Negotiations Were Conducted at Arm's Length.

There is no doubt that the Settlement Agreement was reached through arm's length bargaining.  Again, the Ninth Circuit issued an Order referring the matter to its Mediation Office to explore settlement.  Over the course of the following year, the parties engaged in numerous settlement conferences supervised by the appointed Ninth Circuit Mediator, as well as a private mediation session with Mr. Carroll, the special master appointed in <u>Rodriguez</u> to oversee discovery.  *See* <u>Rodriguez</u>, 2007 U.S. Dist. LEXIS 74767 at *30.  During the course of these mediations, Class Counsel's primary goal was to achieve the maximum substantive relief possible for the Class, while Defendants sought to minimize

1    the costs of any settlement.  (Mar. 18, 2013, Harris Decl. ¶ 12.)  In light of the arguments

2    made on both sides, the parties ultimately agreed upon a $9.5 million Settlement Amount.

3                              ii.      *The Settlement Has No Obvious Deficiencies.*

4          According to the Ninth Circuit:

5                "Assessing a settlement proposal requires a district court to balance a

6          number of factors:  the strength of the plaintiffs' case; the risk, expense,

7          complexity, and likely duration of further litigation; the risk of maintaining a

8          class-action status throughout the trial; the amount offered in the settlement;

9          the extent of discovery completed and the stage of the proceedings; the

10         experience and views of counsel; . . . and the reaction of the class members

11         to the proposed settlement.

12   Dunleavy, 213 F.3d at 458 (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th

13   Cir. 1998)) (ellipses in original).  Certain factors may predominate in different factual

14   contexts, and one factor may so strongly predominate that it alone provides sufficient

15   grounds for approval of a settlement.  See Torrisi v. Tucson Elec. Power Co., 8 F.3d

16   1370, 1376 (9th Cir. 1993).

17                              a.      *The Strength of Plaintiffs' Case.*

18         Although the allegations in this action track many of those made in the earlier

19   Rodriguez action, the two cases are *not* the same, and it would not be appropriate to

20   compare the average recovery in Rodriguez with that in the present action.  Again, the

21   agreement not to purchase West Bar that was central to the prior case took place nearly a

22   decade before the current Class Period.  In addition, the "co-marketing" agreement that

23   was also at issue was dissolved as part of the Rodriguez settlement.  Thus, this alleged

24   entry-barrier was not present for virtually the entire Class Period.  As suggested by the

25   Ninth Circuit itself in its Order reversing the ruling on West' Motion to dismiss, this

26   presents a significant litigation problem for Plaintiffs.  (See Mar. 18, 2013, Req. for

27   Judicial Notice Ex. 9 at 2–3 (stating that, although "Plaintiffs' claims that they will be

28   injured by BAR/BRI's continuing monopolistic behavior have been adequately pled for

standing purposes," there is a question as to "whether, as a result of the reforms in the
Rodriguez settlement, [P]laintiffs' standing claim will ultimately fail on the merits").)
Even if Plaintiffs are ultimately successful in demonstrating a residual anticompetitive
impact on the bar-review market, those anticompetitive effects arguably have dissipated
over time, reducing the amount of damages to which any Class Member is entitled.
Insofar as this Court articulated questions about the strength of the plaintiffs' case in
Rodriguez, see Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *26–27 (stating that
"whether th[e Rodriguez] plaintiffs would obtain a favorable, unanimous jury verdict as
required by Federal Rule of Civil Procedure 48 is far from guaranteed" and that "this
factor [thus] weighs in favor of approving the [s]ettlement"), such issues are *a fortiori*
magnified in the present action.

In any event, *any* claim, regardless of its strength, can ultimately fail.  Litigation,
after all, is always uncertain, and Plaintiffs could therefore lose at trial.  In fact, since this
case's inception—and throughout the year-long Ninth Circuit-mandated mediation—
Defendants have argued that their alleged market-division arrangement was nothing more
than a valid "co-marketing" agreement that was actually *pro*-competitive.  (Mar. 18,
2013, Harris Decl. ¶ 13.)  West has also argued that its dominant market position is
simply the result of the high-quality products and services it offers, not the result of
anticompetitive behavior prohibited by the Sherman Act.  (Mar. 18, 2013, Harris Decl.
¶ 13.)  Moreover, even assuming that Plaintiffs prevailed at trial, there is no guarantee
that they would recover the full amount of the damages they request.  See, e.g.,
Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *26–27 (explaining that "[c]laims for
violation of federal antitrust laws are notoriously difficult to prove") (citing Palmer, 498
U.S. at 48).  As one district court has noted in connection with analyzing an antitrust
class settlement, "[d]amages would likely be established at trial through a 'battle of
experts,' with each side presenting its figures to the jury and with no guarantee whom the
jury would believe."  In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 256 (E.D.
Del. 2002).  Finally, again assuming that Plaintiffs prevailed at trial, there is still a risk

1  that they might end up recovering nothing, as "[t]he history of antitrust litigation is

2  replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered

3  no damages, or negligible damages, at trial or on appeal." In re Nasdaq Market-Makers

4  Antitrust Litig., 187 F.R.D. 465, 476 (S.D.N.Y. 1998).

5                    **b.      *The Likely Duration of Further Litigation.***

6          This action has been in the court system for close to five years now, and Class

7  Members still remain unreimbursed for the alleged violations.  Granting approval of the

8  Settlement Agreement would create a Gross Settlement Fund that would quickly correct

9  that deficiency.  Because the putative Class has not been certified and because Notice has

10 not been sent out, the likely duration of further litigation might well be several years.  See

11 Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *28 (explaining that "[a]ntitrust class actions

12 'are notoriously complex, protracted, and bitterly fought'"; that they are "'arguably the

13 most complex actions to prosecute'"; and that, absent settlement, they "would most likely

14 take several years to finally resolve, considering the length of trial and appeals") (quoting

15 In re Visa Check/MasterMoney Antitrust Litig., 297 F. Supp. 2d 503, 510 (E.D.N.Y.

16 2003)).  In light of the lengthy time necessary to litigate complex antitrust cases such as

17 this, the prompt payment to Class Members under the Settlement Agreement has

18 meaningful value to the Class even apart from the contingent nature of any recovery were

19 this case litigated to conclusion.  Accordingly, this factor "strongly weigh[s] in support of

20 approval of the Settlement." Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *28 (citing

21 Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 527 (C.D. Cal.

22 2004)).

23                    **c.      *The Risk of Maintaining Class-Action Status Through Trial.***

24         As explained in Rodriguez:

25         Although [p]laintiffs believe it is unlikely, there is no guarantee that

26         [d]efendants would not move for and obtain decertification of the [c]lass

27         before or during trial.  See In re Nasdaq Market-Makers Antitrust Litig., 187

28         F.R.D. 465, 476 (S.D.N.Y. 1998).  As noted by one court, if

"insurmountable management problems were to develop at any point, class certification can be revisited at any time under Fed. R. Civ. P. 23(c)(1)." Id. Further, even if the [c]lass remained certified throughout the trial and [p]laintiffs prevailed, [d]efendants would surely challenge class certification on appeal.  If at any point the [c]lass were decertified or certification were reversed on appeal, the [c]lass would recover nothing.

Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *29.  These same concerns are inherent here, particularly given (i) that Plaintiffs' proposed nationwide Class implicates different bar exams—each costing different amounts—administered across separate States and (ii) that the residual anticompetitive impact from the now-terminated co-marketing agreement has arguably decreased over the life of the Class Period.  See Dukes, 131 S. Ct. 2541, 2551 (explaining that "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but[] rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation" and that "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers").  "Thus, this factor also weighs in favor of approving the Settlement." Id.

### d.    *The Amount Offered in the Settlement.*

The Settlement Fund is $9.5 million.  Of course, this represent a compromise by the parties in light of the risks and costs of further litigation.  Because the total damages in Rodriguez were estimated to fall between $158 and $168 million for a class twice the size of the present Class, see Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *30, and because much of the anticompetitive activity herein has arguably ceased on account of the Rodriguez settlement, the $9.5 million Settlement Fund represents a reasonable resolution of the case.  See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 241 (3d Cir. 2001) (noting that reasonable settlement recoveries can range from 1.6% to 14% of total damages); Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., 2005 U.S. Dist. LEXIS 9705 at *30 (E.D. Pa. filed May 20, 2005) (in an antitrust class action, holding

that a settlement of "11.4% of total damages . . . compares favorably with the settlements reached in other complex class action lawsuits"); Nichols v. SmithKline Beecham Corp., 2005 U.S. Dist. LEXIS 7061 at *52 (E.D. Pa. filed Apr. 22, 2005) (approving an antitrust settlement of between 9.3% and 13.9% of damages); Lazy Oil Co. v. Witco Corp., 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (in approving an antitrust settlement, noting cases approving settlements for 0.2% to 16% of potential damages).

        e.      **The Extent of Discovery and the Stage of the Proceedings.**

      Given the procedural posture of this case, Plaintiffs have been unable to undertake any formal discovery.  However, as explained by the Ninth Circuit, "'in the context of class action settlements, "formal discovery is not a necessary ticket to the bargaining table" where the parties have sufficient information to make an informed decision about settlement.'"  Dunleavy, 213 F.3d at 459 (quoting Linney, 151 F.3d at 1239).  In negotiating the present Settlement Agreement, Class Counsel reviewed the case file from Rodriguez, including the extensive discovery therein.  (Mar. 18, 2013, Harris Decl. ¶ 13.) Class Counsel also undertook their own comprehensive investigation to inform their negotiating position, including market research and risk re-evaluation in light of intervening federal-court decisions, including Dukes.  (Mar. 18, 2013, Harris Decl. ¶ 13.) Furthermore, after the Ninth Circuit had issued its Order on West's Motion to dismiss, the parties engaged the services of Mr. Carroll—again, the special master appointed to oversee discovery in Rodriguez—to help bring this matter to closure.  Mr. Carroll has concluded that the terms of the present Settlement Agreement are "very satisfactory," and, "without reservation, [he] recommends the Court's approval."  (Mar. 18, 2013, Carroll Decl. ¶ 4.)  This factor thus weighs in favor of approval.

        f.      **The Experience and Views of Counsel.**

      As reflected in the Harris Declaration filed herewith, Class Counsel have substantial experience in prosecuting class actions, including antitrust matters.  (See Mar. 18, 2013, Harris Decl. ¶¶ 2–3.)  Class Counsel are of the opinion that the Settlement Agreement represents a very reasonable bargain for both sides, given the inherent risks,

1  hazards, and expenses of carrying the case through trial.  (Mar. 18, 2013, Harris Decl.

2  ¶¶ 13–14.)  As this Court has itself explained, this weighs strongly in favor of approving

3  settlement.  See Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *32–33 (explaining that "the

4  trial court is entitled to, and should, rely upon the judgment of experienced counsel for

5  the parties"; that, "[h]ere, [c]lass [c]ounsel have considerable experience in litigating

6  antitrust matters, class actions, and other complex litigation"; and that "[t]his factor [thus]

7  weighs in favor of approving the [s]ettlement").

8                    **g.      The Reaction of Class Members to the Proposed Settlement.**

9            Although the reaction of Class Members to the Settlement Agreement cannot be

10  known until preliminary approval is given, Notice is sent out, and responses to the Notice

11  are received, Plaintiffs submit that the favorable reaction to the earlier settlement in this

12  case can be used to gauge the response to new Settlement Agreement.  In response to the

13  earlier, lesser $5.285 million settlement, of the 184,496 mailed notice packets, 47,542

14  claim forms were timely submitted (= 26% of the Class), and only 113 exclusion requests

15  and 62 objections were received by the Claims Administrator.  (Mar. 18, 2013, Harris

16  Decl. ¶ 9.)  This comports with the positive response to the approved Rodriguez

17  settlement, in which this Court found "overwhelming support from the [c]lass."  See

18  Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *32–33 (explaining that "52,000 claims were

19  filed" from a class of 376,000" and that "only 54 [c]lass [m]embers submitted

20  [o]bjections," i.e., "less than a thousandth of a percent").  Regardless, "in any class action

21  of significant size, the absence of any objections would be 'extremely unusual,'" id. at

22  *33 (quoting In re Anthracite Coal Antitrust Litig., 79 F.R.D. 707, 712–13 (M.D. Pa.

23  1978)), and "this factor [thus] weighs in favor of approving the Settlement," Rodriguez,

24  2007 U.S. Dist. LEXIS 74767 at *33.

25                    **iii.     The Settlement Does Not Grant Preferential Treatment to the**

26                              **Named Plaintiffs.**

27            As noted above, Class Counsel will apply for Incentive Awards for the named

28  Plaintiffs of $4,000 for their efforts in bringing and prosecuting the case.  (Mar. 18, 2013,

Harris Decl. Ex. 1 at ¶ 50.)  Such payments are regularly sought and awarded to compensate representative plaintiffs for the risks of bringing suit and the willingness to act on behalf of unnamed class members.  See Rodriguez, 563 F.3d at 958–59 ("Incentive *awards* are fairly typical in class action cases.  Such awards are discretionary and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general.") (emphasis in original) (internal citations omitted).  Approving the Incentive Awards—which will not have an appreciable effect on the average Class Member recovery—is appropriate here in light of the "stigma" Plaintiffs may face regarding future employment for having initiated this case.  See, e.g., Campbell v. First Investors Corp., 2012 U.S. Dist. LEXIS 155549 at *21 (S.D. Cal. filed Oct. 29, 2012).

## V.   *Appointment of a Claims Administrator.*

The Settlement Agreement provides for the appointment of a Claims Administrator to implement the claims process.  (Mar. 18, 2013, Harris Decl. Ex. 1 at ¶ 5.)  Again, the Claims Administrator chosen by the parties is Gilardi, a well-established firm based in San Rafael, California with a respected national reputation.  (Mar. 18, 2013, Harris Decl. ¶ 15.)  Because this is the same firm that was appointed in connection with the preliminary approval of the earlier settlement, substantial efficiencies will be achieved by appointing Gilardi once again in connection with the new Settlement Agreement.  (Mar. 18, 2013, Harris Decl. ¶ 15.)

The parties agree that, in providing Notice to the Class, Gilardi should follow the e-mail/postcard procedure detailed above in lieu of the procedure outlined in the Settlement Agreement.  The proposed procedure is constitutionally sound and constitutes the best notice practicable under the circumstances.  See Franks v. Kroger Co., 649 F.2d 1216, 1222–23 (6th Cir. 1981) (explaining that Rule 23 "provides the courts with 'virtually complete discretion' in selecting the kind of notice to employ in order to inform class members of a settlement hearing").  Again, the parties' proposed settlement-notice

procedure complies with due process because the long-form notice to which Class Members will be directed contains the information required by Rule 23.  See, e.g., In re Easysaver Rewards Litig., 2013 U.S. Dist. LEXIS 15738 at *42–43; Sarabi, 2012 U.S. Dist. LEXIS 125390 at *7–8; In re TD Ameritrade Account Holder Litig., 2011 U.S. Dist. LEXIS 103222 at *27–28.

## VI.   Proposed Calendar.

Were the Court to grant preliminary approval of the Settlement Agreement, the following calendar would be appropriate:

(A)   April 15, 2013:  The Court conditionally certifies the Class, preliminarily approves the Settlement Agreement, and appoints the Claims Administrator.

(B)   May 6, 2013:  The Claims Administrator provides the Summary Notice to Class Members (as detailed above).

(C)   July 15, 2013:  All completed Claim Forms, objections, and exclusion requests must be submitted no later than this date.

(D)   August 5, 2013:  Hearing on objections, the motion for final approval, and the motion for fees and reimbursement of costs.

## VII.   Conclusion.

The new Settlement Agreement addresses the two main issues that the Court had with the earlier proposed settlement:  the discount certificates, which arguably encouraged further business with Kaplan instead of disgorging ill-gotten gains, and the average monetary recovery.  Under the new Settlement Agreement, there are no discount certificates, and the average monetary recovery is estimated to nearly double the earlier amount.  This reflects a reasonable resolution, given the perhaps ever-diminishing residual effect of the now-terminated "co-marketing" agreement.  The Court should therefore grant conditional certification and preliminary approval.

DATED:  March 18, 2013                    _____/s/ David Zelenski_____
                                          Alan Harris, David Zelenski
                                          Attorneys for Plaintiffs